# 23-6136-cr

# United States Court of Appeals

### *for the*

## Second Circuit

———————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

MICHAEL HILD, AKA Sealed Defendant 1,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

BRIAN A. JACOBS
MORVILLO ABRAMOWITZ GRAND IASON
& ANELLO PC
*Attorneys for Defendant-Appellant*
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

CP COUNSEL PRESS    (800) 4-APPEAL • (320641)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ...................................................... 7

ISSUES PRESENTED .......................................................................... 7

STATEMENT OF THE CASE ............................................................. 8

STATEMENT OF FACTS ................................................................... 9

    A.    LWF ............................................................................... 9

    B.    LWF Acquires Its HECM-IO Bond Portfolio and Cooperating Witness Darren Stumberger Joins LWF to Manage It ....................... 10

    C.    IDC Has Difficulty Valuing the Bonds ................................. 12

    D.    LWF Develops "Scenario 14" ........................................... 14

    E.    LWF Submits Scenario 14 Prices to IDC ............................. 15

    F.    LWF's Contracts With Its Lenders ...................................... 16

    G.    LWF's Liquidity Problems in 2017 ..................................... 19

    H.    The Defense Case ........................................................... 20

    I.    Summations, Verdict, and Sentencing ................................. 21

SUMMARY OF ARGUMENT ........................................................... 22

ARGUMENT ..................................................................................... 23

POINT I

The Evidence Was Insufficient To Prove Hild Misrepresented Bond Prices Or Had Intent To Defraud ...................................................... 23

    A.    Applicable Law ............................................................... 24

    B.    The Evidence Was Insufficient to Prove Falsity or Intent ............... 24

POINT II

This Court Should Vacate and Remand for a New Trial
(or at Minimum Resentencing) Following *Ciminelli* .....................................34

POINT III

This Court Should Order a New Trial on De Novo Review Because
Hild's Trial Counsel Was Conflicted and Ineffective ...................................41

A.     Applicable Law ..............................................................................41

B.     Relevant Facts ...............................................................................44

C.     This Court Should Order a New Trial Because Hild's Counsel
       Labored Under An Actual Conflict of Interest Such that
       Prejudice is Presumed Under *Sullivan*, and the District Court
       Erred in Finding Otherwise ...........................................................57

D.     This Court Should Order a New Trial Under *Strickland* ...................67

POINT IV

This Court Should Order a New Trial Based on Newly Discovered
Evidence of the Lenders' Windfall Gains from the Bonds ..........................70

A.     Relevant Facts ...............................................................................71

B.     Discussion ......................................................................................75

POINT V

This Court Should Order a New Trial Because the District Court
Failed to Recuse Itself As a Result of Possible Conflicts ...........................81

POINT VI

The Cumulative Prejudice of the Foregoing Errors Deprived
Hild of a Fair Trial........................................................................................84

CONCLUSION ......................................................................................................85

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Armienti v. United States*,
  234 F.3d 820 (2d Cir. 2000) ...................................................................42

*CFTC v. Wilson*,
  No. 13-CV-7884 (RJS), 2018 WL 6322024
  (S.D.N.Y. Nov. 30, 2018) ................................................ 25, 26, 27, 28

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
  343 F.3d 120 (2d Cir. 2003) ...................................................................84

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ................................................................... *passim*

*Cuyler v. Sullivan*,
  446 U.S. 335 (1980) ................................................................... *passim*

*DiMattina v. United States*,
  949 F. Supp. 2d 387 (E.D.N.Y. 2013) ...................................................76

*Eisemann v. Herbert*,
  401 F.3d 102 (2d Cir. 2005) ........................................................... 43, 64

*Eze v. Senkowski*,
  321 F.3d 110 (2d Cir. 2003) ...................................................................69

*Henry v. Poole*,
  409 F.3d 48 (2d Cir. 2005) .....................................................................67

*Lafler v. Cooper*,
  566 U.S. 156 (2012) ...............................................................................66

*Liljeberg v. Health Serv. Acq. Corp.*,
  486 U.S. 847 (1988) ...............................................................................83

*LoCascio v. United States*,
  395 F.3d 51 (2d Cir. 2005) ........................................................ 3, 41, 42, 43

*Mathis v. Hood*,
  937 F.2d 790 (2d Cir. 1991) ......................................................... 60, 61, 62

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ...............................................................................66

*Pavel v. Hollins,*
    261 F.3d 210 (2d Cir. 2001) ................................................................69

*Strickland v. Washington,*
    466 U.S. 668 (1984) ................................................................. *passim*

*United States v. Amico,*
    486 F.3d 764 (2d Cir. 2007) ........................................................ 83, 84

*United States v. Arrington,*
    941 F.3d 24 (2d Cir. 2019) ................................................................58

*United States v. Balde,*
    943 F.3d 73 (2d Cir. 2019) ................................................................39

*United States v. Brown,*
    623 F.3d 104 (2d Cir. 2010) ..............................................................44

*United States v. Bruno,*
    661 F.3d 733 (2d Cir. 2011) ..............................................................39

*United States v. Cancilla,*
    725 F.2d 867 (2d Cir. 1984) ..............................................................60

*United States v. Carmichael,*
    269 F. Supp. 2d 588 (D.N.J. 2003) ....................................................77

*United States v. Certified Envtl. Servs., Inc.,*
    753 F.3d 72 (2d Cir. 2014) ..................................................... 7, 84, 85

*United States v. Connolly,*
    24 F.4th 821 (2d Cir. 2022) ....................................................... *passim*

*United States v. Gilmore,*
    471 F.3d 64 (2d Cir. 2006) ................................................................38

*United States v. Giraldo,*
    822 F.2d 205 (2d Cir. 1987) ..............................................................65

*United States v. Guiliano,*
    644 F.2d 85 (2d Cir. 1981) ................................................................40

*United States v. Hertular,*
    562 F.3d 433 (2d Cir. 2009) ..............................................................41

*United States v. Jackson,*
    180 F.3d 55 (2d Cir.), *on reh'g*, 196 F.3d 383 (2d Cir. 1999)............37

iv

*United States v. Litvak*,
  808 F.3d 160 (2d Cir. 2015) ....................................................64

*United States v. Mahaffy*,
  693 F.3d 113 (2d Cir. 2012) ....................................................80

*United States v. Malpiedi*,
  62 F.3d 465 (2d Cir. 1995) ............................................. *passim*

*United States v. Marcus*,
  560 U.S. 258 (2010) ..................................................................38

*United States v. Melhuish*,
  6 F.4th 380 (2d Cir. 2021) ......................................................69

*United States v. Nolan*,
  956 F.3d 71 (2d Cir. 2020) ......................................................43

*United States v. Parse*,
  789 F.3d 83 (2d Cir. 2015) ......................................................66

*United States v. Polouizzi*,
  564 F.3d 142 (2d Cir. 2009) ....................................................75

*United States v. Rechnitz*,
  75 F.4th 131 (2d Cir. 2023) ....................................... 81, 82, 83

*United States v. Robinson*,
  430 F.3d 537 (2d Cir. 2005) ....................................................80

*United States v. Rooney*,
  37 F.3d 847 (2d Cir. 1994) ......................................................40

*United States v. Siddiqui*,
  959 F.2d 1167 (2d Cir. 1992) ..................................................79

*United States v. Silver*,
  864 F.3d 102 (2d Cir. 2017) ....................................................39

*United States v. Skelos*,
  707 F. App'x 733 (2d Cir. 2017) .............................................39

*United States v. Tarricone*,
  996 F.2d 1414 (2d Cir. 1993) ..................................................69

*United States v. Vernace*,
  811 F.3d 609 (2d Cir. 2016) ....................................................75

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ...................................................................81

*United States v. Williams*,
   372 F.3d 96 (2d Cir. 2004) ............................................................. 60, 61

*United States v. Wright*,
   665 F.3d 560 (3d Cir. 2012) ..................................................................40

*Winkler v. Keane*,
   7 F.3d 304 (2d Cir. 1993) ......................................................................42

## Statutes & Other Authorities:

15 U.S.C. § 78ff ..........................................................................................8

15 U.S.C. § 78j .............................................................................................8

18 U.S.C. § 371 ............................................................................................8

18 U.S.C. § 1343 ..........................................................................................8

18 U.S.C. § 1344 ..........................................................................................8

18 U.S.C. § 1349 ..........................................................................................8

18 U.S.C. § 3231 ..........................................................................................7

28 U.S.C. § 455 ................................................................................... 81, 83

28 U.S.C. § 1291 ..........................................................................................7

Fed. R. Civ. P. 29 ............................................................... 8, 9, 21, 26

Fed. R. Civ. P. 33 ............................................................. 9, 44, 50, 74, 80

New York Rule of Professional Conduct 1.7 ........................................43

New York Rule of Professional Conduct 3.4 ........................................52

**INTRODUCTION**

Defendant-Appellant Michael Hild was convicted at trial in the United States District Court for the Southern District of New York (Abrams, J.), but he never should have been charged with a crime.

Hild was convicted of providing falsely inflated valuations of the bond portfolio held by his company, Live Well Financial ("LWF"), to a third-party pricing service, Interactive Data Corporation ("IDC"), supposedly in order to secure loans from LWF's lenders who used IDC to obtain pricing information for the bonds. The government's evidence at trial, however, merely confirmed Hild's good faith. The government's cooperating witnesses who worked at LWF with Hild conceded that the bond valuations they provided to IDC — which the government argued were inflated, and thus false and misleading — were in fact a legitimate effort to price the bonds accurately.

Faced with this exculpatory testimony, the government argued to the jury that the mere fact that Hild and his colleagues were providing pricing information to IDC without telling the lenders was itself problematic, because the lenders (whose loans were secured by the bonds) viewed IDC as independent from LWF. But IDC's contracts made plain that its prices were provided by outside parties (such as LWF). The government also argued that LWF could not have sold the bonds for the prices LWF provided to IDC, but the proof on that point was entirely

1

lacking, where LWF's methodology had not been disclosed to the market, and where the cooperating witnesses confirmed that prices would have gone up if the methodology were disclosed (thus validating LWF's methodology). Because the evidence failed to establish either Hild's intent to defraud or the falsity of the bond valuations provided to IDC, this Court should reverse. *See United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022).

To the extent the Court does not reverse, the Court should vacate Hild's conviction and remand to a new district judge for a new trial for four reasons.

<u>First</u>, *Ciminelli v. United States*, 598 U.S. 306 (2023), which came down after Hild's sentencing, requires a new trial. *Ciminelli* invalidated this Court's "right-to-control" jury instruction that the District Court used for multiple counts here, and the District Court has already acknowledged that its jury instructions "appear to be at odds" with *Ciminelli*. (SPA-100.)[1] An amicus brief before the Supreme Court in *Ciminelli* cited Hild's case as example of a conviction the government secured using the faulty right-to-control instructions. (SPA-99.) Consistent with the instructions that were then the law, the government made its right-to-control arguments — that the lenders were entitled to know LWF was

---

[1] "A" refers to the Joint Appendix filed with this brief, and "SPA" refers to the Special Appendix filed with this brief.

providing prices to IDC — a centerpiece of its presentation. As a result, a new trial is required on all counts.

*Second*, this Court should order a new trial because the District Court erred when it denied Hild's post-trial motion seeking a new trial based on the ineffective assistance of counsel, which this Court reviews *de novo*. In that motion, Hild explained how he learned, shortly after the jury verdict, that his trial counsel, Benjamin Dusing (assisted by Brandy Katy Lawrence), had been laboring under serious and undisclosed conflicts of interest that adversely affected their performance, such that "prejudice is presumed" and a new trial required. *LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005).

In particular, before and during Hild's trial, without Hild's knowledge, Dusing himself was a defendant in a case in Kentucky (where he was represented by Lawrence and, occasionally, by himself), in which Dusing faced both the loss of custody of his child and serious sanctions for extensive misconduct (which ultimately resulted in Dusing's suspension from the practice of law and time in jail). Dusing's personal interests in those Kentucky proceedings led him to cut short Hild's defense case and not call defense witnesses, so that Hild's trial would end before a key hearing in Kentucky was scheduled. After Hild learned of Dusing's misconduct and filed a motion for a new trial, the government responded by submitting a 76-page affidavit from Dusing, but the District Court declined to

3

rely on it "in light of Dusing's deeply troubling conduct" and "subsequent suspension from the practice of law." (SPA-30-31.)

Notwithstanding the absence of a credible attorney affidavit and the otherwise egregious facts, however, the District Court concluded (incorrectly) that counsel did not have a presumptively prejudicial "actual conflict of interest" under *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), and instead applied the stricter standard of *Strickland v. Washington*, 466 U.S. 668 (1984), under which prejudice is not presumed. To be sure, the District Court found the question of whether to apply *Sullivan* or *Strickland* to be "a challenging question" (SPA-2), and granted Hild bail pending appeal (over the government's objection) as a result. But the District Court's resolution of this question — in favor of *Strickland* — was erroneous, and this Court should reverse.

The District Court wrongly found that in order for *Sullivan* to apply, the conflict between Hild's and Dusing's interests needed to be of such a character that Dusing had a secret incentive for Hild to be found guilty, but neither *Sullivan* nor its progeny sets such a high bar. Rather, this Court has stated that "the applicable standard requires *only* the demonstration of a conflict inconsistent with a *plausible* trial strategy or tactic." *United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995) (emphasis added). The fact that Dusing had an incentive to cut Hild's trial short and not call witnesses — according to Dusing's own paralegal, whose proffered

4

statements the District Court credited — was alone sufficient to satisfy *Sullivan*, under which prejudice should have been presumed, and a new trial ordered.

The District Court also misapplied *Strickland*, under which Hild also should get a new trial. The record here amply demonstrates both Dusing's deficient performance and prejudice, as required under *Strickland*, particularly with respect to Dusing's failure to call an expert witness. Expert testimony regarding LWF's bond pricing methodology was essential to the defense case, and the expert (who submitted an affidavit), would have directly rebutted the government's arguments on falsity and intent, including by explaining how LWF's methodology was appropriate. Had counsel offered this expert testimony, there is at least a reasonable likelihood that the outcome of trial would have been different.

*Third*, this Court should order a new trial because the District Court abused its discretion when it denied Hild's second post-trial motion for a new trial based on newly discovered evidence. At Hild's sentencing, the government conceded the evidence was insufficient to calculate restitution, and the District Court deferred the determination. (SPA-74.) When the government finally produced additional evidence of four of LWF's lenders' purported losses, those materials revealed for the first time, years after trial, that before and during Hild's trial — where lender representatives testified regarding supposedly significant losses they suffered as a result of the supposedly inflated bond prices — these lenders were at the same time

5

secretly receiving tens of millions of dollars in "coupon payments" from holding the bonds after obtaining them following LWF's default. Even now, the question of restitution remains unresolved, and the lenders have resisted producing a complete record of their gains from the bonds. Notwithstanding that the lenders' belated disclosures contradicted the government's trial arguments, corroborated Hild's defenses, and impeached the lenders' testimony, the District Court declined to order a new trial, holding that the evidence could have been discovered earlier and was not sufficiently material to have likely resulted in an acquittal. (SPA-90-97.) This decision was an abuse of discretion.

_Fourth_, vacatur and reassignment for a new trial is appropriate because the District Court abused its discretion when it failed to recuse itself as a result of a potential conflict. (SPA-65.) The law firm at which the District Court previously worked and at which its spouse currently is a partner has represented two of the victim lenders and the parent company of IDC. Before Hild's sentencing, the District Court recused itself in analogous circumstances, _see United States v. Bankman-Fried_, No. 22-CR-673 (S.D.N.Y.) (Dkt. 23), but the District Court declined to recuse itself here. The District Court now is deciding whether to award ICBC nearly $20 million in restitution. This Court should vacate and reassign the case.

Each of the foregoing errors, viewed independently, warrants reversal or vacatur. Even if the Court "would hesitate" to conclude as much, viewing "the record as a whole," the "cumulative prejudice" of these errors deprived Hild of a fair trial. *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 95-96 (2d Cir. 2014). This Court should reverse Hild's conviction, or else grant a new trial.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 18 U.S.C. § 3231. Hild timely filed a notice of appeal from a final judgment of conviction entered January 31, 2023. (SPA-68; A-990.) On September 14, 2023, Hild timely filed an amended notice of appeal from the District Court's order dated September 12, 2023, denying Hild's second motion for a new trial. (SPA-76; A-1138.) This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether the Court should reverse Hild's conviction because the evidence was insufficient to establish falsity or intent.

2.    Whether the Court should order a new trial because the District Court's jury instructions were plainly erroneous after *Ciminelli*.

3.    Whether, on de novo review, Hild should receive a new trial due to the egregious misconduct of Hild's trial counsel.

7

4.     Whether the District Court abused its discretion when it declined to order a new trial based on newly discovered evidence of the lenders' receipt of massive coupon payments.

5.     Whether the District Court abused its discretion in failing to recuse itself such that a new trial before a different district judge is required.

## STATEMENT OF THE CASE

Hild appeals from a judgment of conviction entered January 31, 2023, in the United States District Court for the Southern District of New York, following a 14-day jury trial before the Honorable Ronnie Abrams, U.S.D.J., following the District Court's denial of Hild's first motion for a new trial, and from a subsequent order dated September 12, 2023, denying Hild's second motion for a new trial.

On August 26, 2019, indictment 19 Cr. 602 (RA) (the "Indictment") was filed charging Hild in five counts:  Count One charged conspiracy to commit securities fraud (18 U.S.C. § 371); Count Two charged conspiracy to commit wire and bank fraud (18 U.S.C. § 1349); Count Three charged securities fraud (15 U.S.C. §§ 78j(b), 78ff); Count Four charged wire fraud (18 U.S.C. § 1343); and Count Five charged bank fraud (18 U.S.C. § 1344).  (A-24.)

Trial against Hild commenced on April 13, 2021, and concluded on April 30, 2021, when the jury returned a verdict of guilty on all counts.  On July 27, 2021, Hild renewed his motion for a judgment of acquittal pursuant to Rule 29 of the

8

Federal Rules of Criminal Procedure, and alternatively sought a new trial pursuant to Rule 33 based principally on ineffective assistance of counsel. Over the next year and a half, while these motions were pending, the parties filed supplemental submissions with the District Court, and presented oral argument. The District Court denied Hild's motions in a 64-page opinion dated December 7, 2022. (SPA-1.)

On January 27, 2023, the District Court sentenced Hild to 44 months' imprisonment, but deferred the determination of restitution. (SPA-68, 74.) On February 27, 2023, the District Court granted bail pending appeal over the government's objection. (A-17.)

On May 29, 2023, Hild filed a second Rule 33 motion for a new trial on the basis of newly discovered evidence. The District Court denied that motion in a 26-page opinion dated September 12, 2023. (SPA-76.) The District Court also referred the determination of restitution to United States Magistrate Judge Katharine H. Parker, whose report remains pending.

## STATEMENT OF FACTS

### A.    LWF

Hild founded LWF in 2005, and served as its CEO. (A-138, 151.) LWF acted as a mortgage broker and banker that facilitated home equity conversion mortgages ("HECMs"). (A-503-04.) In about 2011, LWF received approval from

9

Ginnie Mae to securitize HECMs, which allowed LWF to pool individual loans to create an HECM "mortgage-backed security," which were bonds that LWF could then sell. (A-291, 507-08.)

### B. LWF Acquires Its HECM-IO Bond Portfolio and Cooperating Witness Darren Stumberger Joins LWF to Manage It

Relevant here is one type of mortgage bond: the HECM interest only bond ("HECM-IO bond"), which includes only the interest portion of the loan rather than the entire reverse mortgage. (A-67, 292.) Prior to 2014, LWF did not invest in HECM-IO bonds, and Hild had no experience with them. (A-176, 436.) In July 2014, Darren Stumberger (who testified as a government cooperating witness), an employee at Stifel Financial, an investment bank, contacted Hild and proposed that Stifel would sell a portfolio of HECM-IO bonds to LWF and Stumberger (together with his "team of experts") could join LWF to manage the portfolio. (A-114, 511.) Stumberger explained to Hild how LWF would benefit from acquiring the bond portfolio, because they would diversify LWF's revenue and provide a stable investment. (A-510.)

Stumberger characterized HECM-IO bonds as "among the most complex in fixed income" that required "expertise" to value. (A-111.) Hild (who also testified) recalled he was "outside [his] comfort zone" with the bonds, but gained comfort with the deal because Stumberger and his team would be joining LWF to manage the portfolio. (A-511.)

Stumberger was, by his own account, "among the most highly respected trader bankers in the segment of this market." (A-156.) He had extensive experience with the bonds at multiple financial institutions. (A-66-67, 70.)

In September 2014, LWF purchased Stifel's HECM-IO bond portfolio for approximately $50 million. (A-70-71, 114-15.) Because LWF did not have the liquidity to purchase the bond portfolio directly, the deal was financed in part by repurchase ("repo") agreements with repo lenders. (A-116.) Repo lenders provide short-term loans collateralized by the underlying security, the value of which generally is determined by a third-party pricing service. (A-117-18, 122.) Here, LWF sold the bonds to the lenders and agreed to buy them back (or roll them over) at a specific price after a designated period had passed. (A-71-72, 197, 222.) The bonds themselves served as collateral. If the price of the collateral decreased, the lender could require partial repayment of the loan (a "margin call"); if the price increased, LWF could request to borrow more through its own margin call; and if LWF defaulted (as happened here), the lender would obtain the bonds and the regular income they generated through coupon payments. (A-74.)

The prices for the HECM-IO bonds were published by IDC, "the dominant market leader." (A-73, 109, 117-18.) In 2014, at the time LWF acquired the bonds, IDC did not independently price the bonds because it did not have an independent valuation model. (A-119-20.) Instead, IDC accepted valuations

11

submitted by brokers such as Stifel and LWF (known as "broker quotes"). (A-73, 96.)

With the financing secured, Stumberger and two colleagues at Stifel (Dan Foster and Ernie Calabrese, each of whom reported to Stumberger) joined LWF to manage the HECM-IO bond portfolio. (A-115-16.) Stumberger reported to Hild, and was responsible for "manag[ing] the bond portfolio" by "valuing it, marketing it to market, and just analyzing the portfolio." (A-71.) Calabrese was responsible for "negotiating documents and managing" relationships with lenders, and Foster was responsible for "the analytics, the modeling, the analysis on the portfolio" in order to "determine the valuations" of the bonds. (A-71.)

### C.    IDC Has Difficulty Valuing the Bonds

By September 2014, LWF began to deliver broker quotes to IDC. The prices that LWF provided were consistent with prices at which Stumberger believed LWF could sell the bonds. (A-73.) IDC — as an independent third party — did not necessarily price the bonds at the value submitted by LWF, and Stumberger agreed that LWF "could not dictate what IDC has to do." (A-121-22.)

Stumberger, the bond expert, testified that "it takes expertise" to value the bonds, which were difficult to price for multiple reasons, including that even experts disagreed about underlying pricing "inputs and assumptions." (A-111.) The duration of the bonds ranged widely, from 10 years to 50 years, further making

valuation difficult. (A-111.) Because "[h]istorically holders of these bonds have been long-term holders," the bond market was highly "illiquid," with only a few market participants. (A-113, 179, 372-73.) Therefore, while a bondholder could theoretically sell the bonds into the market, "[t]here's no way of telling where a bond could be sold at any given point in time"; its price was "indeterminate." (A-113.)

Beginning in January 2015, "IDC announced that [it] had the ability now to create the valuations, model the bonds," such that it no longer needed to accept broker quotes. (A-73, 124.) But IDC's model was unable to value HECM-IO bonds accurately: IDC's valuations "caus[ed] a daily decline in the bond prices," resulting in inaccurate prices that triggered margin calls from LWF's lenders. (A-74, 79.)

Stumberger and his team "were frustrated" with IDC's model, which they believed "didn't work," and LWF frequently challenged IDC's prices. (A-123, 173, 178-79.) Hild asked Stumberger to speak with IDC "to rectify this problem"; Stumberger did so, and thereafter "IDC ceased modeling the bonds themselves" and requested that LWF "resume deliver[ing]" broker quotes. (A-74.)

Accordingly, in February 2015, LWF resumed providing broker quotes to IDC. (A-131-32.) In general, Stumberger and his team would present their "thoughts on portfolio valuation" to Hild, who would approve the prices to be

13

submitted. (A-75.) "[O]ver time," Hild (together with LWF's Chief Financial Officer Eric Rohr, who also testified as a cooperating witness) "would propose additional scenarios or sets of inputs to run" beyond the bond valuations presented by Stumberger. (A-76.) For example, among the numerous assumptions that could affect the valuation of the bonds, Stumberger would model "multiple valuations changing just the prepayment speed assumption," which accounted for "the rate in which the underlying pool of mortgages is paid off and the bond is paid down." (A-77.) Each valuation with differing assumptions was labeled as a "scenario." (A-77-78.)

### D. LWF Develops "Scenario 14"

In 2015, LWF conducted an "extensive" analysis in order to price the bonds more accurately. (A-188.) Stumberger and his team ran various "adjustments and scenarios" to its methodology to calculate the "intrinsic value" (the "true value") of the bonds based on, among other things, the significant coupon payments the bonds generated for whoever held them. (A-111, 126-27, 188, 304.) By September 2015, after months of analysis and discussions, there was "consensus" within LWF that the illiquid market methodology generally undervalued the bonds. (A-81, 127-28, 304.)

On the basis of this consensus, LWF determined that certain "assumptions" driving the existing pricing methodology for the bonds should be refined. (A-128,

303.) In one scenario, following discussions with Stumberger, Hild directed that one assumption, the benchmark for the yield input, be changed from where that assumption had been set in prior methodologies, resulting in a "large increase in the prices or the valuation of the portfolio." (A-81, 126.) This scenario was called "Scenario 14." (A-81.) Scenario 14 was a "buy and hold kind of methodology" that reflected LWF's intent to "hold the[] bonds to maturity." (A-81, 129.) Stumberger understood the Scenario 14 prices were distinct from the prices "obtainable in the market," given that to the extent any market existed, the market's pricing methodology undervalued the bonds. (A-92.)

E.    **LWF Submits Scenario 14 Prices to IDC**

Although Scenario 14 began as "an academic exercise," in about September 2015, LWF began submitting the prices derived from Scenario 14 to IDC. (A-81, 303-04.) IDC marked the bonds at the higher prices, which caused the valuation of LWF's bond portfolio to increase and thereby "caused the amount of [its] loan[s] to go up with the lenders." (A-131.) As a result, LWF was able make margin calls and acquire more bonds with the additional financing. (A-81, 134.)

Each of the government's witnesses — including the cooperating witnesses Stumberger and Rohr — agreed that Scenario 14 was a good-faith effort to arrive at an accurate model of the value of the bonds. According to Rohr, everyone at LWF "obviously felt like" Scenario 14 was a "brilliant insight to valuations."

15

(A-452.)  Rohr was in favor of the decision to use Scenario 14 to model the portfolio, but also stated (with scant explanation) that he "knew it was wrong" to provide the Scenario 14 prices to IDC.  (A-305, 309.)

Stumberger agreed that Scenario 14 was "an effort [] to get it right" from "an intrinsic value standpoint."  (A-189.)  Stumberger also expressed his concern to Hild, however, that "the lenders were expecting or wanting a market value" from IDC, presumably meaning a price at which the bonds could immediately be sold (into an illiquid "market" whose methodology undervalued them), "not an intrinsic value."  (A-130.)  Notwithstanding this concern, Stumberger testified:  "Did I go into work every day purposely knowing I was doing something wrong?  The answer is no."  (A-156.)

### F.    LWF's Contracts With Its Lenders

One of the central disputes at trial was over the meaning of the term "market" price.  The government contended that LWF's lenders "wanted" IDC's prices for the bonds to be "market" prices, meaning (in its view) the prices at which bonds could be immediately liquidated (such that when IDC based its prices on LWF's submissions, the prices ended up "above market").  (A-590, 598.)  The contracts between LWF and the lenders, however, defined "market value" to mean the daily prices *published by IDC*, without regard to whether the bonds could be liquidated at those prices.  (A-211-12, 216, 228, 230-32, 250.)

IDC's own contracts with subscribers (like Ginnie Mae's disclosures, *see infra*, footnote 2) confirmed that the prices IDC published "may not conform to actual purchase or sales prices in the marketplace," and that due to the complexity of the HECM-IO bonds, "[t]here are many [valuation] methodologies" and "there is significant professional disagreement about which is best." (A-377, 646, 653.)

At some point, notwithstanding that he did not intend to do anything wrong, Stumberger "began making recordings of conversations" with Hild to document that Hild directed the submission of the Scenario 14 prices to IDC. (A-81.) Those calls, however, demonstrated how LWF wanted to avoid disclosing its valuation methodology because LWF was able to obtain what it viewed as undervalued bonds at a discount, and believed the prices would increase if its methodology were disclosed. For example, in a recorded call regarding the application of Scenario 14 valuations that would cause the valuation of the portfolio to rise by $11.4 million, Hild said, "I'm sure as hell not going to flow through 11.4 million in one day. But, you know, we would need to have a gradual, kind of a gradual glide path." (A-82-83.) Stumberger testified that a "glide path" was a "series of submissions [that] would draw less attention to the magnitude of the valuation increase." (A-83.)

In late 2015 and 2016, LWF acquired additional bonds and applied the same Scenario 14 analysis to determine the price submitted to IDC and referenced by the

lenders. (A-84, 86.) Stumberger testified he understood the lenders were not aware of the lower prices LWF paid to acquire the bonds — only the prices listed by IDC. (A-86, 88.) (As Hild testified, however, at least one lender was specifically aware of the lower price LWF paid because it used that lower price to decrease LWF's borrowing base. (A-565.)) According to Stumberger, because LWF internally valued the bonds at a higher price than it purchased the bonds for, LWF's lenders "would be lending more money than [LWF had] needed to purchase the bond at the market," creating what Hild called in one recorded call a "self-generating money machine." (A-84.)

Rohr testified that he, Hild, and Stumberger had "lots of debate on whether we should disclose" Scenario 14 to "alleviate some of the pressure we may feel if we ever had to sell." (A-427.) Ultimately, LWF did not disclose Scenario 14 because, according to Stumberger, Hild viewed it as a "proprietary" valuation methodology; if LWF shared its "secret sauce" then "[e]veryone would gravitate towards it," and "it would create more competition." (A-88.) Rohr testified that he and others at LWF believed they "understood" the bonds and "the market better than everybody else." (A-454.) Stumberger agreed that if LWF's methodology were disclosed, its competitors would "subscribe to the same thinking" and competition for the bonds would increase. (A-148.)

18

### G.    LWF's Liquidity Problems in 2017

In early 2017, LWF again adjusted its pricing methodology.  (A-139.)  Scenario 14 had been based on "generic market inputs," and therefore "did not include regulatory inputs" or "macro events in the market," which could impact price.  (A-137.)  In 2016, "there [was] a series of regulatory updates being implemented or announced or discussed," and Stumberger, his team, and Hild discussed the anticipated impact of those regulations on the portfolio.  (A-138, 424-25.)  In February 2017, LWF implemented a new pricing methodology to account for those regulatory changes, known as "Scenario 4," which resulted in an increase in the valuation of the bonds of over $20 million. (A-102.)  In about August 2017, regulatory changes did occur.  (A-424-25, 444).  As it had done with Scenario 14, LWF re-valued the portfolio gradually using Scenario 4; as a result of the higher valuations, LWF was able to borrow more money from its lenders.  (A-102-03, 347-49.)

Stumberger and Rohr each stated that the increases related to LWF's need for liquidity.  (A-139, 347, 443-44.)  After LWF's liquidity crisis ended, they asserted, the bond valuations gradually returned to the valuations derived using Scenario 14.  (A-354.)

19

### H.    The Defense Case

The defense introduced testimony from two witnesses:  Stuart Cantor (a former LWF director) and Hild.  (A-487, 502.)  Cantor testified as to Hild's compensation, including that Hild had for years personally guaranteed LWF's debt without recompense.  (A-490.)

Hild testified that as LWF grew, he was not as involved in the "day-to-day" of the business and he took on an "oversight capacity" from a "20,000-foot view." (A-509.)  In particular, Hild was dependent on Stumberger and his team to manage LWF's bond portfolio and submit prices to IDC.  (A-510, 515.)  With respect to Scenario 14, Hild characterized his understanding of it as a "middle-of-the-road assumption" that "was viewed as more accurate than the other framework that the team had used," and that no one within LWF raised concerns about implementing it.  (A-523-24.)  With respect to the increases in the valuation of the portfolio in 2017, Hild testified that Stumberger and his team had described Scenario 4 as incorporating assumptions "that would reflect what we would expect from" a "big regulatory change," which did occur.  (A-530.)

Defense counsel, Dusing, did not introduce a single exhibit during the direct examination of Hild and introduced only one exhibit through Cantor.  (A-494.) Dusing did not introduce any expert testimony or any other witnesses.

20

After the government rested, Dusing made a Rule 29 motion, which the District Court denied.  (A-481-83.)

## I.    Summations, Verdict, and Sentencing

In summation, the government conceded that the concept of a "fair value" of the bonds was "confusing" as defined by the contracts with IDC and the lenders. (A-589, 591.)  With respect to Scenario 14, the government acknowledged that Rohr believed that the market undervalued the bonds.  (A-594.)  The government further conceded that it is appropriate "to have an investment thesis" and even that the thesis might have been correct; nevertheless, the government argued that LWF deceived its lenders because LWF "force[d]" the lenders "to buy in to [LWF's] view about how the market's wrong" and did not "tell them about the risk if [LWF is] wrong."  (A-594.)

Dusing argued that Hild and LWF acted in good faith to estimate the bonds' value.  He explained that Scenario 14 was a "legitimate" and "sophisticated valuation tool" and a "genuine, sincere effort on everyone's part to more accurately predict something that was really hard to predict, namely how much cash was going to be generated from bonds that generated cash to an indefinite extent for an indefinite lifetime."  (A-606.)  Dusing emphasized that because LWF's contracts defined "market value" as "fair value as determined by IDC or other third party,"

21

Hild had not deceived LWF's lenders by submitting the Scenario 14 valuations to IDC. (A-605.)

The jury returned a verdict of guilty on all counts. (A-639.) On January 27, 2023, the District Court sentenced Hild principally to 44 months' imprisonment. (SPA-68, 70.) On February 27, 2023, the District Court granted bail pending appeal over the government's objection. (A-17.)

## SUMMARY OF ARGUMENT

This Court should reverse Hild's conviction because the evidence, even in the light most favorable to the government, was insufficient to establish falsity or intent to defraud. If this Court does not reverse, it should vacate Hild's conviction and remand for a new trial before a different district judge for four reasons.

*First*, after *Ciminelli*, the District Court's jury instructions on three counts were plainly erroneous, and the remaining two counts were infected by the error.

*Second*, on *de novo* review, a new trial is required under *Sullivan* and *Strickland* in light of trial counsel's undisclosed conflicts of interest and counsel's deficient and prejudicial performance.

*Third*, the District Court abused its discretion in denying a new trial based on newly discovered evidence that the lenders secretly pocketed enormous coupon payments from the bonds.

*Fourth*, the District Court abused its discretion in declining to recuse itself due to a potential conflict stemming from the District Court's spouse's law firm's representation of three relevant players in this case whose interests plainly are adverse to Hild's.

*Fifth*, the cumulative prejudice to Hild of the foregoing errors deprived Hild of a fair trial.

## ARGUMENT

### POINT I

### The Evidence Was Insufficient To Prove Hild Misrepresented Bond Prices Or Had Intent To Defraud

This Court should reverse Hild's conviction because no rational juror could have found that Hild caused any false or fraudulent statements to be made, or had intent to defraud. The Indictment charged that Hild "misrepresent[ed] the value of certain bonds" by "submit[ting] inflated prices" to IDC. (A-34-36, 45-49.) But the government failed to prove falsity: The evidence showed that Scenario 14 was a good-faith effort to determine *accurate* prices for the bonds, and no evidence proved the prices LWF submitted to IDC were false. For that reason alone, Hild's conviction must be reversed. The government also argued that Hild concealed from LWF's lenders that LWF was "secretly" behind the IDC prices, thereby depriving the lenders of the right to control their property (a theory that is no longer valid under *Ciminelli*). But the fact that LWF communicated pricing

23

information to IDC, and that IDC used that information, was neither secret nor misleading. IDC's own contracts with the lenders provided both that IDC could base prices on broker quotes from clients like LWF, and that IDC's prices may not reflect actual market prices. On this record, no rational jury could have found that any false statements were made, or that Hild acted with intent to defraud.

### A. Applicable Law

"A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden." *Connolly*, 24 F.4th at 832. "In reviewing such a challenge," this Court "view[s] the evidence in the light most favorable to the [g]overnment" and "draw[s] all inferences and resolv[es] all issues of credibility in favor of the government." *Id.* (quotation marks omitted). This Court "assess[es] the evidence as a whole," rather than "piecemeal or in isolation." *Id.* (quotation marks omitted). This Court affirms if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation marks omitted).

### B. The Evidence Was Insufficient to Prove Falsity or Intent

The government's proof at trial was insufficient to show falsity or intent. The government's primary argument was that the bond prices LWF submitted to IDC — primarily generated by the Scenario 14 model — were false because they

24

were above-market, "inflated" prices that did not reflect what the bonds could be sold for in the open "market." (A-60, 588, 591, 611-12.)

The proof at trial, however, provided no basis for the jury reasonably to conclude that the Scenario 14 prices were false. To the contrary, the evidence — including the testimony of the government's cooperators — showed the Scenario 14 prices were a good-faith effort to determine accurate values for the bonds in the context of a highly illiquid market.[2] The government's cooperating witnesses agreed that Scenario 14 sought "to get it right" from "an intrinsic value standpoint" (A-130, 189), and that Scenario 14 was a "good" valuation method and the product of a "brilliant insight [in]to valuations" (A-367, 374, 452). The evidence showed that Hild, too, believed Scenario 14 produced more accurate valuations than other models. (A-189, 368, 523, 568.)

The lack of evidence of falsity — and the presence of affirmative evidence of good faith — makes this case analogous to *CFTC v. Wilson*, No. 13-CV-7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), in which then-District Judge Richard J. Sullivan entered a judgment for the defendants following a bench trial.

_____

[2] Ginnie Mae has acknowledged that "[t]here is no assurance that a secondary market will develop" or "continue" for the HECM-IO bonds, and that such markets "have experienced periods of illiquidity and can be expected to do so in the future." Ginnie Mae, Offering Circular Supplement, at 16-17 (Sept. 23, 2013), *available at* ginniemae.gov/investors/disclosures_and_reports/ProspectusesLib/ 2013Sep23-021O.pdf (last visited Dec. 14, 2023).

25

Judge Sullivan found the government was "[u]nable to prove" that the allegedly false prices at issue were, in the context of a similarly illiquid market, "actually inflated or above fair market value." *Id.* at *14. The District Court, in addressing Hild's Rule 29 motion, sought to distinguish *Wilson* on the basis that the claim there "specifically required proof that the prices were 'artificial'" while the charges here "did not" (SPA-23 n.3), but that is a distinction without a difference: The government's argument in *Wilson* was the same as here, *i.e.*, that the prices LWF submitted to IDC were "artificial," and the evidence did not establish artificiality.

Given that the cooperating witnesses undercut the government's theory of falsity, the government sought to salvage its case by arguing that the prices LWF submitted to IDC should have been prices at which the bonds could have been immediately sold in the "market," that nobody in the market would pay Scenario 14 prices (regardless of their accuracy), and accordingly, that Hild intentionally deceived the lenders by submitting Scenario 14 prices to IDC knowing that IDC would adopt them and represent them to be "market" prices.

But the evidence did not comport with this theory either. The evidence showed that Scenario 14 was developed because the "complex" bonds required "expertise" to value in an illiquid market whose participants typically were "long-term holders." (A-111, 113, 178-79, 185, 201, 366, 372-74.) With this context, far from establishing that the market would not pay Scenario 14 prices, the evidence

showed (1) the government's cooperators and Hild believed the market *would* pay higher prices for the bonds if LWF had disclosed Scenario 14; and (2) the reason the "intrinsic" Scenario 14 prices differed from any existing "market" prices was because LWF kept Scenario 14 — a proprietary model — secret.

The evidence further showed that LWF kept Scenario 14 secret for a legitimate reason: to preserve LWF's business advantage. Rohr admitted that everyone at LWF believed Scenario 14 was a "brilliant insight" into valuations and that if this "insight" was disclosed LWF would lose its "competitive advantage." (A-306, 452-54.) Stumberger too testified that he understood that LWF believed "the higher valuations were kind of a secret sauce." (A-88.) Hild relied on Stumberger and Rohr as the subject matter experts on the bonds. (A-155, 453, 510-13, 523, 530.) Both Stumberger and Rohr conceded that they did not have any intent to defraud. (A-155, 361.) Hild and LWF thus kept Scenario 14 proprietary to protect their business advantage, not to deceive others. The government did not present any evidence showing that LWF had an obligation to disclose its proprietary methodology, and indeed, the government conceded that "there is nothing inherently wrong with keeping secret an investment thesis that views a security as undervalued by the market." (A-13 (08/20/2021 Gov't Brief at 17).) It was not a crime for Hild to seek, as Judge Sullivan put it in *Wilson*, to "tak[e]

27

advantage" of LWF's "more accurate assessment" of the bonds' true value.  2018 WL 6322024, at *19.

Instead of offering proof that the bonds *could not* be sold at Scenario 14 prices, the government instead introduced evidence of isolated sales to buyers who did not accurately value the bonds and whose transactions are not representative of the bonds' value.  (A-210, 348.)  The existence of transactions at prices below Scenario 14 does not, in any event, prove the bonds *could not* have been sold at Scenario 14 prices, as required.  Such evidence also cannot obscure the central fact that the evidence established that LWF personnel believed that market participants would have paid Scenario 14's accurate prices.  Thus, the evidence at trial did not prove falsity.

The evidence also failed to prove Hild's intent to defraud.  The government argued that Hild's intent to defraud could be inferred by LWF's not disclosing to the lenders that it was providing quotes to IDC or that the valuation given to IDC was LWF's own valuation (rather than a so-called "market" price).  But the fact that LWF's valuations were higher than the prices available in the illiquid "market" does not make LWF's valuations misleading.  Hild and the cooperating witnesses believed their valuation methodology was accurate.

Nor was there any proven requirement that LWF submit prices to IDC at which the bonds could be *immediately* bought and sold in the "market."  Rather,

28

the contracts between LWF and the lenders expressly defined "market value" simply as the price "obtained from" IDC. (*E.g.*, A-211, 232, 293.) Although the District Court suggested that LWF's contract with IDC "create[d] an expectation that the rates provided by IDC [to the market] are tied to market rates" (SPA-24 n.4), in fact, the contract confirmed that (1) IDC's quotes "may not conform to actual purchase or sale prices in the marketplace" (A-646), and (2) because the bonds were "complicated financial instruments," there are "many methodologies" used "to generate approximations of the[ir] market value" and "significant professional disagreement about which is best," and accordingly, "[n]o evaluation method, including those used by [IDC], may consistently generate approximations that correspond to actual 'traded' prices" (A-377, 653). That contract further disclosed that IDC's quotes could be based on "broker quotes" from clients such as LWF. (A-212, 646.) LWF also disclosed that its submitted prices may be based on "estimates that may involve highly subjective assessments" and "do[] not imply" either "actual traded levels (if any)" or "a theoretical liquidation value." (A-644.) LWF's submission of Scenario 14 values to IDC did not show fraudulent intent, and there was no other evidence (for example, an affirmative misrepresentation to the lenders) supporting a finding that Hild had intent to defraud.

Although the government's primary trial argument was that the bond valuations LWF submitted to IDC were false and inflated, the government also

29

argued that LWF's financial statements (which reflected its Scenario 14 valuations of the bonds) also were misleading. (SPA-14, 21-22.) But the evidence was insufficient on this point for largely the same reasons it was insufficient as to the government's primary argument. The evidence showed Hild believed the Scenario 14 prices were legitimate, and that LWF could sell the bonds at Scenario 14 prices after disclosing the methodology to the market, and therefore believed LWF's financial statements were accurate; the evidence was not sufficient to show otherwise.

This Court's recent decision in *Connolly*, 24 F.4th 821, confirms the need for reversal. There, this Court, on analogous facts, reversed the defendants' wire fraud and bank fraud convictions, finding that the government failed to show falsity and intent to defraud.

In *Connolly*, the defendants were Deutsche Bank ("DB") employees charged with "inducing co-workers to submit to the [British Bankers' Association ("BBA")] false statements that could influence LIBOR rates, in order to increase [DB's] profits . . . on existing derivatives contracts." *Id.* at 824. The BBA, which was responsible for setting a daily LIBOR rate, relied on information contributed by selected banks, including DB. *Id.* at 824-25. The BBA's instructions required each contributor bank to submit "the rate at which it could borrow funds." *Id.* at 825.

The BBA would then set the LIBOR rate by eliminating the four highest and lowest submissions and averaging the rest. *Id.*

The evidence in *Connolly* showed that DB's rate submissions were made by the government's cooperating witnesses (the "CWs"). *Id.* at 826. To make their submissions, the CWs maintained spreadsheets that were automatically updated with live market data, but into which various factors could be manually inputted. *Id.* at 827. The defendants sometimes asked the CWs to "make LIBOR submissions that would be beneficial to DB derivatives traders' positions," and the CWs would accordingly submit a higher or lower rate. *Id.* at 827-29. The CWs "testified that they 'knew' the practice . . . was 'wrong.'" *Id.* at 830.

This Court reversed the defendants' convictions. *Id.* at 832. The Court explained that "[t]he precise hypothetical question [from the BBA] to which the [DB was] responding was at what interest rate '*could*' DB borrow," and that "[i]f the rate submitted is one that [DB] *could* request, be offered, and accept, the submission, irrespective of its motivation, would not be false." *Id.* at 835 (emphasis added). The Court thus disagreed that the government was not required to show "that DB '*could not* have borrowed funds at the rates [the CWs] submitted' after receiving a request [from the defendants] for higher or lower rate submissions." *Id.* (quoting district court) (emphasis in original). Rather, the government had to demonstrate "that the LIBOR submissions . . . *were untrue*."

*Id.* (emphasis added). The Court highlighted that, notwithstanding the CWs' testimony that their conduct was "wrong," there was no testimony as to the "key" question going to falsity — whether "DB could not have borrowed" money "at the rate stated in any of DB's LIBOR submissions." *Id.* at 835-36.

Rather than present evidence of falsity, the government relied on testimony that "there was always an understanding that the panel banks [including DB] would submit *the one* best estimate of *the true borrowing costs they had*." *Id.* at 836 (alterations omitted) (emphasis in original). The Court found, however, that the evidence did not prove there was "one true interest rate" or that the "submissions that were actually made were not rates at which DB 'could' . . . borrow." *Id.* at 836-37, 41. For that reason, although the defendants may have "violated any reasonable notion of fairness" and the panel banks' "understanding," the evidence was insufficient to "show that any of the trader-influenced submissions were false, fraudulent, or misleading" for purposes of the wire fraud and bank fraud statutes. *Id.* at 841, 843.

The Court's analysis in *Connolly* is instructive and, following the same analysis, reversal is appropriate here. First, there was insufficient evidence that LWF's Scenario 14 submissions to IDC were false or otherwise violated the terms of its contract with IDC because, as in *Connolly*, there was not sufficient evidence to prove that LWF could not have resold the bonds at Scenario 14 prices. The

32

cooperators testified that Scenario 14 was a good-faith effort to value the bonds in an illiquid market, and that the disclosure of the proprietary Scenario 14 model to the market would have *increased* bond prices (*i.e.*, the "market" price would have risen toward the Scenario 14 price). (A-130, 148, 189, 306, 374.) As in *Connolly*, the conclusory testimony of cooperating witnesses that their conduct was "wrong" does not satisfy the government's burden to prove that the submitted prices were false or misleading. (A-130, 305, 309.)

Second, as in *Connolly*, that LWF did not disclose to lenders that it was "behind IDC prices" is irrelevant. (A-589, 600-01.) The IDC contracts provided that IDC could base prices on broker quotes and that its prices "may not conform to actual purchase or sale prices." (A-646.) Although the lenders may have had some "understanding that LWF did not contribute to IDC's prices, violating an informal and unstated "understanding," per *Connolly*, is not fraud.

Third, as in *Connolly*, that LWF "implement[ed] the Scenario 14 values incrementally, on a 'glide path'" (SPA-9, 25) also does not satisfy the government's burden to prove falsity or intent. "Regardless of the motive" behind the gradual implementation of Scenario 14 — which was actually to protect LWF's business advantage by not disclosing its proprietary methodology — the "record remains bereft" of evidence that the Scenario 14 values were false or that Hild intended to deceive LWF's lenders. *Connolly*, 24 F.4th at 840.

33

Finally, as in *Connolly*, that LWF's conduct allegedly was "unfair" to lenders, *id.* at 841, does not establish a fraud. Even if LWF and Hild's conduct "may have violated any reasonable notion of fairness" — which it did not — the government's failure to prove sufficiently that the Scenario 14 prices were false or intentionally misrepresented "means it failed to prove conduct that was within the scope of the" fraud statutes. *Id.* at 843.

On this record, the fact that LWF was able to purchase the bonds at a low price and then profit off of transactions with its lenders as a result of its higher valuations does not support an inference either of falsity or intent to defraud. Accordingly, this Court should reverse.

### POINT II

### This Court Should Vacate and Remand for a New Trial (or at Minimum Resentencing) Following *Ciminelli*

To the extent the Court does not reverse, the Court should order a new trial on all counts following the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which invalidated this Court's "right to control" theory of fraud. The government argued that Hild was guilty of fraud because Hild failed to inform LWF's lenders that LWF was "pulling the strings at IDC." (A-588.) In other words, the government's theory of fraud hinged in substantial part on the "right-to-control" theory, that is, the allegation that Hild deprived the lenders of valuable economic information (*i.e.*, that LWF was behind the prices IDC posted)

34

that was necessary for them to make discretionary economic decisions such as whether to issue loans. (*E.g.*, A-590 (AUSA arguing Hild "was IDC," "controlled IDC," and "knew that [the lenders] wanted independent values for these bonds, and he tricked them"); A-600 (AUSA arguing "at no point during these conversations did [Hild] say [']I'm behind IDC prices['] . . . . What about your moral duty to these lenders, who are telling you they need their money back, and you're hiding from them this important fact?"); A-601 (AUSA arguing, "How many different times did [the government] ask [Hild] whether he thought the lenders would care that [LWF] was behind IDC prices?").)

In *Ciminelli*, however, the Supreme Court found that the right to control theory is "invalid under the federal fraud statutes." 598 U.S. at 317. There, the defendant was convicted of wire fraud in connection with bid-rigging. *Id.* at 309-11. At trial, the government proceeded on a right-to-control theory, arguing the defendant "deprived" the victim "of potentially valuable economic information" "necessary to make an informed economic decision," that is, that the defendant "tailor[ed]" the bid requirements set by the organization that awarded the contracts in order to give his company an advantage in bidding, which deprived that organization of information going to the fairness of its bidding process. *Id.* The district court "instructed the jury that the term 'property'" for purposes of wire fraud "includes intangible assets such as the right to control the use of one's

35

assets," and accordingly the jury could convict if it found a "depriv[ation] of potentially valuable economic information." *Id.* at 311. The Supreme Court, however, reversed, holding that "the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 316. The use of the clause "federal fraud *statutes*" in *Ciminelli* makes clear that the holding applies not only to wire fraud but also to other federal fraud crimes.

Due to *Ciminelli*, which came down after the verdict here, the District Court's jury instructions were erroneous.[3] With respect to Count Four (wire fraud), the District Court instructed that the government was required to prove that Hild "employed a device, scheme, or artifice to defraud or obtain money or property by false pretenses, representations, or promises." (A-629.) The District Court further instructed:

> [A] person is not deprived of money or property only when someone directly takes his money or property from him. Rather, a person is also deprived of money or property when that person is provided false or fraudulent information that, if believed, would ***prevent him from being able to make an informed decision or make informed decisions*** about what to do with his money or property. In other words, a person is deprived of money or property when he is deprived of the ***right to control*** that money or property. And he is deprived of the ***right to control*** that money and property when he receives false or fraudulent

---

[3] Hild's case was cited in an amicus brief filed in *Ciminelli* as an example of a case in which the government procured a conviction using a right-to-control instruction. *See* Brief of Amicus Curiae N.Y.C.D.L. in Support of Petitioner at 5a, *Ciminelli v. United States*, No. 21-1170 (filed Sept. 6, 2022).

statements that affect his ***ability to make discretionary economic decisions about what to do with that money or property***.

(A-630 (emphasis added).)  The jury instructions thus expressly defined "property" to include the "right to control" property in the manner that *Ciminelli* now forbids.

With respect to Count Five (bank fraud), the District Court repeated that the government had to prove a scheme "to obtain money or property" (A-631-32); although the District Court did not repeat the "right-to-control" instruction from Count Four, the use of the phrase "money or property" in the Count Five instruction necessarily incorporated the same definition of "money or property." *See United States v. Jackson*, 180 F.3d 55, 71-72 (2d Cir.) (district court's instruction on one count was erroneous, and its instruction on other counts "incorporated th[at] error"), *overruled on other grounds on reh'g*, 196 F.3d 383 (2d Cir. 1999).

With respect to Count Two (conspiracy to commit wire and bank fraud), the District Court expressly incorporated by reference the instructions it gave for the substantive wire and bank fraud counts (Counts Four and Five), which included the erroneous right-to-control instruction.  (A-636.)  For Count One (conspiracy to commit securities fraud) and Count Three (securities fraud), the District Court did not say anything to prevent the jury from considering its right-to-control instruction in connection with those counts as well.  (A-626-27, 633-34.)

37

The District Court's jury instructions were plainly erroneous under *Ciminelli*. The District Court has acknowledged that *Ciminelli* "appears to be at odds with certain instructions given to the jury at Hild's trial." (SPA-100.)

This Court should find that the standard for plain error is met and order a new trial because "(1) there is an error; (2) the error is clear or obvious . . . ; (3) the error affected the appellant's substantial rights, [*i.e.*,] it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quotation marks omitted).

Here, there can be no reasonable dispute that the jury instructions on Counts Two, Four, and Five now constitute error that is plain (where plain error is assessed "at the time of appellate consideration," *United States v. Gilmore*, 471 F.3d 64, 66 (2d Cir. 2006)).

As to the third element, the error affected Hild's substantial rights because the government argued at length in summation and throughout the trial that the jury should convict because Hild deprived the lenders of valuable economic information necessary for them to make discretionary economic decisions such as whether to issue loans — a theory now barred by *Ciminelli*. (*E.g.*, A-590, 599-601.) The jury, for its part, did not specifically find that Hild deprived any victims of a traditional property interest (as opposed to the right to control that

38

property). The verdict form did not specify the property interest upon which the jury convicted; rather, it asked, as to the wire and bank fraud and related conspiracy counts, only whether the jury found the defendant guilty and, if yes, whether "the objective of the scheme was to affect a financial institution." (A-667.) Accordingly, there is no basis to conclude that the jury necessarily convicted Hild solely on the basis of a traditional property interest. *See United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017) (although some evidence constituted an appropriate basis to convict following subsequent Supreme Court precedent, "the jury *may have convicted*" on the basis of "conduct that is not unlawful, and a properly instructed jury might have reached a different conclusion" (emphasis added)); *United States v. Skelos*, 707 F. App'x 733, 737 (2d Cir. 2017) (erroneous "instruction invites conviction on acts outside" the scope of governing law); *United States v. Bruno*, 661 F.3d 733, 740 (2d Cir. 2011) (vacating conviction where "the district court did not require the jury to find that" the defendant engaged in offense conduct consistent with subsequent Supreme Court precedent).

As to the fourth factor, the error affected the fairness and integrity of the proceedings because the faulty instructions led the jury to convict Hild of conduct that is not criminal. *See United States v. Balde*, 943 F.3d 73, 98 (2d Cir. 2019).

For all of these reasons, at a minimum, Hild's conviction on Counts Two, Four, and Five should be vacated.

In addition, the District Court's erroneous right-to-control instructions also infected Counts One and Three (conspiracy to commit securities fraud and securities fraud) because of spillover prejudice from the plainly erroneous instructions on Counts Two, Four, and Five.

The government made right-to-control arguments the centerpiece of its case, including that LWF purportedly "chain[ed]" the lenders to its "investment thesis" and "force[d] them to buy in to [its] view about how the market's wrong," but without "tell[ing] them about the risk if [LWF is] wrong." (A-594.) Given the weakness of the case and the possibility that the right-to-control arguments influenced the jury's determination even on the securities fraud counts, a new trial is required on all counts. *United States v. Rooney*, 37 F.3d 847, 856 (2d Cir. 1994) (vacating one count and ordering new trial on additional counts due to spillover prejudice); *United States v. Guiliano*, 644 F.2d 85, 88-89 (2d Cir. 1981) (ordering new trial on third count due to spillover prejudice where the evidence on that count "was barely sufficient"); *see United States v. Wright*, 665 F.3d 560, 565 (3d Cir. 2012) (erroneous instruction "requires a new trial on [defendants'] honest services fraud convictions and [] prejudicial spillover tainted their traditional fraud convictions").

Accordingly, a new trial on all counts is required under *Ciminelli*. To the extent the Court vacates only Counts Two, Four, and Five, a *de novo* sentencing is

required.  *See United States v. Hertular*, 562 F.3d 433, 445-46 (2d Cir. 2009)

("Where we overturn one or more counts of conviction but leave others in place,

our general rule has been to remand for *de novo* sentencing proceedings.").

<div align="center">

**POINT III**

**This Court Should Order a New Trial on De Novo Review Because Hild's
Trial Counsel Was Conflicted and Ineffective**

</div>

This Court should order a new trial because Hild received ineffective

assistance from his trial counsel, Dusing and Lawrence.  They acted with

undisclosed "actual conflict[s] of interest" that adversely affected their

representation, *Sullivan,* 446 U.S. at 348, and they also were ineffective in the

traditional sense, committing errors that deprived Hild of a fair trial, *see Strickland*,

466 U.S. at 687.  The District Court, in assessing Hild's new trial motion, erred by

applying an incorrect and invented legal standard to the *Sullivan* claim, wrongly

requiring Hild to show that his counsel had an incentive to see him convicted, and

by misconstruing the facts underlying the *Strickland* claim.  Applying the correct

standard to the record here, this Court should order a new trial.

### A. Applicable Law

"A defendant's Sixth Amendment right to effective assistance of counsel

includes the right to representation by conflict-free counsel." *LoCascio*, 395 F.3d

at 56 (quotation marks omitted).  "Although a defendant is generally required to

show prejudice to prevail on an ineffective assistance of counsel claim, this is not

<div align="center">

41

</div>

so when counsel is burdened by an actual conflict of interest." *Id.* (quotation marks omitted). "Where a defendant shows '(1) an actual conflict of interest that (2) adversely affected his counsel's performance,' prejudice is presumed." *Id.* (quoting *Sullivan,* 446 U.S. at 348); *see Malpiedi*, 62 F.3d at 469.

As to the first element, an "actual conflict" exists where "the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Armienti v United States*, 234 F.3d 820, 824 (2d Cir. 2000); *see Sullivan*, 446 U.S. at 356 n.3 (Marshall, J., concurring in part). As to the second element, counsel's performance is "adversely affected" by the conflict where the conflict causes "an 'actual lapse in representation.'" *LoCascio*, 395 F.3d at 56 (quoting *Sullivan*, 446 U.S. at 349). An "actual lapse" is demonstrated by "some plausible alternative defense strategy or tactic" that "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993) (quotation marks omitted).

"This is not a test that requires a defendant to show that the alternative strategy or tactic not adopted by a conflicted counsel was reasonable, that the lapse in representation affected the outcome of the trial, or even that, but for the conflict, counsel's conduct of the trial would have been different." *Malpiedi*, 62 F.3d at 469. "Rather, it is enough to show that a conflict existed that was inherently in conflict with a plausible line of defense or attack on the prosecution's case." *Id.*

42

(quotation marks omitted); *see Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005) ("[T]he defendant need not show that the defense would necessarily have been successful had it been used, only that it possessed sufficient substance to be a viable alternative." (quotation marks and alterations omitted)).

A lawyer's "personal interests" can conflict with the representation of a client. Under the New York Rules of Professional Conduct, absent a client's written consent, a lawyer "shall not represent a client" if "there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or *other personal interests*." N.Y. Rules of Prof'l Conduct R. 1.7(a)(2) (emphasis added). A lawyer's representation of two clients with "differing interests" also creates a conflict. *Id.* at 1.7(a)(1). Both of these species of conflicts can only be waived, if at all, by a client's informed consent, in writing. *Id.* at 1.7(b)(4).

"The question of whether [counsel's] representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed *de novo*." *LoCascio*, 395 F.3d at 54; *United States v. Nolan*, 956 F.3d 71, 76 (2d Cir. 2020) (vacating conviction after reviewing ineffective assistance claim *de novo*).

## B.    Relevant Facts

After the jury returned a guilty verdict in April 2021, Hild hired new counsel (the undersigned), and, on July 27, 2021, filed a Rule 33 motion based on ineffective assistance (consistent with *United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010)).

In the motion, Hild argued that his trial counsel, Dusing and Lawrence, labored under an undisclosed "actual conflict of interest" both before and during Hild's trial in April 2021.  During that time period, Dusing was engaged in disputes with two different mothers of his children in a Kentucky family court, where Lawrence served as his counsel (and where he at times represented himself *pro se*). (SPA-27.)  As a result of these two conflicting proceedings, Hild argued, Dusing and Lawrence curtailed Hild's defense case, such that prejudice should be presumed and a new trial ordered.  (SPA-27.)  At a minimum, Hild argued that the Court should hold a hearing, or otherwise find counsel ineffective under *Strickland*.  (SPA-31, 49.)

Hild's motion described at length the Kentucky proceedings and the ways in which they caused Dusing and Lawrence to curtail Hild's defense case, and the District Court largely adopted Hild's factual recitation.  (SPA-27-30.)  In the first case, *Dusing v. Tapke*, Case No. 15-CI-1945 (K.Y. Kenton Fam. Ct. of the 16th Jud. Cir.), the Honorable Christopher J. Mehling of the Kentucky family court

issued an opinion on March 9, 2021 sanctioning Dusing for making frivolous motions, holding Dusing in contempt, and sentencing him to "7 days in jail." (A-1140, 1146-47.)

The second case, *Bakker v. Dusing*, Case No. 19-CI-560 (K.Y. Kenton Fam. Ct. of the 16th Jud. Cir.), was pending before Judge Mehling at the same time. There, the petitioner, J.B., sought sole custody of her child with Dusing based on Dusing's violent and abusive behavior. Following trial in February and March 2021, on April 5, 2021, Judge Mehling awarded J.B. sole custody, days before the final pretrial conference and the start of Hild's trial on April 13. (SPA-28; A-1148.) Judge Mehling found that Dusing not only had repeatedly lied to the court, but also had "perpetuated violence" and "physical and emotional abuse" on J.B., including by "biting her face, spitting on her, barricading her in a closet, hitting her head on a wall, pinching, [] throwing food, water and other objects at [her]," and "threatening to kill" her. (SPA-28; A-1149-50, 1161-62, 1166.) Judge Mehling further found that Dusing, through his attorney, had attempted to bribe a doctor Dusing had retained as an expert after the doctor issued a report making negative findings about Dusing. (A-1156-57.) The April 5 order triggered deadlines for Dusing to move to vacate the judgment or to appeal, and precipitated a "flurry of activity" that persisted throughout Hild's trial (SPA-28), as Dusing faced both the loss of the custody his child and serious personal and professional sanctions.

On April 13 (the first day of Hild's trial), J.B. filed the first of four sanctions motions against Dusing and Lawrence based on their conduct in the Kentucky matter, all of which were noticed for a hearing on May 4. (SPA-28.) On April 15, Dusing cross-examined the government's key cooperating witness, Stumberger, and also filed, *pro se*, a 45-page motion to vacate the April 5 order in Kentucky. Dusing noticed the hearing on that motion too for May 4. (SPA-28; A-1168.) In the motion, Dusing broadly accused the Kentucky court of corruption and "illegal conduct." (A-1169-74.) The same day, J.B. filed a motion for additional findings of fact and noticed that hearing, too, for May 4. (SPA-28.) On April 16, as Dusing continued his cross-examination of Stumberger, J.B. filed a second sanctions motion against Dusing, arguing that he misled multiple Kentucky courts in filings. (SPA-28; A-1213.)

On April 19, on Dusing's behalf, Lawrence (as his counsel), filed a motion to continue the Kentucky proceedings. The motion acknowledged the Kentucky proceedings had been "a distraction" from Hild's trial and argued that counsel would suffer "serious prejudice" in Kentucky absent continuation. (SPA-29.) (The Kentucky court denied the motion in an order dated April 26, which was not docketed until April 29, when closing arguments began in Hild's trial. (SPA-29.))

On April 22, in Kentucky, J.B. filed an opposition to Dusing's motion to vacate, and sought sanctions on the ground that Dusing had made improper

46

"threats and allegations against the Court and its staff" and filed a motion "riddled with lies." (A-1217-18.) On April 28, J.B. filed another motion seeking attorney's fees. (A-1225.) Both motions were noticed for May 4.

The defense case in Hild's trial began on April 27. (SPA-29.) At that time, the Kentucky court was scheduled to hear several significant sanctions and other motions on May 4. Hild's defense case proceeded rapidly, in an apparent effort by Dusing and Lawrence to conclude the trial before May 4. Dusing did not introduce a single exhibit during the direct examination of Hild (and introduced just three exhibits on redirect that did not relate to key issues). The government seized on this dearth of defense exhibits, highlighting it in summation. (A-618-19.) With the only other witness called by the defense, Dusing introduced only one irrelevant exhibit. (A-494.) The parties gave closing arguments on April 29, and the verdict was issued on the afternoon of Friday, April 30 — one business day before the May 4 Kentucky hearing. (SPA-29.)

After Hild's trial concluded, in an effort to forestall the May 4 hearing, counsel falsely claimed to the Kentucky court that Hild's trial was ongoing. At 11:42 p.m. on April 30, *after* Hild's trial had concluded, Lawrence emailed the Kentucky court clerk, stating:

> [I]t is not clear that we will be back Tuesday from New York. If we are, we are not going to be prepared to proceed with all of these motions. There is no realistic way. It's a federal criminal jury trial.

47

(SPA-29; A-1243.)  On May 3, Lawrence represented (inaccurately) that counsel was in New York "working around-the-clock" on Hild's trial and that "the timeframe for completion of the case through a verdict has lengthened" and "it is clear that the trial could last well into and through May."  (A-1237-38.)

On August 20, 2021, the government filed its opposition to Hild's motion for a new trial, together with affidavits from Dusing, Lawrence, and Jeffrey Otis (a third lawyer).  (A-13.)  The government argued that no conflict existed because counsel's interests were not adverse to Hild's, that no lapse in representation occurred, and that a hearing was unnecessary.

Dusing's stunning 76-page affidavit (with an additional 45 pages of exhibits) (A-673) asserted that he was "not aware of much of the activity" in the Kentucky litigation during Hild's trial, including that the May 4 hearing had been scheduled; that Otis "handled all of the court filings" in Kentucky; that Dusing did not "cut short" Hild's case; and that the decision not to notice an expert was made because no expert was "willing to give the desired opinion and [because of] Hild's [un]willingness to pay."  (A-674-75, 683-84, 690, 695, 699-701, 707, 715, 723, 726, 729.)

Lawrence's affidavit asserted that the Kentucky litigation was not a distraction during Hild's trial, that Otis dealt with the Kentucky litigation during Hild's trial, and that Dusing "had limited (if any) involvement."  (A-797-804.)

48

Otis's affidavit asserted he "was responsible for, and worked on, day-to-day operations involving the pending domestic litigations during the trial of Hild," including "drafting and filing motions on behalf of Dusing." (A-805.)

On September 3, 2021, Hild filed a reply (A-806), together with affidavits from Hild (A-845), Allen Davis (the bond expert who had been identified, consulted with counsel, and drafted a preliminary report, but had not been noticed to testify) (A-847), and an attorney then with the undersigned's law firm (A-903). The reply explained that Dusing's affidavit was incredible on its face, as it was replete with transparent misrepresentations.

In particular, Dusing's claims that he was unaware of the activity in Kentucky during Hild's trial and that Otis prepared and handled all Kentucky filings were contradicted by the facts that Dusing signed two lengthy motions *pro se*; that the Otis and Lawrence affidavits made clear that Otis played only a minor role in Kentucky; that Dusing conceded the April 5 order in Kentucky was a "major event" whose "impact was maximally prejudicial" to him; and that Dusing's own paralegal confirmed that he was aware of the status of the Kentucky litigation and was concerned he would not make his May 4 hearing if he called defense witnesses in Hild's trial. (A-818-21; 906-09.) The reply further explained that, contrary to Dusing's assertions that Davis would not deliver a helpful opinion and would be too expensive, Davis said he would have confirmed (consistent with

49

the defense theory) that a bond's intrinsic value is the best estimate of its value in the absence of a liquid market (among other things), and Hild confirmed he never told Dusing he was unwilling to pay Davis's fee. (A-828, 845, 848.) The reply thus argued that the District Court should not credit or rely on Dusing's affidavit, and explained that the remaining evidence clearly established an actual conflict (and at minimum met the standard for a hearing). (A-816-18.)

During the year and a half Hild's motion was pending in the District Court, the parties filed numerous letters regarding further events in Kentucky. In September, November, and December 2021, Hild filed letters noting that Dusing had publicly posted videos making violent threats against opposing counsel, a Kentucky court employee, and the Kentucky court; that the Kentucky court referred the matter for criminal investigation; and that Dusing's behavior further confirmed that his affidavit was not credible. (A-850, 912-21.) In February and March 2022, Hild filed letters informing the District Court that Dusing had been suspended from the practice of law in Kentucky and Ohio. (A-859, 872.) On March 24, 2022, Hild filed a letter noting that another judge of the Kentucky family court concluded Dusing was not credible. (A-875.) On April 26, 2022, the government filed a letter claiming Dusing's "post-trial issues are irrelevant" to Hild's Rule 33 motion. (A-924.) The next day, Hild filed a letter explaining that

Dusing's post-trial conduct is relevant to the "key issue" whether to credit Dusing's affidavit. (A-927.)

On April 29, 2022, the District Court held oral argument on Hild's motion. (A-935.) In May 2022, Hild filed a letter noting that Dusing's petition to dissolve his Kentucky suspension had been denied, and that Dusing had harassed Lawrence in her home, prompting an emergency 911 call. (A-945.) In July 2022, Hild filed a letter explaining that disciplinary charges had been filed in Kentucky against Dusing, alleging he had asserted positions in court in bad faith, disrupted proceedings, attempted to falsify evidence, and made false statements and threats. (A-953.)

On August 9, 2022, the government filed a letter arguing that the disciplinary charges against Dusing were not based on the allegations contained in the bar complaint initially filed by Hild and thus somehow "call[ed] into question Hild's credibility." (A-957.) The government further suggested that Hild was not credible in light of certain Twitter posts he allegedly made.

In August 2022, Hild filed a letter reiterating that, over the course of nearly a year, the government had ignored the multiple serious issues demonstrating Dusing's lack of credibility; failed to respond meaningfully to Hild's letters detailing those issues; refused to disclaim its reliance on Dusing's affidavit; and instead attacked Hild's credibility. (A-962.) In September 2022, Hild filed a letter

stating that an Ohio disciplinary body said that it investigated certain Twitter posts threatening *Hild*, and linked those posts to Dusing's law office. (A-973.)

On December 7, 2022, the District Court issued an Opinion & Order denying Hild's motion for a new trial. (SPA-1.) At the outset, the District Court acknowledged that courts "[o]rdinarily" "will rely on an attorney affidavit to rebut attacks on a lawyer's alleged conflicts or ineffectiveness." (SPA-30.) Here, however, the District Court expressly declined to rely on Dusing's affidavit in light of his "deeply troubling conduct," which included his "threatening . . . a judge, staff attorneys, and opposing counsel" and his "suspension from the practice of law in two states." (SPA-30-31.)[4]

Notwithstanding that the facts were largely undisputed and that Dusing's affidavit was not credited, the District Court still denied Hild's motion. The District Court began by citing the legal standard, under which prejudice is presumed and a new trial required where the defendant shows (1) "that an actual conflict of interest existed, which arises when the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of

_____

[4] The number of misstatements in Dusing's affidavit is largely beyond the scope of this appeal. But it bears noting that notwithstanding those numerous misstatements (catalogued in the papers below (A-815-30)), the federal laws criminalizing misstatements to a federal court, and the admonition in Rule 3.4(a)(4) of the New York Rules of Professional Conduct that "[a] lawyer shall not . . . knowingly use perjured or false evidence," the government still asked the District Court to rely on Dusing's affidavit (A-941).

action"; (2) an "actual lapse in representation" shown by "some plausible alternative defense strategy not taken by counsel"; (3) and "causation," meaning that "the alternative defense was inherently in conflict with or not undertaken *due* to the attorney's other loyalties or interests." (SPA-32-33 (quotation marks omitted).)

The District Court also characterized Hild's three principal arguments: (1) that the schedule for Hild's trial "conflicted with the schedule in the Kentucky litigation" such that "Dusing's and Lawrence's strong interests in that proceeding were inherently in conflict with the ability to defend him at trial, including with their ability to mount a robust defense case that would last past May 4"; (2) that "Dusing and Lawrence were preoccupied with the Kentucky litigation, which led to a lack of preparedness and several errors at trial"; and (3) that "Dusing had reason to believe he faced disciplinary proceedings and thus had a personal interest in using Mr. Hild's trial to demonstrate his competency" (and thereby to avoid an adjournment or withdrawal in Hild's case). (SPA-36-37 (quotation marks and alterations omitted).)

Despite initially invoking the proper legal standard, the District Court elaborated on that standard incorrectly, writing that for a lawyer's interests to inherently conflict with a client's, the lawyer must have "'an actual adverse interest' in the outcome" of the client's case. (SPA-37.) Applying this faulty

53

standard, the District Court rejected Hild's claims, finding that "Dusing and Hild's incentives regarding the outcome of Hild's trial were still aligned — they both wanted to see Hild acquitted." (SPA-37.) The District Court acknowledged that "the Kentucky litigation implicated matters critically important to Dusing on a personal level," where he "faced the loss of custody over his daughter, among the most challenging circumstances any parent can confront," he "also stood accused of serious misconduct, both personal and professional," and where "it is clear that the May 4 hearing date presented, at the very least, potential overlap with Hild's trial." (SPA-38-39.) But given that Dusing and Hild both "wanted to see Hild acquitted," the District Court denied Hild's motion. (SPA-39 (quotation marks omitted).)

The District Court elaborated at length on its decision. With respect to Hild's claim that the May 4 hearing in Dusing's personal litigation inherently conflicted with his ability to put on a robust defense case at Hild's trial, the District Court found that "[w]hile the timing of Hild's trial may have posed a scheduling conflict for Dusing, it did not cause a divergence in their interests regarding the *outcome* of Hild's trial such that Dusing would have had any *incentive for the jury to return a guilty verdict*." (SPA-40 (emphasis added).) Because the "outcome of Hild's criminal case had no bearing whatsoever on Dusing's post-trial motions in his Kentucky family court case," the District Court wrote, "there was thus no

inherent conflict between the conference in Kentucky [on May 4] and Hild's ongoing trial, only a scheduling burden caused by proceedings held close together in time, along with any emotional or psychological toll occasioned by it." (SPA-41.)

The District Court also wrote that Hild had "not shown that any plausible trial strategies were foregone — let alone that they were foregone as a result of the scheduling of the May 4 hearing." (SPA-42.) As part of his motion, Hild had proffered testimony from Dusing's former paralegal (A-906-09), who explained that Dusing was "well-aware of the proceedings in Kentucky" and had stated, while planning Hild's defense case, that he "wouldn't be able to make his [May 4] hearing if we call all these witnesses" (SPA-42-43). The District Court "credit[ed] this proffered testimony as true," but nevertheless found that "it is unclear whether the witnesses referenced [who Dusing did not call] were actually available, what testimony they would have offered, or whether their testimony would have even been plausibly helpful to Hild's case." (SPA-43.) (Notably, despite finding these facts "unclear," the District Court did not hold a hearing.)

As to the absence of expert testimony, the District Court asserted that Hild ignored "that his defense team would have needed to notice and disclose any expert it intended to call at trial well before the May 4 hearing was even scheduled." (SPA-44.) But Hild had in fact noted that Dusing missed the expert

disclosure deadline of February 15, 2021 because that was just a week before Dusing's own Kentucky trial began, and in any event Dusing could have sought to excuse the late notice. (A-12 (07/27/2021 Hild Mem. in Supp. of Motion at 34-35).) The District Court also found that neither Dusing's and Lawrence's "preoccupation" with the Kentucky proceedings, nor Dusing's anticipated disciplinary proceedings, created an actual conflict. (SPA-45-48.)

Finally, the District Court noted that because it found that Dusing did not have an actual conflict, "it need not evaluate in the alternative whether Lawrence, a more junior lawyer with no criminal experience, was conflicted or could have provided effective assistance notwithstanding Dusing's representation." (SPA-48 n.8.)

Having found no actual conflict between Hild and Dusing, the District Court analyzed Hild's claim under *Strickland*, and held that Hild failed to establish counsel's deficient performance or prejudice. (SPA-49-53.) Hild principally argued that Dusing's failure to call the bond expert Davis was deficient and prejudicial because Davis's testimony would have established that in the absence of an active market, the value of the bonds here is best estimated using the bonds' intrinsic values. (A-847-49.) The District Court denied Hild's motions without a hearing. (SPA-31, 50.)

### C. This Court Should Order a New Trial Because Hild's Counsel Labored Under An Actual Conflict of Interest Such that Prejudice is Presumed Under *Sullivan*, and the District Court Erred in Finding Otherwise

This Court should order a new trial, on *de novo* review. Hild's motion squarely established all of the necessary elements of an actual conflict of interest such that prejudice is presumed and a new trial required. Hild's motion showed that (1) Dusing did not disclose his personal Kentucky litigations to Hild, and Hild did not provide informed consent to any conflict in writing or otherwise (A-669); (2) Dusing's and Hild's interests "diverged" with respect to a course of action, namely, putting on a robust defense case with additional defense witnesses and exhibits (where such a defense case would conflict with Dusing's personal interests in the May 4 hearing in Kentucky, and Lawrence's interests in that hearing as Dusing's counsel); (3) calling defense witnesses (including a key expert witness) is a "plausible alternative defense strategy"; and (4) Dusing's decision not to mount a robust case was "due to" the Kentucky litigation, where Dusing's own paralegal — whose proffered testimony the District Court credited (SPA-43) — said as much, and where Dusing was otherwise preoccupied. Hild's motion thus met the *Sullivan* standard by demonstrating "a conflict inconsistent with a plausible trial strategy or tactic," necessitating a new trial. *Malpiedi*, 62 F.3d at 470.

Instead of applying the proper standard, the District Court invented a new standard that necessarily led to the denial of Hild's motion, despite the fact that the

57

District Court generally accepted Hild's allegations as true and declined to credit Dusing's affidavit. This Court has stated that "the applicable standard requires *only* the demonstration of a conflict inconsistent with a plausible trial strategy or tactic." *Id.* (emphasis added); *see United States v. Arrington*, 941 F.3d 24, 43 (2d Cir. 2019) (applying *Malpiedi* and vacating conviction). But the District Court, under its invented standard, required Hild to demonstrate not only that Dusing's conflict was inconsistent with a plausible trial strategy, but also that Dusing's conflict gave him an incentive for Hild to be found guilty. Applying this faulty standard, the District Court incorrectly stated that Hild failed to show an actual conflict because there was no "divergence in their interests regarding the outcome of Hild's trial such that Dusing would have had any incentive for the jury to return a guilty verdict." (SPA-40.) That is, the District Court incorrectly required Hild to show that Dusing had "'an actual adverse interest' in the *outcome*" of Hild's case. (SPA-37 (emphasis added).) Having crafted this incorrect standard, the District Court found that Hild had not met it, writing that "Dusing and Hild's incentives regarding the outcome of Hild's trial were still aligned — they both wanted to see Hild acquitted." (SPA-37.)[5]

---

[5] Had the matter proceeded to a hearing, Hild expected the evidence to show that Dusing did have an incentive to lose, given that Hild's fees were effectively funding Dusing's personal Kentucky litigations.

The District Court's decision flies in the face of this Court's binding case law. This Court has never held that *Sullivan*'s "actual conflict" standard applies only in those rare cases where the lawyer not only has a conflict, but also has an incentive to lose the case. In *Malpiedi*, for example, this Court found that counsel had an actual conflict where counsel's prior representation of a witness before the grand jury conflicted with the defendant's interest in a full cross-examination of that witness. *See* 62 F.3d at 469-70. The district judge in that case denied the defendant's new trial motion based on the conflict, finding that notwithstanding counsel's prior representation of the witness, counsel had performed a "very effective" cross-examination of the witness. *Id.* at 468. This Court reversed, finding that "the applicable standard requires only the demonstration of a conflict inconsistent with a plausible trial strategy or tactic," and further cross-examination "even if not mandatory, was certainly a plausible strategy." *Id.* at 470.

Consistent with *Malpiedi*, Hild did not need to demonstrate that Dusing had an "incentive for the jury to return a guilty verdict," as the District Court erroneously held. (SPA-40.) The attorney in *Malpiedi* did not have an "incentive for the jury to return a guilty verdict" and did not even refrain entirely from cross-examination of the attorney's prior client. Rather, the attorney merely refrained from cross-examination in one respect, and this Court still found — contrary to the District Court's ruling there — that a new trial was required.

59

This Court's observation that "the applicable standard requires *only* the demonstration of a conflict inconsistent with a plausible trial strategy or tactic" applies with equal force here, as calling additional defense witnesses and introducing exhibits (which likely would have prolonged the trial past May 4), "even if not mandatory, was certainly a plausible strategy" requiring a new trial. *Malpiedi*, 62 F.3d at 470 (emphasis added); *see United States v. Cancilla*, 725 F.2d 867, 871 (2d Cir. 1984) (counsel's failure to mount more vigorous defense case due to conflict required new trial).

In crafting an incorrect standard, the District Court miscited and misconstrued this Court's precedent. The District Court wrote:

> Actual conflicts arise when "counsel's inability to make [] a conflict-free decision" is so substantially impaired [sic] that a court may not rely upon the result of the adversarial system. [*United States v.*] *Williams*, 372 F.3d [96,] 106 [(2d Cir. 2004)]. The Kentucky litigation itself did not form such a divergence of incentives, such that Dusing had "had [sic] an actual adverse interest" in the outcome of Hild's trial. *Mathis v. Hood*, 937 F.2d 790, 795 (2d Cir. 1991). In other words, unlike the types of conflicts that the Second Circuit have [sic] found to be actual conflicts, Dusing and Hild's incentives regarding the outcome of Hild's trial were still aligned — they both wanted to see Hild acquitted.

(SPA-37.)

Every sentence in this paragraph is problematic. In the first sentence, the District Court presumably means "ability" rather than "inability," and intends to say that "[a]ctual conflicts arise when counsel's [*ability*] to make a conflict-free decision is so substantially impaired that a court may not rely upon the result of the

adversarial system." (SPA-37 (quotation marks omitted).) Beyond the apparent typo, however, the citation to *Williams* is misplaced. Nothing in *Williams* suggests that the way to assess whether an actual conflict is present is to look at whether counsel's decision-making ability is "substantially impaired," as the District Court writes. A standard assessing "substantial impairment" is the District Court's invention. In the full (mis)quoted language from *Williams* (which is itself an unattributed quote from *Malpiedi*), this Court says that "[c]ounsel's inability to make such a conflict-free decision *is itself a lapse in representation*." *Williams*, 372 F.3d at 106 (quoting *Malpiedi*, 62 F.3d at 469) (emphasis added). In the language from *Williams* that the District Court cut from its partial quote — "*is itself a lapse in representation*" — this Court makes plain that when counsel is operating under a conflict, that circumstance in "*itself*" is a "lapse in representation," regardless of whether counsel's decision-making ability is "substantially impaired," as the District Court wrote.

The second sentence of the District Court's paragraph is even more problematic. The District Court writes: "The Kentucky litigation itself did not form such a divergence of incentives, such that Dusing had 'had [sic] an actual adverse interest' in the outcome of Hild's trial," citing "*Mathis v. Hood*, 937 F.2d 790, 795 (2d Cir. 1991)." The District Court's reliance on *Mathis* is misplaced. *Mathis* concerned the standard for "*per se*" conflicts, *Mathis*, 937 F.2d at 795, a

standard the District Court elsewhere acknowledged as distinct from the standards governing "actual conflicts" (as present here) and "potential conflicts." (SPA-32.) Further, in the language the District Court quotes from *Mathis*, this Court was merely summarizing a specific finding from the district court in that case, rather than expressing the applicable standard. The full sentence from which the District Court quotes states that the district court in *Mathis* "rejected the state's argument that the conflict was speculative and found that [the lawyer] *had an actual adverse interest* in the outcome of [his client's] appeal." 937 F.2d at 795 (emphasis added). This language in *Mathis*, contrary to the District Court's usage of it, does not purport to articulate the governing standard for assessing when an actual conflict is present; rather, it merely articulates one (extreme) circumstance that satisfies the standard. Still, in the very next sentence, the District Court doubles down, writing that "[i]n other words, unlike the types of conflicts that the Second Circuit have [sic] found to be actual conflicts, Dusing and Hild's incentives regarding the outcome of Hild's trial were still aligned — they both wanted to see Hild acquitted." (SPA-37.) Nothing in *Mathis* or this Court's other case law, however, measures the presence of an attorney's conflict by whether the attorney has an incentive to see a client convicted or acquitted, and the District Court's holding to the contrary was erroneous and inconsistent with decisions such as *Malpiedi*.

The next paragraph in the District Court's opinion also fails to accurately reflect this Court's precedent. The District Court wrote, "where, as here, an attorney faced with a choice between his client's trial and a personal or other professional obligation chooses to prioritize that obligation over his 'ethical obligation to dutifully represent his client,' *Strickland* provides the appropriate remedy. *O'Neil*, 118 F.3d at 71." (SPA-37-38.) But in language in *O'Neil* the District Court omits, this Court made plain that *O'Neil*'s rule is for cases involving *fee disputes*. The full quoted sentence reads: "To the extent that the attorney shirks his ethical obligation to dutifully represent his client *as a result of a fee dispute*, we believe *Strickland* provides the appropriate analytic framework." 118 F.3d at 71 (emphasis added). *O'Neil* does not purport to set the rule for cases where "an attorney faced with a choice between his client's trial and a personal or other professional obligation," as the District Court would have it. In fact, in the same paragraph, *O'Neil distinguishes* its fee-dispute-specific rule from cases involving "multiple representation," for which *Strickland* is *not* appropriate. The present case more closely resembles those multiple representation matters than a fee dispute.

Under the correct standard set by this Court, which "requires *only* the demonstration of a conflict inconsistent with a plausible trial strategy or tactic," *Malpiedi*, 62 F.3d at 470 (emphasis added) — that is, a trial strategy or tactic that

"possess[es] sufficient substance to be a viable alternative," *Eisemann*, 401 F.3d at 107 — this Court should order a new trial, as Dusing's and Lawrence's conflicting obligations in Kentucky were inconsistent with multiple plausible trial strategies for Hild. Most obviously, they could have called an expert witness to discuss the propriety of LWF's methodology and the lack of liquidity in the bond market; such testimony was critical to Hild's defense given the "complicated" nature of the bonds and the "subjective" pricing methodologies. *See United States v. Litvak*, 808 F.3d 160, 182 (2d Cir. 2015). They also could have called additional fact witnesses, including other LWF employees or an IDC representative.

The District Court suggested that Hild "fail[ed] to connect the absence of these witnesses to the scheduling of the May 4 hearing," stating that "there is no allegation that these witnesses were prepared to testify, or that they were waiting in the wings or sent home at the last minute to cut the defense case short." (SPA-43.) But here too the District Court applied the wrong standard. There is no requirement that witnesses be "waiting in the wings"; this Court "requires only the demonstration of a conflict inconsistent with a plausible trial strategy or tactic," *Malpiedi*, 62 F.3d at 470. Hild met that standard — Davis, for one, had met with Hild's team and could have testified — and the District Court wrongly resolved questions of causation against Hild without holding a hearing. In any event, Dusing's own paralegal, for one, provided the causal connection the District Court

64

sought in a proffered statement — which the District Court credited — stating that putting on additional witnesses in Hild's trial would mean Dusing "wouldn't be able to make his hearing" in Kentucky on May 4. (SPA-43.)

Separately, the District Court suggested that Dusing's failure to provide an expert notice meant that the decision not to introduce expert testimony was not due to Dusing's conflict (SPA-44), but the expert notice was due at a time in February 2021 when Dusing was preoccupied with his Kentucky case, which went to trial just a week after notice was due. More importantly, district courts have "wide latitude" to permit evidence notwithstanding late disclosure, *United States v. Giraldo*, 822 F.2d 205, 212 (2d Cir. 1987), and it was at least a "plausible" strategy for Dusing to try (even belatedly) to introduce expert testimony.

The District Court expressed a concern that finding an "actual conflict" under *Sullivan* "would dramatically alter the existing legal framework" and "open the floodgates" to claims of purported conflicts "every time a lawyer has a family vacation, obligations to care for an ailing loved one, or a child to pick up from daycare." (SPA-38.) But Dusing's and Lawrence's conflicts bear no resemblance to the ordinary scheduling conflicts that arise in everyday life. Rather, their conflicts relate specifically to their undisclosed work in pending cases in other courts for other clients (Dusing represented by Lawrence and himself), where that work conflicted with the work necessary for Hild's defense. Such circumstances

65

fall comfortably within the *Sullivan* framework, and there is no reason to think a ruling in Hild's favor on the unique facts here will result in a flood of comparable motions. For one thing, the Rules of Professional Conduct generally prevent what occurred here. For another, this Court previously has vacated convictions where a lawyer's conduct was comparatively less egregious. *See United States v. Parse*, 789 F.3d 83, 98, 112-20 (2d Cir. 2015) (vacating conviction where lawyer failed to disclose concerns of juror bias).

Finally, the Supreme Court has repeatedly rejected the "floodgates" concern in cases involving allegations of ineffective assistance. *See Lafler v. Cooper*, 566 U.S. 156, 172 (2012) (finding "floodgates" concern was "misplaced," where "[c]ourts have recognized claims of this sort for over 30 years" and "there is no indication that the system is overwhelmed"); *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("[w]e confronted a similar 'floodgates' concern in [a prior case], but a "flood did not follow in that decision's wake"). *Sullivan* has been on the books for more than four decades, and no parade of horribles has occurred; there is no reason to think a ruling in Hild's favor — applying the longstanding law to the extraordinary facts of this case — would result in the consequences the District Court feared. Rather, a ruling in Hild's favor is necessary precisely to confirm that *Sullivan* is not rendered a hollow precedent. If the facts here can be shoehorned

66

into the *Strickland* standard, then future cases of severe attorney misconduct and conflicts risk going unremedied.

For all of the foregoing reasons, this Court should order a new trial.

### D.    This Court Should Order a New Trial Under *Strickland*

Dusing's and Lawrence's misconduct described above, combined with their failure to notice and call an expert witness at trial, was constitutionally deficient under *Strickland*.  To demonstrate a violation of the Sixth Amendment right to effective assistance, a party must show that (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) "the deficient performance prejudiced the defense."  *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 687-98).

In assessing Hild's claim under *Strickland*, the District Court "assum[ed] the failure to call [the bond expert] Davis was unreasonable," but found that "the absence of his testimony" was not prejudicial.  (SPA-50.)  The District Court recited Davis's preliminary findings that:

> (a) in the absence of an active, liquid [] securities market, the value of a mortgage security is the value of the estimated discounted future cash flows (intrinsic value); (b) there was no active, liquid market for the HECM IO bonds; and (c) it is appropriate for a CEO to rely on other officers in the company, and in particular the CFO, in valuing company assets [when preparing accurate financial statements].

(SPA-50.)  The District Court allowed that testimony on these points "may have been somewhat helpful to Hild's case," but held that "it would not have affected

the outcome of the trial with any reasonable likelihood" because "each of these arguments were already presented to the jury through other testimony." (SPA-50.) In the District Court's view, the jury already heard testimony from LWF employees and the lenders that "the liquid market for the HECM IO bonds was, at best limited," and (from cooperating witnesses) that the "Scenario 14 assumptions model began as an academic exercise to value the bonds." (SPA-50-51.) The District Court explained, however, "there was ample evidence to the contrary — that above-market prices were submitted to IDC in order to generate cash for [LWF — and that lenders expected the IDC prices would reflect an independent third party's evaluation of the price for which the bonds could be sold." (SPA-51.) In the District Court's view, "[w]hile the expert's testimony may have been helpful to support Hild's own testimony that the prices were an effort to 'get it right,' it is not . . . reasonably likely that the expert's testimony would have changed the jury's verdict." (SPA-51.)

The District Court's analysis, however, betrays a misunderstanding of the record. First, it is wrong that Davis's findings "were already presented to the jury through other testimony." (SPA-50.) Davis's key point is that in the absence of an "active, liquid market," the bonds' value could not be assessed by looking at purchase and sale prices, and instead needed to be assessed by looking at their "intrinsic value," *i.e.*, the "value of the estimated discounted future cash flows."

68

(A-848.)  There was no comparable testimony whatsoever at trial.  None of the testimony the District Court cited as ways in which Davis's testimony was "already presented" to the jury said what Davis would have said.

Second, the District Court was also wrong in its assessment that Davis's testimony would have been merely "helpful to support Hild's own testimony that the prices were an effort to 'get it right,'" and would not have "changed the jury's verdict."  (SPA-51.)  The District Court once again missed the key point of Davis's findings, which is that because there was no "market" value for the bonds (in the traditional sense), the most accurate "value" of the bonds *was* their intrinsic value. Davis's testimony would likely have led to Hild's acquittal because the government's entire case rested on the argument that Hild misrepresented the "market" value of the bonds; had the jury understood that the *correct* value of the bonds was the intrinsic value, which is what Hild and LWF tried to assess, the jury would have better understood that nothing was misrepresented.

This Court has repeatedly recognized that the failure to call an expert witness in a case where expert testimony is foreseeably important can amount to ineffective assistance of counsel.  *See United States v. Melhuish*, 6 F.4th 380, 388 (2d Cir. 2021); *Eze v. Senkowski*, 321 F.3d 110, 130 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001); *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993).  Here, expert testimony was important due to the

69

complicated issues at trial, including the central issue of how properly to value complex bonds in an illiquid market. Yet, Dusing did not seek to introduce expert testimony, notwithstanding that he previously had identified and consulted with Davis, who drafted a preliminary report. (A-857.)

Third, Dusing's failure to call an expert was also prejudicial because the government elicited (and relied on in summations) improper lay opinion testimony that the bond prices LWF gave to IDC were "overvalued," "mark[ed] up," "wrong," and a "fraud." (A-269, 273, 305, 312, 314, 323-24, 328, 472, 592, 595-96, 601.) Davis's testimony would have squarely countered the government's arguments.

Because Dusing's performance was deficient and prejudicial under *Strickland*, this Court should order a new trial.

## POINT IV

### This Court Should Order a New Trial Based on Newly Discovered Evidence of the Lenders' Windfall Gains from the Bonds

The evidence at trial established that the purported victim lenders loaned money to LWF secured by collateral — bonds that produced steady and substantial income known as "coupon payments" — and that upon LWF's default, the lenders took possession of the bonds and the income from the coupon payments. (A-71-72, 152, 213-14, 231, 236-37, 253, 292.) But over two years after trial, the government for the first time produced evidence showing the extent to which the

70

lenders secretly received tens of millions of dollars in coupon payments (the "Newly Discovered Evidence"). (A-1016, 1073-1128.)

The Newly Discovered Evidence contradicted the government's trial arguments, corroborated Hild's defense case, and revealed that the lenders provided misleading testimony at trial. Had that evidence been timely produced, the jury likely would have acquitted, because the evidence showed that (1) the bonds were performing in line with LWF's valuation (and thus were properly and not fraudulently valued), (2) Hild lacked intent to defraud, and (3) the lenders were not misled, as the government claimed. Accordingly, a new trial is necessary.

**A. Relevant Facts**

The government's central theme at trial was that the bonds were fraudulently overvalued and that the lenders got "stuck with the bonds," which were all but worthless, after LWF's default. (A-60, 588.) One of Hild's defenses was that he lacked intent to defraud and acted with good faith, including because he believed the "lenders were secured[,] not by liquidating the [bonds] but by the revenue streams generated thereby." (A-247, 606-07.) Hild argued that, in the event the lenders took possession of the bonds upon LWF's default, and held the bonds and collected the income from the regular coupon payments, that "cash flow coming in year after year" would be sufficient quickly to make the lenders whole. (A-606-07.) The government, however, told the jury that argument was "magical"

71

thinking; characterized it as an argument "that the lenders *someday*, maybe if they held these bonds *forever*, *someday* they would be paid off by the cash flows"; and argued that "it doesn't matter that Hild has some *fantasy* that *30 years from now* the bonds will pay off, the lenders will get repaid." (A-613-14 (emphasis added).)

The trial testimony from the lenders tracked the government's argument. Three lenders' representatives testified. On behalf of Mirae, Richard Misiano testified that when LWF defaulted, Mirae took possession of the bonds and "sold" them. (A-210.) The government asked, "how would you describe [Mirae's] loss," and Misiano replied that "it was a significant amount of money and reputation damage" and "effectively wiped out the fixed income P [and] L, which was the vast majority of the profitability of the firm in 2018." (A-210.) On cross-examination, however, Misiano said "I apologize," and corrected his earlier testimony, stating that Mirae "sold a small amount of the bonds" but "hold[s] the majority of the bonds." (A-213.) Counsel followed up by asking whether Mirae was still holding some of the bonds and receiving revenue streams through coupon payments, and Misiano answered affirmatively. (A-214.) Counsel asked whether the future revenue streams generated by holding the bonds could "be more than the amount of the loan to LWF," and Misiano answered that "you can't recover on the loan" based on the revenue streams. (A-214.) The Newly Discovered Evidence

reveals, however, that at the time of trial, Mirae *already* had received at least $25 million in coupon payments over just a brief period. (A-1087.)

On behalf of ICBC, Alan Levy testified that holding the bonds after LWF's default "is not what we'd ever do." (A-232.) But the Newly Discovered Evidence shows that claim was inaccurate: ICBC did in fact effectively hold the bonds for nearly two years and received nearly $40 million in coupon payments. (A-1114.)

On behalf of Flagstar, Joe Redoutey testified that after Flagstar placed LWF in default, Flagstar obtained the bonds and subsequently sold them; that Flagstar could have decided to hold the bonds; and that if Flagstar had done so, it would have received revenue from them. (A-242, 253.)

After trial, on January 20, 2023, the government submitted affidavits from four lenders — Mirae, ICBC, Flagstar, and Customers Bank — to establish the loss amount for purposes of sentencing. (A-16.) The government also acknowledged, however, that the affidavits were "not sufficiently detailed to determine" a restitution amount, and requested the restitution calculation be deferred. (SPA-89.) The District Court deferred the issue to April 27, 2023. (SPA-74.)

On April 24, 2023, the government filed a letter stating (without explanation) that "[h]aving further reviewed" the lenders' affidavits, a restitution amount could be calculated, and requested over $69 million. (A-996.) In response, Hild argued that the affidavits still were insufficient. (A-1013.) On the

same date, the District Court again deferred a ruling, and directed the parties to file additional letters.  (A-1016.)

On May 16, 2023, in response to the District Court's order, the government requested over $73 million in restitution, together with the Newly Discovered Evidence — *i.e.*, exhibits from the four lenders (Mirae, Flagstar, ICBC, and Customers Bank).  (A-1073-1128.)

On May 29, 2023, Hild filed a response to the restitution calculation along with a Rule 33 motion for a new trial.  (A-19.)  Hild argued that the Newly Discovered Evidence showed that the lenders secretly received regular and enormous coupon payments from the bonds they held, and thus (1) impeached the lenders' testimony about the lack of revenues the bonds generated, (2) contradicted the government's trial arguments (which inaccurately portrayed the coupon payments as minimal), and (3) corroborated Hild's defense that the bonds were properly valued and that he lacked intent to defraud.  The government filed responses, and Hild filed a reply.  (A-19-20.)

On July 17, 2023, the District Court issued an order directing the government to "indicat[e] its position" on producing "additional discovery regarding the victims' calculations of losses (including their receipt of any coupon payments while holding the bonds at issue, and how they arrived at a fair market value for the bonds)."  (A-20.)  On August 4, 2023, the government filed a letter

reiterating its position in opposition to producing additional discovery on coupon payments. (A-20.)

On August 9, 2023, the District Court held oral argument. (A-1063.) On September 12, 2023, the District Court issued an Opinion & Order denying the motion for reasons set out below. (SPA-76.)

### B. Discussion

This Court reviews a district court's denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009). A new trial is appropriate where "(1) the evidence is newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Vernace*, 811 F.3d 609, 620 (2d Cir. 2016) (alterations omitted). Each element is satisfied here.

As to the first element, the District Court did not contest that the detailed breakdown of the massive coupon payments the lenders received was "newly discovered." The information in the Newly Discovered Evidence (which the government produced in May 2023) sharply conflicted with the trial evidence. The lenders testified the coupon payments would not meaningfully compensate for their losses, but that was not so: The lenders received millions of dollars in such

payments before, during, and after the trial.  (*E.g.*, A-1087, 1114.)  Piggybacking

on the lenders' misleading testimony, the government at trial derided the defense's

argument that coupon payments could compensate the lenders as a "fantasy"

(A-247, 616), but the Newly Discovered Evidence confirmed that the lenders

received enormous benefits by holding the bonds for even a brief period (and may

even have profited).[6]

     As to the second element (diligence), the District Court stated that it was

"unclear" whether Hild could reasonably have obtained the coupon payment

information prior to trial.  (SPA-94.)  According to the District Court, Hild was

"aware" the lenders received coupon payments because counsel (briefly and

superficially) cross-examined the lenders on that issue, and accordingly "could

have issued Rule 17(c) subpoenas" or used a "provider[] of publicly available

financial data" to obtain "some details related to the coupon payments."  (SPA-94.)

But the question is whether Hild would have been able to acquire the coupon

payment data prior to trial "without unusual effort."  *DiMattina v. United States*,

949 F. Supp. 2d 387, 397 (E.D.N.Y. 2013).  Here, Hild could not reasonably have

obtained the detailed information on coupon payments necessary to cross-examine

the lenders where (1) Hild did request discovery from the government at the outset

---

[6] Hild informed the District Court that Davis, the bond expert, is available to provide testimony, including to explain that Mirae has suffered no loss and has likely profited by tens of millions of dollars.

of the case; (2) the government resisted producing the coupon payment data for months after sentencing until the District Court ordered it to do so (A-1016); and (3) even now, the information *still* is incomplete (A-23 (11/20/2023 Hild Letter and 12/13/2023 Order)).

The District Court also was wrong to endorse the government's assertion that the necessary data from the lenders could be obtained from public sources. If such data were readily available, the government could have obtained and submitted it months ago. That the District Court felt compelled — after over nine months of restitution proceedings — to refer the restitution issue to the Magistrate Judge for an examination of whether additional discovery was warranted (A-1137) corroborates that the Newly Discovered Evidence could not readily have been obtained prior to trial. For these reasons, where the new evidence was not available "through no fault of" Hild and contradicts prior sworn testimony, the diligence prong is met. *United States v. Carmichael*, 269 F. Supp. 2d 588, 597, 600 (D.N.J. 2003).

As to the third element (materiality), the District Court found that the newly discovered evidence was not material because the government established "contemplated harm" at trial by showing that Hild knew there was a "distinction between what [LWF] represented to be the market value of the bonds and the[ir] actual market value," and therefore "[p]roof that the lenders eventually recouped

some — or, indeed, even all — of the collateral initially represented by [LWF] via coupon payments" (*i.e.*, proof going to "actual harm") is "immaterial." (SPA-93-94.)

The District Court has its analysis backwards. The Newly Discovered Evidence is material because it corroborates that Hild did not "contemplate harm." As a result of the incomplete trial evidence, the government felt free to argue in summation that LWF's bond submissions were artificially inflated and "fake" prices (A-588-89, 591, 595, 601); that the bond portfolio was "fraudulently overvalued" (A-589); that Hild "kept [the lenders] in the dark about how undercollateralized they were" (A-591); that "the lenders lost tens of millions of dollars" (A-591); that defense counsel's argument that the prices were not a "markup" was "baloney" (A-595); that defense counsel's suggestion that the lenders "were repaid" was "offensive" (A-616); and that "the lenders someday, maybe if they held these bonds *forever*, *someday* they would be paid off by the cash flows," and "[j]ust because someday in some *magical world* things will all work out, that's not a defense of fraud," "[s]o it doesn't matter that Hild has some *fantasy* that 30 years from now the bonds will pay off, the lenders will get repaid" (A-616 (emphasis added)).

The Newly Discovered Evidence, however, supports the defense's argument that the lenders were fully secured and could be fully repaid had they held the

bonds. This new evidence demonstrates the lenders gave misleading testimony about their unwillingness to hold the bonds and the lack of revenues the bonds generated, and supports Hild's defense that the bonds were properly valued and not "inflated," and that he lacked intent to defraud because he (correctly) believed that the lenders were secured by the coupon payments. The District Court missed that the Newly Discovered Evidence is material because it strongly supported the defense case and seriously undermined the government's case. *See United States v. Siddiqui*, 959 F.2d 1167, 1173 (2d Cir. 1992) (newly discovered document was superior corroboration than defendant's own testimony).

As to the fourth element, the District Court found that the Newly Discovered Evidence was "merely cumulative" because "it was hardly a secret at trial that coupon payments to the tune of millions of dollars were generated by the [] bonds," as shown by the "financial statements reflecting the millions of dollars that *Live Well* was receiving" from coupon payments. (SPA-96 (emphasis added).) But the fact that *LWF* received coupon payments is wholly different from what the Newly Discovered Evidence shows, namely, the coupon payments the *lenders* received. This evidence was not before the jury and therefore was not cumulative.

The District Court also found that the Newly Discovered Evidence was "merely impeaching" because it undermined the lenders' testimony. Although the evidence did impeach the lenders, the evidence was not "*merely*" impeaching. The

Newly Discovered Evidence also corroborated aspects of Hild's defense case, including that he lacked intent to defraud because he believed the "lenders were secured not by liquidating the [bonds] but by the revenue streams generated" by the coupon payments. (A-247, 606-07.)

Finally, as to the fifth element, the Newly Discovered Evidence likely would have resulted in an acquittal. The key issues at trial were falsity and intent. The government claimed the lenders were fooled into believing the bonds that secured their loans had fraudulently inflated values. But the Newly Discovered Evidence confirms the lenders were not fooled at all, and in fact obtained bonds whose value is confirmed by the massive coupon payments received over a brief period. The Newly Discovered Evidence firmly supports Hild's defense case.

A Rule 33 motion should succeed where the weight of the evidence was not overwhelming, the government's case has been weakened by the new evidence, and the new evidence casts doubt on the verdict, even if the verdict is otherwise supported by legally sufficient evidence (which it is not). *E.g.*, *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005). Had the new evidence been timely disclosed, the defense would have (1) impeached the credibility of the lenders, (2) rebutted a central line of argument pursued by the government, and (3) shown Hild's lack of intent. Accordingly, a new trial is warranted. *See United States v. Mahaffy*, 693 F.3d 113, 132 (2d Cir. 2012) (vacating conviction where "suppressed

[evidence] would have been useful [] to impeach" key witness and "called squarely into question [his] credibility"); *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (granting new trial where new evidence showed key witness testimony was false), *abrogated on other grounds by Ciminelli*, 143 S. Ct. 1121.

## POINT V
### This Court Should Order a New Trial Because the District Court Failed to Recuse Itself As a Result of Possible Conflicts

Possible conflicts should have led the District Court to disqualify itself pursuant to 28 U.S.C. § 455(a), which provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This Court "evaluate[s] partiality under § 455(a) 'on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance.'" *United States v. Rechnitz*, 75 F.4th 131, 142 (2d Cir. 2023). This Court reviews "a district court's decision not to recuse itself for abuse of discretion." *Id.*

Here, the law firm Davis Polk & Wardwell LLP — at which the District Court's spouse is a partner (and at which the District Court previously was employed) — represented multiple parties (Mizuho, ICBC, and IDC's parent company) whose interests plainly were adverse to Hild's. (A-15 (12/28/2022 Hild Letter).) At trial, the government alleged that Mizuho and ICBC were two of the victims of the fraud (A-590-91, 593), and ICBC now stands to benefit financially

81

from the verdict, including through the $20 million in restitution the government

seeks for ICBC.  (A-23 (10/31/2023 Gov't Letter).)  The government also argued

that Hild "was IDC" and "controlled IDC."  (A-590.)

      The District Court's rationale for not disqualifying itself was that its spouse

"had no involvement with any representation" of Mizuho, ICBC, or IDC's parent

company.  (SPA-65.)  But just two weeks beforehand, in another matter, the

District Court made the opposite decision in a case with less compelling facts.  In

*United States v. Bankman-Fried*, the District Court recused itself because Davis

Polk "advised FTX" (a victim in that case) together with other "parties that *may* be

adverse to FTX and Defendant Bankman-Fried."  *United States v. Bankman-Fried*,

No. 22-CR-673 (RA) (S.D.N.Y.) (Dkt. 23) (emphasis added).  The District Court

similarly stated that its spouse "had no involvement" in those representations, but

nevertheless recused "to avoid any possible conflict, or the appearance of one."  *Id.*

      The District Court did not explain why Hild's case warranted different

treatment, and its arbitrary and unexplained decision not to recuse creates "the

appearance of partiality."  *Rechnitz*, 75 F.4th at 142.  That is particularly so given

that the District Court previously acknowledged that cases involving Davis Polk

"would present a potential conflict of interest" and thus committed to "recuse

[itself] from cases in which Davis Polk represented a party or appeared."  (Ronnie

Abrams, "U.S. Senate Committee on the Judiciary, Questionnaire for Judicial

Nominees," at 30 (July 26, 2011), *available at*

judiciary.senate.gov/imo/media/doc/RonnieAbrams-PublicQuestionnaire.pdf.)

Notwithstanding that commitment to recuse, Davis Polk here has represented (in

other matters) two victims and another party adverse to Hild. To the extent recusal

is a "close case[]," this Court has stated that in such cases "the balance tips *in favor*

*of recusal*." *Rechnitz*, 75 F.4th at 143 (emphasis added).

The District Court's decision not to recuse itself also was based on "a clearly

erroneous factual finding." *Id.* at 142. The District Court found that the lenders

represented by Davis Polk were two of "many victims here," but there were not

"many victims": ICBC and Mizuho are just two of a handful of lenders, and IDC

was a central player at trial. The District Court now is in a position to award ICBC

some $20 million in restitution. (A-23 (10/31/2023 Gov't Letter).)

Accordingly, the District Court's failure to recuse constitutes an abuse of

discretion, and warrants a new trial and reassignment. This Court considers three

factors "in determining how best to address a violation of § 455(a)." *United States v.*

*Amico*, 486 F.3d 764, 777 (2d Cir. 2007) (citing *Liljeberg v. Health Serv. Acq. Corp.*,

486 U.S. 847, 862 (1988)). All three factors strongly support a new trial. As to the first

factor — "the risk of injustice to the parties" — absent a new trial, Hild will have been

prejudiced by the potentially conflicted District Court (1) presiding over a trial in which

its former firm and its spouse's current firm has represented two victims and another

party whose interests are adverse to Hild's, and now, following Hild's conviction, (2) being in a position to award one such victim millions in restitution. As to the second factor — "the risk that the denial of relief will produce injustice in other cases" — the potential conflict here already has arisen in other cases (including *Bankman-Fried*), and likely will arise in future cases, as Davis Polk is a large law firm with many clients, and foreseeably will represent players in future cases before the District Court. As to the third factor — "the risk of undermining the public's confidence in the judicial process" — in light of the District Court's unexplained decision not to recuse, absent a new trial in this case that already has drawn significant public attention, the public's confidence in the judicial process risks being undermined. *Id.* at 777-78 (ordering new trial and reassignment in light of potential conflict under *Liljeberg*); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 132-33 (2d Cir. 2003) (same).

## POINT VI

### The Cumulative Prejudice of the Foregoing Errors Deprived Hild of a Fair Trial

The foregoing errors, viewed cumulatively, "infected every stage of the trial" and thus require vacatur. *Certified Envtl. Servs.*, 753 F.3d at 96. Taken together, Hild was deprived of a fair trial because (1) the jury instructions upon which the government's theory of conviction rested (and its arguments to the jury were made) were plainly erroneous after *Ciminelli*; (2) Hild's conflicted counsel failed to call an expert to testify on key issues and cut short his defense case so that Hild's trial would end before a key

hearing in counsel's personal litigation; (3) the government failed to disclose important evidence demonstrating that Hild correctly believed the lenders were fully secured, thus leaving the jury without corroboration for Hild's defense of lack of intent; and (4) the District Court oversaw the trial and sentencing notwithstanding its potential conflicts of interest. Accordingly, even if this Court "would hesitate to vacate" for "any one of the errors discussed above in isolation" — and it should not hesitate — the Court should "consider[] the record as a whole," and find that, on the facts here, the "cumulative prejudice" to Hild was so significant that a new trial is necessary. *Id.*

## CONCLUSION

For the foregoing reasons, this Court should reverse Hild's conviction based on the insufficiency of the evidence, or else order a new trial.

Dated:    December 14, 2023
          New York, New York

                              Respectfully submitted,

                              MORVILLO ABRAMOWITZ GRAND
                              IASON & ANELLO, P.C.

                              By:   */s/ Brian A. Jacobs*
                                  Brian A. Jacobs
                                  Morvillo Abramowitz Grand Iason &
                                  Anello P.C.
                                  565 Fifth Avenue
                                  New York, NY 10017
                                  bjacobs@maglaw.com

                              *Attorneys for Defendant-Appellant*
                              *Michael Hild*

85

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the 20,000 word limit imposed by this Court (Dkt. 31), excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 19,885 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated:      December 14, 2023
             New York, New York

                                              By:   */s/ Brian A. Jacobs*

# SPECIAL APPENDIX

i

**TABLE OF CONTENTS**

**Page**

Opinion and Order of the Honorable Ronnie
   Abrams, U.S.D.J., dated December 7, 2022 .......... SPA-1

Order of the Honorable Ronnie Abrams, U.S.D.J.,
   dated January 3, 2023 ......................................... SPA-65

Judgment, dated and filed on January 31, 2023,
   Appealed From ....................................... SPA-68

Opinion and Order of the Honorable Ronnie
   Abrams, U.S.D.J., dated September 12, 2023,
   Appealed From ....................................... SPA-76

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<div style="border:1px solid">
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/7/2022
</div>

UNITED STATES OF AMERICA,

v.

MICHAEL HILD,

          Defendant.

No. 19-CR-602 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Following a fourteen-day jury trial, Defendant Michael Hild was convicted of committing securities fraud, wire fraud, and bank fraud, as well as conspiring to do so. The evidence established that Hild and his co-conspirators at Live Well Financial ("Live Well"), a company he founded and for which he operated as Chief Executive Officer, engaged in a multi-year scheme to fraudulently inflate the value of a portfolio of bonds used as collateral to secure cash loans. Although the loan amounts were nominally based on prices provided by a third party, the evidence demonstrated that Live Well had directly supplied valuations to that third party, unbeknownst to its lenders, basing them on its own internal pricing methodology rather than on what the bonds could readily be sold for in the market. As a result, Live Well was able to purchase the bonds at one price, provide the third party its own inflated valuations, and then use those inflated bond values as collateral to take out loans worth significantly more than the price for which the bonds could be sold. This arrangement resulted in a substantial cash windfall for Live Well, defeated the design of the loan agreements with the lenders, and left the loans critically undercollateralized.

After he was convicted, Hild filed motions for a judgment of acquittal, or, in the alternative, for a new trial. His motions advance arguments regarding sufficiency of the evidence, prejudicial

error related to certain opinion testimony, and ineffective assistance of counsel under the standard governed by *Strickland v. Washington*, 466 U.S. 668 (1984)—each involving issues by now familiar in this district.

Hild also raises a novel legal argument, however, which presents a challenging question at the intersection of the Sixth Amendment right to conflict-free counsel and the modern reality—all too familiar to those who work in the legal profession—that other obligations, personal and professional, inevitably arise, even when ensuring a fair trial for the accused. Namely, can a scheduling 'conflict,' in the colloquial sense, together with the preoccupation and workload that accompany it, rise to the level of an "actual conflict" under the framework of *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), and its progeny, requiring a limited "presumption of prejudice" upon a motion for a new trial? Or, in the alternative, should such a scheduling 'conflict' instead be viewed under the *Strickland* rule, requiring a defendant to demonstrate both that counsel's representation fell below a reasonable professional threshold, and that such error prejudiced the outcome?

Specifically, Hild claims that his trial counsel, Benjamin Dusing and Brandy Katy Lawrence, labored under an "actual conflict of interest" leading to a lapse in his representation because, at the time of his trial, they were involved in ongoing litigation in Kentucky related to the custody of Dusing's daughter. Hild argues that, because a hearing in the Kentucky litigation was scheduled on a date that could have overlapped with the end of his trial in New York, and because Dusing and Lawrence were "preoccupied" with this litigation, the Court should view his motion under *Sullivan*'s more lenient framework, thereby warranting him a new trial.

Hild and Dusing have submitted declarations with competing narratives regarding whether, and the degree to which, the Kentucky litigation affected Hild's defense at trial. For the purposes of the present motion, however, the Court assumes each of Hild's such allegations to be true. And

SPA-3

in light of some of the unusual and troubling circumstances present here, the Court does not take issue with Hild's characterization of this case as one distinguishable "from the run-of-the-mill case where a lawyer has multiple obligations." Oral Arg. Tr. 9. At the time of Hild's trial, Dusing was confronting the loss of custody over his daughter, stood accused of domestic abuse, and ultimately faced serious professional sanctions given his violent and erratic behavior. (Indeed, he was subsequently suspended from practicing law in two states.) Such circumstances may well have taken a psychological toll, and could understandably have left Dusing deeply concerned about events in Kentucky while at trial in New York. But in another sense, balancing multiple obligations and personal and professional priorities is the norm of the profession. Where the issue complained of is divided attention, rather than divided loyalties, *Strickland* stands ready to remedy any attorney's failure to effectively advocate for the accused at trial, regardless of why his representation "fell below an objective standard of reasonableness." *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

The Supreme Court has cautioned against "expansive application" of the rare "*Sullivan* exception" for an actual conflict, such that it would swallow the *Strickland* rule. *Mickens v. Taylor*, 535 U.S. 162, 175–76 (2002). To grant Hild the remedy he seeks would do just that. The Court therefore concludes that, where an attorney with otherwise undivided loyalties "shirks his ethical obligation to dutifully represent his client" due to another obligation—be it a vacation, caring for an ailing loved one, attending a child's play, another client's trial, or a hearing such as Dusing's— "*Strickland* provides the appropriate analytic framework." *United States v. O'Neil*, 118 F.3d 65, 72 (2d Cir. 1997).

Once viewed through the well-established *Strickland* lens, the Court concludes that Dusing's representation of Hild at trial was not constitutionally deficient. To the contrary, over

3

SPA-4

the course of a two-and-a-half-week trial, the Court observed Dusing's representation first-hand and found him to be a zealous and articulate advocate—at the very least on par with other white-collar litigators who regularly practice in this district. Dusing presented a clear defense theory that was similar in many respects to the theory set forth in Hild's post-trial briefing and he advanced that theory by way of robust cross-examination, and through the testimony of his client, which spanned multiple days. The Court is unconvinced that such representation fell outside the "wide range of reasonable professional assistance" so as to constitute *Strickland* error. 466 U.S. at 684. Even assuming it did, Hild fails to demonstrate that, but for any alleged error, "the result of the proceeding would have been different." *Id.*

Accordingly, for the additional reasons that follow, Hild's motions are denied in their entirety.

## BACKGROUND

Hild's Rule 29 motion relies on arguments regarding the sufficiency of the evidence presented at trial, whereas his Rule 33 motion largely relies on events occurring outside the trial record to establish purported ineffective assistance of counsel.

Accordingly, this opinion will proceed, first, by describing the facts established at trial, *see infra* at 5–14, and applying the operative standard for Hild's Rule 29 motion, *see infra* at 15–26; second, by describing the events giving rise to Hild's argument in his Rule 33 motion of ineffective assistance of counsel (due to an alleged "actual conflict" or otherwise), *see infra* at 27–30, and applying the law to those claims, *see infra* at 30–53; and, finally, by addressing Hild's arguments in the alternative for a new trial, *see infra* at 53–64.

4

SPA-5

## I.     Evidence Presented at Trial

### A.     Founding of Live Well and Reverse Mortgage Servicing

Live Well was established in 2005, and, at all relevant times, Hild was its CEO, Tr. 1247, 1867, and largest shareholder, Tr. 1904–05; *see also* GX321.  Hild founded Live Well to pursue a business opportunity in the burgeoning reverse mortgage space.  Tr. 1785–88.  Reverse mortgages, or Home Equity Conversion Mortgages ("HECMs"), are a financial product designed to provide liquidity to senior homeowners whose net worth is primarily tied up in their home equity.  Tr. 57–58, 578–79, 1788.  HECMs permit individuals to receive monthly cash income by using their home equity as collateral.  Tr. 579.  For many years, Live Well operated as a traditional and reverse mortgage broker and servicer: it reviewed applications from borrowers, approved loans, and then serviced those loans.  Tr. 946, 1790–91, 1814.

Beginning in approximately 2011, Live Well began securitizing reverse mortgages into bonds called HECM mortgage-backed securities ("HMBSs").  Tr. 947.  After it began to sell these securities, it "[g]rew dramatically."  Tr. 1806.  Packaging the mortgages as bonds allowed Live Well to generate revenue more quickly by selling pools of similar reverse mortgages to investors in bulk, rather than one-by-one.  Tr. 947–49.  Key among these bonds was a subcategory called HECM "interest only" ("HECM IO") bonds, which are made up of derivatives of HECMs that include only the interest portion of the loan rather than the entire reverse mortgage.  Tr. 59, 60, 950–52; *see also* Tr. 1814.  The HECM IO bonds are particularly attractive to investors because holders of those bonds receive regular interest payments.  Tr. 1818.

### B.     Expansion Into Purchasing HMBSs & the Stifel Transaction

In 2014, Live Well expanded beyond securitization of reverse mortgages into the purchase of HMBSs.  Tr. 58–59, 951–52, 1817.  Hild stated that the goal of purchasing these bonds and

holding them as investments was to diversify the company's revenue and reduce its susceptibility to cyclical changes in the mortgage space.  Tr. 1814.

At Hild's direction, the company acquired a portfolio of fifteen HECM IO bonds worth $55 million from Stifel Financial, a small investment bank that had previously held and traded in HMBSs (the "Stifel Transaction").  Tr. 57, 72–73, 951–53.  In addition to the bond portfolio, Live Well also hired three Stifel employees—Darren Stumberger, Ernie Calabrese, and Dan Foster—who had managed the portfolio at Stifel, to continue their work at Live Well.  Tr. 969.  Stumberger, described by Hild as the "reverse mortgage bond guru," Tr. 1815–17, was a particularly important hire due to his expertise in the area, *see id.; see also* Tr. 73–74, 969.

Live Well did not have the cash on hand to buy the bonds outright, and it thus financed the acquisition using a combination of cash, "warehouse loans" it had access to through its mortgage business, and loans collateralized by the underlying bonds, the latter of which were referred to as "repo financing."  Tr. 76–77, 731–32, 952.  The repo financing agreements were loans structured as repurchase agreements in which Live Well sold the bonds to lenders and agreed to buy them back at a specific price after a short period had passed, typically thirty to sixty days.  Tr. 76–77, 261; *see also* Tr. 1826.  At the end of the period, lenders would generally "roll" the loan forward, Tr. 674–75, but they could alternatively end the lending agreement and demand repayment of the loan amount, Tr. 572–75.  In the case that Live Well was unable to repay the loan at the end of the term, the lenders would keep the collateral (the HECM IO bonds), which they could either hold or sell to repay the defaulted loan.  Tr. 76–77.

Typically, the loan amount was determined by discounting the value of the underlying bond by 10% to 30%.  Tr. 86.  This discount, often called a "haircut," ensured that the lenders remained sufficiently collateralized if the bonds decreased in value, and priced in the risk of a lender having

SPA-7

to sell the bonds.  Tr. 81, 588–89; *see also* Tr. 396, 573, 674–77.  Different repo lenders extended loans with different haircut amounts, and Live Well preferred to borrow from lenders with lower haircuts, thereby maximizing the amount of cash it was loaned.  Tr. 1069, 1162, 1461.

As the prices of the collateral fluctuated up or down, either party could request that the loan amount be adjusted accordingly.  Tr. 85–87.  If the value of the collateral decreased, lenders could require partial repayment of the loan amount via margin call, Tr. 85–86, and if the value of the bonds increased, Live Well could request to borrow more via "reverse margin call," Tr. 86–87.

With one exception, the loan agreements between Live Well and the lenders required that the prices for the bonds be set by an independent third party.  Tr. 78–80, 575–76, 598–600.[1]  To take one example, Live Well's contract with Mirae Asset Securities (USA) Inc. ("Mirae") required that the amount of the loan be adjusted based on "the aggregate Market Value of all Purchased Securities."  GX603 at 3; Tr. 599–600.  "Market Value" was defined as:

> the price for such Securities on [a given] date obtained from (i) Interactive Data Corporation ("IDC") or (ii) if no quotation is available from IDC, then a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein.

GX603 at 11; *see also* Tr. 598–601.  As lenders typically lacked the expertise or experience required to value the bonds themselves, *see* Tr. 575–76, they thus relied on a third party—Interactive Data Corporation ("IDC")—to provide prices, *id.*; *see also* Tr. 81–82.  Stumberger testified that, based upon conversations with the lenders, it was his understanding that they required third-party prices "because [they] wanted independent, unbiased view[s] on valuations," and did not want the loan amount determined by the borrower or lender.  Tr. 81–83.

At the time of the Stifel Transaction in 2014, however, IDC was itself unable to value the bonds, and thus relied on "broker quotes" to provide pricing.  Tr. 173.  Also at that time, Live Well

---

[1]     One lender, Nomura, had its own trading desk that set the loan amount "based on the market."  Tr. 79.

7

was providing estimates as to what the bonds could be sold for in the market as broker quotes to IDC. Tr. 83. In other words: IDC published prices provided by Live Well, which were in turn used in repo agreements to calculate the size of the loans Live Well could secure from most of its lenders.

In January of 2015, IDC began using its own independent pricing model to value the bonds. Tr. 85; GX104. Hild and the co-conspirators, however, determined that IDC's model was deficient. Tr. 281–83. Among other issues, IDC was "running the portfolio evaluations daily," and doing so caused a daily decline in the bond prices. Tr. 85–87. The overall downward pressure on the bond prices in turn led to margin calls from the lenders as they became under-collateralized. *Id*. The corresponding need to constantly repay the loans caused strain at Live Well, so Stumberger and his team were directed by Hild to "rectify this problem," Tr. 87–88. Ultimately, IDC ceased modeling the bonds independently and returned to publishing Live Well's broker quotes. Tr. 88–89. Under that system, Live Well "suppl[ied] prices daily to IDC," which IDC used "verbatim." GX104. Live Well and IDC agreed that IDC would "not model the[] bonds until [Live Well was] interested in them doing so." Tr. 89, GX104. Thus, by February of 2015, Live Well had resumed providing broker quotes to IDC. Tr. 93–94.

C.    **Shift to Scenario 14 Pricing**

Live Well developed its own internal models to project the value of the bonds later in 2015. Tr. 100–05, 990–93; GX113. Evidence adduced at trial showed that Hild and other Live Well employees believed that the market generally undervalued reverse mortgage bonds. As Stumberger, who, as noted, Hild described as the "reverse mortgage bond guru," explained, the yield requirement of the bonds "should theoretically . . . drift down gradually" over time, but "it wasn't working like that in the market." Tr. 111–12; *see also* GX402. He described the prevailing

8

methodology as "improper" and "not sound," Tr. 112, and acknowledged the difference between the theoretical value of the bonds and "what happens in reality," GX402.

An assumption regarding yield requirements, among others, was incorporated into a new methodology for valuing the bonds called Scenario 14. Because the Scenario 14 assumptions differed from factors "in the market," the prices of the bonds derived using Scenario 14 were typically higher than those for which they could be sold. Tr. 113–14. Indeed, the jury heard testimony from multiple co-conspirators that they knew the Scenario 14 prices exceeded what the bonds were worth in the market. Tr. 158, 993–97, 1014.

Nevertheless, at Hild's direction, Tr. 91, 93, 103, Live Well began to submit Scenario 14 prices to IDC in September of 2015, Tr. 137, 150, 322–23, 410, 998–99. The shift to Scenario 14 prices in turn resulted in an $11 million increase in the value of Live Well's portfolio. Tr. 119–22; GX402 at 29. But because such a substantial increase in a single day would "raise alarm bells all over the place," in Hild's own words, GX402 at 29, he directed his employees to implement the price increase gradually using a "glide path," *id.*, so as to avoid triggering any "red flags," Tr. 121–22; *see also* Tr. 1004–11; GX402; GX403; GX404.

Because most of its repo agreements relied on IDC, the change to Scenario 14 pricing allowed Live Well to enter loan agreements where the loan amount would exceed the purchase price of the bond, which resulted in an immediate windfall for the company. Tr. 128 (Stumberger testifying Live Well could "purchase new bonds in the market and apply the pricing, the Scenario 14 pricing, submit that to IDC, and because the lenders were relying on IDC pricing, they would be lending more money than needed to purchase the bond at the market."); *see also* Tr. 129–34. As Eric Rohr, the company's Chief Financial Officer, explained, "every time we bought bonds, we would have money left, extra money coming back to our pocket." Tr. 1002. Hild referred to

this process as a "little bit of a self-generating money machine." *Id*. All told, by the end of 2015, the shift to Scenario 14 valuations had resulted in an increase in the value of the company's portfolio of more than $47 million. Tr. 1084.

The witnesses' testimony was consistent that the Scenario 14 assumptions model was created as an "academic exercise" to value the bonds. Tr. 995. The jury heard competing narratives, however, concerning the intent behind submitting the Scenario 14 prices to IDC. According to Hild, these prices were the company's best effort to value the bonds, and thus submitting those values to IDC was appropriate. *See, e.g.,* Tr. 1874–76. Several co-conspirators, however, testified that they knew that providing the Scenario 14 prices to IDC and then borrowing against those prices was "wrong," Tr. 307–09, 1002, 1539, and that they believed that if the lenders had known the IDC prices were based on Live Well's internal investment "thesis," rather than the prices the bond could be readily sold for in the market, the lenders would not have entered the agreements, Tr. 136, 309–12, 996–1009. The lenders expressed this same view directly. Tr. 605–10.

Stumberger went further, testifying that Hild directed the submission of Scenario 14 prices not as part of a good faith effort to value the bonds, but *in order to* increase Live Well's ability to borrow cash from lenders:

> Q. How did you feel about the decision to submit these [Scenario 14] prices to IDC?
> A. I was concerned. I was nervous.
> Q. You said this was done at whose direction?
> A. Michael [Hild]'s.
> Q. Based on your conversations with Mr. Hild, did you have an understanding about why he wanted these higher prices to be submitted to IDC?
> A. Yes.
> Q. What was your understanding?
> A. That it would create a situation, because of the higher valuations, that Live Well could borrow more money via [reverse] margin call.

Tr. 115–16.  Live Well continued submitting prices to IDC, and, from 2015 onward, IDC published those prices "verbatim."  Tr. 1014; 1254–55.

**D.    2017 Liquidity Events**

In January 2017, one lender, Wedbush, asked to speak with a Live Well dealer for more information about how the bonds were being valued.  Tr. 166–67.  On a recorded call, Hild and other co-conspirators discussed how to respond to the request.  *See* GX407.  There were several risks posed by Wedbush discussing prices with a dealer, in that Wedbush could learn the IDC rates were above market rates and/or learn that the prices were broker quotes that came from Live Well. Tr. 166–77.  Hild and others discussed their options: Live Well could screen a dealer in advance, to see if they would come up with a valuation matching the Scenario 14 prices on IDC, or they could find a "slimy" dealer willing to represent the IDC prices were correct.  Tr. 169–75, 1147, GX407.  Eventually, Hild questioned whether they could persuade Wedbush that the rates were not improper, given that Live Well was uniquely qualified to evaluate the bonds.  Tr. 136–42. Stumberger responded that Wedbush and other dealers were not concerned with the "intrinsic" value of the bonds, but rather on what they could be sold for in the market:

> HILD: . . . the reason we're in this space is because we're one of the few people that know how to value these securities, right?  Would you not disagree with the statement, Darren?  That most of the folks that are out there don't know how to value these securities including the big guys?
>
> STUMBERGER: Well, the dealers—the dealers make the market.  They offer bonds a certain way.  They finance them a certain way.  So, whether they—they're doing it right or not is —
>
> HILD: Well, that's my point—
>
> STUMBERGER: —I don't think Scott [at Wedbush] cares about that.  Scott cares about what is the market.  And it's gonna be defined—the market is going to be defined as something that is an 8 or 9% yield to 50 HPC on the— on the—on the sell side.  On the—on the ask.  The bid is behind—is a higher yield.  That's what he's gonna get from, we know, the guys who are pedaling the paper.  May not be

right, or proper, or sound, but that's what's gonna be defined as the market. That's just realistic.

HILD: There's no debating that.

GX407; *see also* Tr. 136–42.[2]  Hild and his co-conspirators also discussed whether to disclose their methodology to the market, which would hurt Live Well "in some respects" because, even if the others in the market agreed, it would increase the purchase price of the bonds. Tr. 1155–56. Another option they considered was to mark down the portfolio to market rates. Tr. 1156–57. Hild considered this option "obviously a non-starter," as it would have resulted in a $50 million loss on the company's income statement and triggered a substantial margin call. Tr. 1157.

In addition to requesting additional quotes, Wedbush also stated it was "no longer comfortable extending credit" with respect to a certain type of bond (MACRs), and that it would reduce Live Well's overall credit line. Tr. 1157. These events created "potential liquidity problems" for the company. Tr. 1157. No other lenders would finance the MACRs, and because they could not be sold at the rate Live Well was "carrying them," Live Well would need almost $22 million in cash to avoid defaulting on its debts. Tr. 1158–63; GX151. Even after Stumberger and Foster "optimized" as best they could, Live Well was left with an effective deficit of $21.8 million, a situation Hild described as a "catastrophe." Tr. 1164; GX151.

Rohr testified that "at some point" it became clear to the Live Well team that the bonds could not be reshuffled and new financing was unavailable such that the "only way out of this situation was somehow getting the value of [Live Well's] collateral increased and getting more credit, and therefore, being able to borrow more against the existing collateral to kind of help facilitate some of these moves and pending liquidity hits." Tr. 1166–67. Rohr testified that Hild

---

[2]    The jury heard similar testimony, that the lenders ultimately cared only about the price for which the bonds could be sold in the market, from one lender directly. *See* Tr. 600–01

instructed them "to raise prices in IDC," although Hild acknowledged that "the trading desk is not going to like it." Tr. 1167. No market rationale was supplied for this proposed increase, and Rohr testified the prices were no longer consistent even with the inflated valuations calculated under Scenario 14. Tr. 1167–68. Rohr described feeling "sick to [his] stomach" at this point, as the prices being submitted were "beyond even our own investment thesis . . . way beyond that." Tr. 1168.

Stumberger and others eventually modeled potential scenarios that would resolve the liquidity crisis, including one option, "Scenario 4," which they ultimately agreed to submit. Tr. 1169. Rohr testified that the "purpose" of Scenario 4 was "to resolve the pending liquidity crisis" at Live Well. Tr. 1169–70. Like Scenario 14, the prices were gradually increased over the course of several weeks to avoid setting off "red flags." Tr. 1169–75; GX408.

In February of 2017, Wedbush indicated that it may not renew its loans when they expired in March, which created another substantial threat: because Wedbush offered the most favorable rates, it would "create a really negative liquidity situation," in Rohr's words, if Wedbush stopped financing the loans. Tr. 1183–84. Rohr testified that Hild continued to direct price increases at that point in an effort to avoid "potentially business-ending, company-ending situations," but that Hild's position was ultimately untenable, as there was "no way out" of the situation. Tr. 1185. Live Well continued to "adjust pricing in IDC" in response to further liquidity events in March 2017, Tr. 1198–1200, increasing the value of the portfolio by another $21 million, Tr. 1202–04.

After the liquidity crisis eased, these prices were gradually returned to the prices derived using Scenario 14. Tr. 1196–97, 1205. Soon after, in September of 2017, Live Well received a subpoena from the Securities and Exchange Commission ("SEC"), which led to a two-year investigation. Tr. 1205.

13

E.    Financial Statements

In addition to the evidence regarding the IDC prices and loans, the government also presented evidence regarding Live Well's financial statements.  Because the bond portfolio was Live Well's largest asset, the application of Scenario 14 prices to that asset resulted in a valuation of the bonds in Live Well's financial statements that was higher than the market rate.  Tr. 1081–89, 1601–11.  Lenders testified that they relied, in part, on the financial statements in making decisions about lending to Live Well.  Tr. 591, 594–98, 682, 685–93.

Rohr testified that, as CFO, he was involved in preparing the company's financial statements, Tr. 1080, and was directed by Hild to value the portfolio using IDC prices to avoid any discrepancies, Tr. 1083.  It was Rohr's view that the characterization of the bonds in the financial statements was not true, both because the prices were above what the bonds could readily be sold for, and because the prices did not come from an independent third party.  Tr. 1087–89.

In 2019, Rohr was replaced as CFO by Glen Haddock, Tr. 1598, who worked at Live Well but was not involved in the fraud, Tr. 1601–02.  Haddock eventually learned that Live Well was providing IDC prices, Tr. 1608–09, and after evaluating the portfolio on his own, expressed his view to Hild that the bonds were overvalued, Tr. 1610–11.  Ultimately, he refused to sign the company's 2019 audited financial statements, Tr. 1616–17, and shortly thereafter Live Well announced it would cease operations and unwind, *see* Tr. 1617–19.

II.    **Procedural History**

On August 26, 2019, Hild was charged in a five-count indictment with conspiracy to commit securities fraud, 18 U.S.C. § 371; conspiracy to commit wire and brank fraud, 18 U.S.C. § 1349; securities fraud, 15 U.S.C. §§ 78j and 78ff; 17 C.F.R. § 240.10b-5; wire fraud, 18 U.S.C. §§ 1343 and 2; and bank fraud, 18 U.S.C. §§ 1344 and 2.  Hild maintained his innocence and

proceeded to trial, which began on April 13, 2021.  Closing arguments concluded on April 29, 2021, and after deliberating for one day, the jury found Hild guilty on all five counts.

On July 27, 2021, Hild moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  The government filed its opposition on August 20, and Hild filed his reply on September 3, 2021.  The Court heard oral argument on Hild's motions on May 18, 2022, and the parties have since filed a series of letters citing supplemental authorities.

## DISCUSSION

For the reasons that follow, Hild's motions for a judgment of acquittal and for a new trial are denied.

### I.     Rule 29 Motion

#### A.     Legal Standard

Pursuant to Rule 29, "on the defendant's motion," a Court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "As a general matter, a defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden."  *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (cleaned up).  To prevail, a defendant must show, "considering all of the evidence, direct and circumstantial, that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (cleaned up).  In evaluating a challenge to the sufficiency of the evidence, the Court views "the evidence in the light most favorable to the government, and draw[s] all reasonable inferences in support of the jury's verdict."  *United States v. Anderson*, 747 F.3d 51, 54 (2d Cir. 2014).   This is an "exceedingly deferential standard of review."  *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008).

"The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (cleaned up). Indeed, the Second Circuit has repeatedly cautioned that in reviewing the sufficiency of the evidence, "the court must be careful not to usurp the role of the jury," and may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (cleaned up). A court "defer[s] to the jury's evaluation of the credibility of the witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence." *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006).

Deference to the jury's assessment of the evidence in conspiracy cases is "especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010). "[B]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence," *United States v. Wexler*, 522 F.3d 194, 207–08 (2d Cir. 2008), and even "[s]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general," *United States v. Mariani*, 725 F.2d 862 (2d Cir. 1984). Finally, the evidence must be viewed "in its totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008), "as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

**B.    Analysis**

Hild challenges the sufficiency of the evidence as to all five counts. In doing so, he advances two lines of argument: (1) that the government failed to demonstrate he misrepresented

the value of the bonds, and (2) that the government failed to prove his fraudulent intent. The Court rejects both arguments. Viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, *see Hassan*, 578 F.3d at 126, the Court finds that a reasonable jury could have convicted Hild based on the evidence presented at trial.

The Court's instructions as to each of the counts were similar in many respects. In the main, each count required that the jury find, first, that Hild had engaged in an act to defraud (or had conspired to do so), and, second, that he had done so with the intent to perpetrate a fraud. To find Hild guilty of the securities fraud charge, for example, the Court instructed the jury that it must determine that Hild had either "(1) employed a device, scheme or artifice to defraud, (2) made an untrue statement of material fact or omitted to state a material fact which made what was said under the circumstances misleading, or (3) engaged in any act, practice, or course of business that operated or would operate as a fraud or deceit upon a purchaser or seller;" and that Hild did so "knowingly, willfully, and with the intent to defraud." Tr. 2273–74. The Court explained that fraud could be established even if the statements "in furtherance of the scheme were literally true," so long as the "statements and/or conduct of the defendant were deceptive." Tr. 2288. It further instructed that "intentionally deceitful statements or half-truths or the concealment of material facts and the expression of an opinion not honestly entertained also may constitute false or fraudulent statements." Tr. 2275–76. Thus, the Court observed that, if the jury determined that Hild employed a scheme to "deceive" the lenders, "the manner in which it is accomplished does not matter," and that "fraud" in this context is a general term

> that embraces all of the various means that individuals devise to take advantage of others. It includes all kinds of manipulative and deceptive acts, whether by making false statements or otherwise . . . . Deception need not be premised upon spoken or written words alone. The arrangement of the words or the circumstances in which they are used may convey the false and deceptive appearance.

17

Tr. 2275–76; *see also* Tr. 2287.

Similarly, the Court instructed that, in order to meet its burden on the wire fraud charge, "the government must prove . . . that the defendant employed a device, scheme, or artifice to defraud or obtain money or property by false pretenses, representations, or promises [and did so] with knowledge of its fraudulent intent and with specific intent to defraud." Tr. 2286–87. And the Court gave an effectively parallel instruction on bank fraud, stating that the key distinction was that the government must prove "that there was a scheme to defraud a bank or scheme to obtain money owed by or under the custody or control . . . of a bank by means of materially false or fraudulent pretenses, representations, or promises." Tr. 2295. The same showings were required for the conspiracy counts. *See* Tr. 2307, 2312.

The Court instructed the jury that for all charges, it must find that Hild's conduct was intentional. *See* Tr. 2279–82, 2290–92, 2297–98, 2308–10. In particular, the Court clarified that "even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent." Tr. 2281. As such, it underscored that "good faith" was a "complete defense" to fraud, and that, even if the jury found Hild's statements were inaccurate, the government was required to prove that Hild did not *believe* the statements were true at the time that he made them. Tr. 2281–82. In sum, the Court instructed that the government was required to prove beyond a reasonable doubt that Hild "knew that his conduct was calculated to deceive and that he nevertheless associated himself with the alleged fraudulent scheme." Tr. 2282.

### 1.   Sufficient Evidence Was Presented as to the Fraud

Sufficient evidence was presented for the jury to conclude that Hild deceived the lenders by negotiating loan agreements under which the valuation of Live Well's bond portfolio was based on purported market prices set by an independent third party, but which was, in reality, based on Hild's company's internal, above-market pricing assumptions. Hild contends that the Scenario 14

18

prices accurately represented the bonds' "intrinsic" value, and that Live Well "kept Scenario 14 a secret," Def. Mem. at 7, solely in order to prevent "additional competition for bonds from dealers and investors," Def. Mem. at 8 (quoting Tr. 383); *see also* Tr. 1870, 1874–76.  That is, it is Hild's position, as it was at trial, that Live Well only withheld the information due to its proprietary nature—the company's "secret sauce."  Tr. 1874–76.  The submission of prices based on Scenario 14 to IDC was thus not a misrepresentation, in Hild's view, because the prices were the company's genuine assessment of what the bonds were worth.  Def. Mem. at 7–8.

But this argument was presented to the jury and rejected.  While there is no dispute that Scenario 14 was created as part of an exercise to model the value of the bonds using different assumptions, Tr. 101–03, 115, 996–1015, the jury also heard testimony that Hild and the other co-conspirators knew that the prices submitted to IDC were well above the prices that the bonds could be sold for in the market.  For example, Stumberger testified that he believed the prevailing market methodology of holding the yield requirement static had an "overly onerous" effect on the valuation of the bonds, causing a pricing decline to be greater "than it should be."  Tr. 111.  Stumberger explained to Hild that notwithstanding his view that Scenario 14 was the "better" way to price the bonds, in reality the market prices were lower:

> Q: This methodology that you were using to value these bonds, did you discuss with Mr. Hild whether or not it was a methodology that was followed by the market for these bonds?
> A. Yes.
> Q. What did you tell him?
> A. My recollection in the discussions was the market, by lowering the yield that dramatically, it would be a departure or a break from where the market how the market was doing it.
> Q. So the prices that result from this new methodology, how would they compare to market prices?
> A. They were higher.

Tr. 114–15.  Rohr and Stumberger also testified that everyone at Live Well, including Hild,

understood their internal valuation was well above the market value.  Tr. 157–58 ("Q. Was it your understanding that the prices submitted under Scenario 14 were not prices that were obtainable in the market?  A. Yes."); Tr. 994 ("Q. [W]as that methodology consistent with the way you understood the market to value the bonds?  A. Not the market—it was not the way the people were transacting in the market."); Tr. 1014 ("Mr. Rohr, when Live Well began submitting the prices to IDC, those [S]cenario 14 prices, did you know you couldn't sell the bond at those prices?  A. Yes."); *see also* Tr. 993–97.  Such a conclusion was also supported by the facts that (1) Live Well routinely purchased the bonds at one price, and then immediately generated cash via the loans that were based on the much higher IDC prices, Tr. 128; *see also* Tr. 1652–66 (describing the process by which Live Well purchased the bonds and "immediately" marked them up 20%), and (2) Live Well maintained records demonstrating the differences between market prices and Scenario 14 prices, *see* Tr. 207; GX201.

Moreover, there was an understanding at Live Well that the bonds' pricing differed from the pricing that the lenders expected from IDC.  Witnesses both from Live Well, Tr. 116, 136, 309–12, 996–1009, and the lenders, Tr, 572–77, 605–10, testified as to the importance of market rates to the repo agreements.  As one lender explained:

> From a repo perspective, we're not an investor looking at intrinsic value and not thinking of that over the life of this investment we're going to get back X return, I'm more interested in the liquidity, where can I sell it on the market.  What does the market pay for this bond today?

Tr. 601.  Stumberger acknowledged the same reality on recorded call.  GX407 ("Stumberger:[] I don't think Scott [at Wedbush] cares about that. Scott cares about what is the market.").  The evidence presented demonstrated that the IDC rate referenced in the agreements was neither independently determined, nor set at or even near the price for which the bonds could be sold.  A

20

reasonable jury could conclude, based on that evidence, that Hild and others engaged in a scheme to defraud the lenders.

Stumberger also testified that Hild specifically directed the shift to Scenario 14 in an effort to grow the company's portfolio, rather than as part of a good-faith effort to value the bonds. He stated that the shift to Scenario 14 pricing followed a decrease in the portfolio's value in August 2015, Tr. at 113–115, and that Hild instructed him to submit the Scenario 14 prices because doing so would allow "Live Well [to] borrow more money via [reverse] margin call." Tr. at 116. He similarly ascribed the price increases in February and March of 2017 to Hild's desire "potentially to raise cash, to extract the cash from lenders to use to supplement the move between the lines," Tr. 197, and "to generate cash for these liquidity needs." Tr. 197–98. Stumberger did not recall any market or macroeconomic events that justified those increases. Tr. 197–98. Rohr expressed the same view—that the price increases in February 2017 were not related to any market condition and instead were carried out to alleviate the liquidity crisis at Live Well. Tr. 1166–68. A reasonable jury could have accepted Stumberger's and Rohr's account of the pricing over Hild's.

The government also presented evidence that Live Well's financial statements deceived the lenders. Rohr testified that he believed the financial statements were fraudulent for a number of reasons. First, he had not disclosed to the outside auditors that Scenario 14 prices were submitted to IDC, and that the portfolio value based on the IDC prices was thus not based on prices from an independent source. Tr. 1092–93. Second, the general representation that "the estimation methods and assumptions used in measuring assets and liabilities reported or disclosed at fair value," GX1400, was inaccurate because Live Well was "using estimates and calculations that [were] derived through Scenario 14, which [Live Well] knew [it] could not transact at in the market and therefore not fair value," Tr. 1094. The jury also heard testimony from Rohr that, as a whole,

baking Scenario 14 prices into the financials deceived the lenders into believing that company had greater assets than it actually did, Tr. 1081–89, and from the lenders that they relied on these financial statements, *see* Tr. 594–98; Tr. 686–92.

In the alternative, Hild argues that each count required the government to prove that he misrepresented the bonds by "submitting 'inflated' prices to IDC in order to induce lenders to loan Live Well more cash." Def. Mem. at 4. According to Hild, the government's failure to call an expert witness or demonstrate that a "an educated buyer who understood Scenario 14 would not have paid Scenario 14 prices," Def. Mem. at 5, amounts to a failure to prove such a misrepresentation, which was required for his conviction on each count. But a specific showing that an educated buyer would not have paid the Scenario 14 rates was not required for the jury to find Hild guilty of fraud—indeed, whether a hypothetical "educated buyer" would have paid Scenario 14 prices is largely irrelevant. The jury was presented with evidence that Hild and his co-conspirators took substantial steps to ensure that there were no such "educated buyers" in the market by deliberately obscuring their pricing source and methodology. It was not the case that Live Well was generating revenue by buying bonds based on its investment thesis and holding the asset as it increased in value. Rather, it was buying bonds at market rate and then taking out cash loans against those bonds at rates it set. Tr. 133. Any corresponding growth in the company's value as a result of this scheme, in other words, was due only to its deliberate manipulation in bond valuation. Had Live Well disclosed the pricing methodology, even if the market participants agreed, that would have only "create[d] additional competition for bonds from dealers and investors." Tr. 382. It is exactly because Scenario 14 prices were a departure from the market's valuation that Live Well was able to buy bonds at one rate and immediately generate cash by marking them, via IDC, at the Scenario 14 price.

22

These circumstances distinguish this case from *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), on which Hild relies.  In *Connolly*, the defendants submitted rates to the London Interbank Offered Rate ("LIBOR") panel that were based, in part, on requests from the trading desk.  *See* 24 F.4th at 834.  The court there held that, notwithstanding testimony from cooperating witnesses that the process was "intuitively wrong," without evidence that the submissions amounted to a "false" response to the LIBOR panel's hypothetical question, the government had failed to establish the "statements were false, half-truths, or fraudulent omissions."  *Id*. at 834–35. In this case, by contrast, the jury was presented with evidence that the agreements were based on "market prices," to be determined by a third party, and that the rates Live Well submitted to IDC far exceeded the prices the bonds could easily be sold for, that Hild was aware of that difference, and that his combination of misstatements and omissions, specifically designed to prevent the lenders from discovering this discrepancy, amounted to fraud.[3]

While the jury could have accepted Hild's version of events, when viewing the evidence in the light most favorable to the government, a reasonable jury could also have determined that

---

[3]     Hild also relies on *United States Commodity Futures Trading Comm'n v. Wilson*, No. 13-cv-7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), a recent case involving complex financial fraud, to argue that the government was required to prove Scenario 14 prices were artificially inflated.  That case is distinguishable for several reasons.  First, the market manipulation claim in *Wilson* specifically required proof that the prices were "artificial." *See id.* at *12 (quoting *In re Amaranth Natural Gas Commodities Lit.*, 730 F.3d 170, 173 (2d Cir. 2013)) (stating the CFTC needed to prove that "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.").  Because "the CFTC offered no evidence or explanation demonstrating that IDCH settlement prices were artificially high," *id.* at *13, or that the company "ever made a bid that it thought could not be accepted by a counterparty," *id.* at *11, Judge Sullivan concluded that the CFTC had not carried its burden.

The fraud charges in this case did not mandate such a specific showing, but merely required the government to prove that Hild had participated in a scheme to defraud lenders and that he did so intentionally.  Indeed, the notion of "artificial prices," as that term applies in the market manipulation concept, is a poor fit for the fraud in this case. Whereas the market manipulation charge in *Wilson* was based on the submission of public bids resulting in an increase in prices and resulting windfall, the conduct in this case was the opposite—Hild never needed to manipulate the visible market rates to create a windfall because the fraudulent scheme allowed him to purchase bonds at market price, submit above-market rates to a third-party pricing entity, and then borrow from lenders using the prices secretly supplied. The windfall was thus guaranteed, without any exposure to other market participants or corresponding risk.

Hild's direction that Live Well submit Scenario 14 prices was not an effort to "get it right," but rather, part of a scheme designed to defraud the lenders and increase Live Well's cash flow.[4]

### 2.      Sufficient Evidence was Presented as to Hild's Intent

Hild also challenges whether the government presented sufficient evidence as to his personal intent to defraud.  In the context of a conspiracy, which is "by its very nature is a secretive operation," the government is not required to present direct evidence of intent.  *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992); *see also id*. ("[I]t is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.") (cleaned up). Under such circumstances, it is well-established that "a jury's verdict may be based on circumstantial evidence, and the [g]overnment is not required to preclude every reasonable hypothesis which is consistent with innocence."  *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) (cleaned up).  In assessing Hild's intent, the Court instructed that the jury could have relied on a variety of evidence, including Hild's "manifestations, his [] words, his [] conduct, his [] acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical

---

[4]      The Court is likewise unpersuaded that the IDC Master Services Agreement "permit[ted] Live Well to provide quotes that did not conform to purchase and sale prices."  Def. Reply at 2.  Hild quotes from the IDC agreement, which states that the Evaluations "may not conform to actual purchase or sale prices," Def. Reply at 2, but in context, it is clear that the contract term "Evaluations" does create an expectation that the rates provided by IDC are tied to market rates:

> "Evaluations" shall mean Vendors' *good faith* opinions of value as to what the holder *would receive in an orderly transaction for the securities* (typically in an institutional round lot position) *under current market conditions*. Evaluations are determined based on Vendor's proprietary models and methodologies, using inputs such as trades, bids, cash flows, loan performance data and other relevant market, sector, issue, issuer and credit information then available to Vendor (including market information communicated to Vendor by its clients), market assumptions and broker quotes. Evaluations may not conform to actual purchase or sale prices in the marketplace or to information available from third parties. Valuations based on different information, models, methodologies or assumptions may differ, in some cases materially, from Vendor's evaluations.

DX D 1a.2 at 1 (emphasis added). Even if this language could plausibly be read to state that the IDC prices might not be in line with market prices, there was sufficient evidence for the jury to reject such a reading in favor of one that lenders reasonably expected that the IDC prices were tied to "what the holder would receive in an orderly transaction for the securities . . . under current market conditions."

inferences that may be drawn therefrom." Tr. 2280.

Hild contends, as he did at trial, that he believed the pricing methodology was genuine and to the extent it was not, he was an unwitting participant in the fraud, having relied on Stumberger's bond expertise and Rohr's financial expertise. *See* Def. Mem. at 12–14; Tr. 1820–21, 1867–68, 1894. The evidence cited above was likely sufficient, on its own, for the jury to infer Hild's intent, but even if it were not, the jury was also presented with testimony directly bearing on his state of mind. In particular, the jury heard testimony from Stumberger and Rohr that Hild directed them to increase the prices submitted to IDC in order to increase the company's ability to borrow from lenders. *See* Tr. 115–16, 1167. The jury also heard recorded phone calls in which Hild spoke candidly about the scheme. It heard Hild, for instance, describe what he now characterizes as a legitimate business operation as a "self-generating money machine," GX402; *see also* Tr. 1002, and heard him discuss with co-conspirators how to best avoid detection in light of an inquiry from one of the lenders, GX407; *see also* Tr. 1145–48. It is reasonable to infer from these statements that Hild understood that supplying Scenario 14 prices to IDC in excess of the market rates was at best misleading, and that he understood the need to prevent the lenders from learning of the fraud.

Hild, moreover, directed Live Well employees at multiple points to take steps to prevent discovery of the scheme, further undermining his contention that he was an unknowing participant. For example, in September 2015, after the Scenario 14 prices were calculated, the value of Live Well's bond portfolio was expected to increase $11.4 million, but Hild expressed to Stumberger that the company was "sure as hell not going to flow through 11.4 million in one day," and that they "would need to have a gradual, kind of a gradual glide path." GX402; Tr. 119–21; *see also* Tr. 1008–10. Stumberger testified that he understood that conversation to suggest he should implement the price increase in several smaller increments ("a tick per day") to avoid detection.

25

Tr. 120–22.  The same conduct was repeated when Live Well increased prices quoted to IDC again in 2017.  GX409; Tr. 200–01.  Hild also directed co-conspirators to buy tranches of bonds going forward, so that lenders would not see the prices of the individual bonds and discover they did not match the prices from comparable bonds in a tranche.  Tr. 1040–41; GX416.

Moreover, Hild acknowledged during cross examination that, at the height of the alleged scheme, he transferred $17 million from his own account to an account in the name of his wife's business.  Tr. 2068.  The jury could reasonably have found, as the government suggested in its summation, that such a transfer spoke to Hild's consciousness of guilt by showing that, as serious questions were raised about Live Well's pricing methodology and the business began to fail, he was actively "trying to hide the money."  Tr. 2242.

Hild's memorandum describes the purportedly legitimate business purposes behind his conduct, but this focus on his own testimony and evidence ignores the plethora of other evidence presented to the jury supporting an inference that he engaged in the fraud intentionally.  Again, while the jury perhaps could have accepted Hild's version of events—in which he was misled into participating in a conspiracy that was lucrative for him personally and professionally—there was more than sufficient evidence for a reasonable jury to find he acted with criminal intent.  *See United States v. Bandrich*, No. 12-cr-934, 2014 WL 7330434, at *3–4 (S.D.N.Y. Dec. 22, 2014).

\* \* \*

In sum: Hild's Rule 29 motion relitigates the weight that should be accorded to the competing testimony and evidence—matters which were properly submitted to the jury.  Because "the court must be careful not to usurp the role of the jury," and may not substitute its own judgment for that of the jury, *Jabar*, 19 F.4th at 76, the Court finds that Hild has failed to carry his substantial burden and his Rule 29 motion is thus denied.

**II.     Hild's Rule 33 Motion**

In the alternative, Hild moves under Rule 33 for a new a trial.  He argues one is warranted because: (1) he was denied effective assistance of counsel in violation of the Sixth Amendment; (2) the verdict was against the weight of the evidence; (3) the government presented improper and prejudicial opinion testimony; and (4) the proof at trial amounted to constructive amendment of the indictment or prejudicial variance.

**A.       Ineffective Assistance of Counsel**

Hild first argues that his trial counsel, Dusing and Lawrence, labored under an "actual conflict of interest" leading to a lapse in his representation because of their interest in the litigation ongoing in Kentucky at the time of Hild's trial related to the care and custody of Dusing's daughter. Under Hild's novel theory, he asks that the Court view the scheduling "conflict" presented by a hearing in the Kentucky litigation, and any related work or "preoccupation" occasioned by it, through the "actual conflict" framework of *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), wherein a "presumption of prejudice" applies, *Burke v. United States*, No. 20-4034-CV, 2022 WL 175488, at *2 (2d Cir. Jan. 20, 2022).

In the alternative, he argues that, in any event, Dusing and Lawrence provided ineffective assistance under the more familiar *Strickland* test.  For the reasons described below, the Court finds that a new trial is not warranted on either basis.

**1.       Additional Factual Background**

During 2020 and 2021, Hild's primary defense attorney, Dusing, was a party to two family court cases in Kentucky (the "Kentucky litigation") concerning the custody of his children.  *See Dusing v. J.T.*, No. 15-CI-1945 (KY Kenton Fam. Ct.); *J.B. v. Dusing*, No. 19-CI-560 (KY Kenton Fam. Ct.).  There is no dispute that this litigation was ongoing during preparation for Hild's trial, although this Court was unaware of it at the time.

27

Of particular importance is the second action, *J.B. v. Dusing*, which went to trial in February and March 2021.  On April 5, 2021, eight days before jury selection in this Court, Judge Mehling, the presiding judge in both actions pending in Kentucky, issued a decision awarding sole custody to the child's mother, the petitioner in the second action, based on his findings that Mr. Dusing had "perpetuated violence" on the petitioner, had subjected her to "physical and emotional abuse," was dealing with potential substance abuse issues, and had demonstrated questionable protective capacity as a parent.  *See* Mehling Opinion, April 5, 2021 at 2–19.  Even after this decision was published, several issues remained outstanding, and motion practice continued through Hild's trial in April 2021.  Specifically, Judge Mehling's April 5, 2021 opinion triggered a 10-day deadline for Dusing to file a motion to alter or vacate the judgment, *see* Ky. R. Civ. P. 59.05, and a 30-day period for Dusing to file a notice of appeal, *see* Ky. R. Civ. P. 73.02(1)(a). What followed, as Lawrence would later describe it in a filing in Kentucky, was a "flurry of activity in [the] litigation on several fronts."  Mot. to Continue at 2, April 19, 2021, *J.B. v. Dusing*.

On the same day that jury selection began in Hild's trial, for instance, on April 13, 2021, opposing counsel in the Kentucky litigation filed a motion for sanctions against Dusing and Lawrence, who was both co-counsel in Hild's trial and one of Dusing's attorneys in the Kentucky litigation.  Two days later, on April 15, 2021, Dusing filed a forty-four-page motion seeking to vacate Judge Mehling's decision, while the petitioner filed a motion for findings of additional facts; on the same day, the jury in New York heard testimony from Stumberger, arguably the government's key cooperating witness in Hild's trial.  A day later, on April 16, while the government's case-in-chief proceeded apace before this Court, a second sanctions motion was filed in Kentucky by the petitioner.  Critically, all four of these motions were then noticed to be heard on May 4, 2021.

Throughout this period, both Dusing and Lawrence were in New York representing Hild, and never made this Court aware of any other proceeding.  But in Kentucky, Lawrence filed a motion seeking to "continue any and all proceedings, suspend communications with the Court staff regarding the scheduling of any future proceedings, and for an extension of the deadline to file responses to any and all actions until no later than June 1, 2021."  Def. Mem. at 20 (quoting Mot. to Continue at 1, April 19, 2021, *J.B. v. Dusing*).  Lawrence's motion explained that she and Dusing were handling Hild's trial, that the Kentucky proceedings had been "a distraction" from Hild's case, and that Dusing and Lawrence would suffer "serious prejudice" if the Kentucky court did not adjourn the deadline.  *Id.*  (quoting Mot. to Continue at 1, April 19, 2021, *J.B. v. Dusing*).  Judge Mehling did not immediately respond to the request for adjournment.

By the time Hild's defense case began on April 27, 2021, the Kentucky court had still not published a ruling on the motion to adjourn the May 4 hearing.  On April 29, 2021, the day closing arguments began in Hild's case, the Kentucky court finally issued an order denying Dusing's application for a continuance.[5]  *See* Def. Mem. at 20–21.  A day after closing statements and the Kentucky Court's denial of the motion to adjourn the hearing, on April 30, 2021, the Hild jury returned a guilty verdict.

Although Hild's trial had concluded, Lawrence continued to seek adjournments in the Kentucky litigation via emails dated April 30, 2021 and May 3, 2021, stating that it was "not clear that [they] would be back Tuesday from New York," and that if they were, they would not be prepared to proceed on all the motions noticed for the May 4 hearing.  Def. Mem. at 24 (quoting Mot. to Continue at 7–8, May 3, 2021, *J.B. v. Dusing*).  Ultimately, the hearing was held by video on May 4, 2021, as originally scheduled.  Neither Dusing nor Lawrence appeared at the remote

---

[5]      Although the order was issued on April 29, it was dated April 26.  It is unclear whether Dusing and Lawrence knew of the order on April 26 or only once it was published on April 29.  *See* Oral Arg. Tr. at 8.

29

hearing, even though Hild's trial had concluded several days beforehand. Counsel for Dusing and the petitioner appeared remotely, and the conference lasted approximately eighteen minutes. Judge Mehling addressed some of the pending motions, but held off on deciding others, including the pending sanctions motions against Dusing, until another hearing scheduled for September 10, 2021. *See* Def. Mem. 20–21 (citing Order, April 29, 2021, *J.B. v. Dusing*).

> ## 2.     The Dusing Affidavit

In support of its opposition, the government filed a 76-page affidavit by Dusing, complete with text messages exchanged between Hild and Dusing, which the government argues demonstrate factual flaws in Hild's theory of an "actual conflict." In the main, Dusing's affidavit asserts that the Kentucky litigation, although it presented "scheduling issues," was "simply not on [Dusing's] mind during the time [he] was in New York for Mr. Hild's trial, in any serious way, shape, or form." Dkt. 118-1, Dusing Aff. at 43. Among other things, Dusing claims in the affidavit that he was "all-but-completely in the dark" about developments in the Kentucky litigation during Hild's trial, *id.*, and that he merely "quickly looked" at Judge Mehling's April 5, 2021 opinion awarding custody of his daughter, resolving to wait to read it "in full until after [he] returned to Kentucky," *id.* at 39–41. Dusing repeatedly asserts that any activity in the Kentucky litigation did not serve as a "distraction to [him] or Ms. Lawrence in any way in [their] preparation and presentation of Mr. Hild's defense at his trial." *Id.* at 72–73.[6]

Ordinarily, a court will rely on an attorney affidavit to rebut attacks on a lawyer's alleged conflicts or ineffectiveness, but in light of Dusing's deeply troubling conduct in the Kentucky matter—which included threatening to "blow up" a judge, staff attorneys, and opposing counsel—and his subsequent suspension from the practice of law in two states, *see Inquiry Commission v.*

---

[6]     Ms. Lawrence, as well as Jeffrey Otis, who represented Dusing in the Kentucky action, submitted affidavits as well. *See* Dkt. 118-2, Lawrence Aff.; Dkt. 118-3, Otis Aff..

*Dusing*, No. 2021-SC-0512-KB (Ky. Feb. 24, 2022) ("Suspension Opinion") (finding "probable cause [] to believe that Dusing's conduct poses a substantial threat of harm to his clients or to the public."); *Disciplinary Counsel v. Dusing*, ___ Ohio St. 3d ___, 2022 Ohio 589 (Mar. 1, 2022), the Court will not do so here.

### 3.    Evidentiary Hearing

Hild first seeks for the Court to hold an evidentiary hearing in connection with his motion for a new trial. Whether to hold such a hearing is committed to the Court's discretion. *See United States v. Levy*, 142 F. App'x 508, 510 (2d Cir. 2005) (citing *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995)). To prevail on a motion for an evidentiary hearing, a defendant "must establish that he has a 'plausible' claim of ineffective assistance of counsel." *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993). Although a district court may hold an evidentiary hearing to further develop a record, it "may also decide a claim of ineffective assistance of counsel [without a hearing] where the record 'provide[s] a sufficient basis upon which to deny the petition.'" *United States v. Scali*, No. 16-cr-466 (NSR), 2018 WL 3536082, at *4 (S.D.N.Y. July 23, 2018) (quoting *Neal v. United States*, 08-CR-0086 (KBF), 15-cv-7665 (KBF), 2016 WL 2993200, at *1 (S.D.N.Y. May 23, 2016)).

In this case, the Court presided over the two-and-a-half-week trial and has now reviewed all the evidence submitted by Hild and the government since the trial concluded. For the reasons that follow, even assuming that each of the facts contained in the affidavits and other documents submitted by Hild could be proven at a hearing, the Court finds that Hild has still failed to establish that his Sixth Amendment rights were violated. Therefore, the Court will assume that Hild's proffered evidence would be substantiated for the purpose of resolving the pending motions, and the application for a hearing is denied.

31

### 4.   Actual Conflict of Interest

#### a.   Legal Standard

Unlike most claims of ineffectiveness of counsel, which are evaluated under the familiar standard established by *Strickland*, there is a separate legal framework for evaluating a claim that an attorney labored under "an actual conflict of interest" which "adversely affected [the] lawyer's performance," *Sullivan*, 446 U.S. at 348.   Under that standard, where an attorney's conduct amounts to an "actual conflict," a limited "presumption of prejudice" applies.   *Burke*, 2022 WL 175488, at *2 (2d Cir. Jan. 20, 2022); *see also United States v. Malpiedi*, 62 F.3d 645, 469 (2d Cir. 1995) (same).   Here, Hild argues that Dusing and Lawrence labored under such an "actual conflict" as a result of the concurrent Kentucky litigation.

As an initial matter of terminology, the Court recognizes that the Second Circuit has delineated "three levels of conflicts of interest: '(1) a *per se* conflict requiring automatic reversal without a showing of prejudice; (2) an actual conflict of interest that carries a presumption of prejudice; and (3) a potential conflict of interest that requires a finding of both deficient performance by counsel and prejudice, under the standard established in *Strickland*.'"  *Burke*, 2022 WL 175488, at *2 (quoting *United States v. John Doe No. 1*, 272 F.3d 116, 125 (2d Cir. 2001)). Hild argues that Dusing and Lawrence's conduct should be evaluated under the second level for whether it constituted an "actual conflict of interest," rather than a *per se* or potential conflict.  *See* Def. Reply at 6–7.

In conducting that inquiry, the Second Circuit has "developed a three-stage analysis to determine if prejudice is presumed for an actual conflict of interest."  *Burke*, 2022 WL 175488, at *2.   "First, the defendant must establish that an actual conflict of interest existed, which arises 'when the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.'"  *Id.* (quoting *United States v. Moree*, 220 F.3d 65, 69 (2d Cir.

32

2000)). Second, a defendant must establish an "'actual lapse in representation,' that resulted from the conflict, which is demonstrated by 'some plausible alternative defense strategy not taken by counsel.'" *Id.* Under this second step—unlike the traditional *Strickland* approach—a defendant need not establish that the alternative defense "would necessarily have been successful, only that it possessed sufficient substance to be a viable alternative." *Id.*; *see also LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005); *United States v. Schwarz*, 283 F.3d 76, 92 (2d Cir. 2002). Finally, "the defendant must show causation by demonstrating that the alternative defense was inherently in conflict with or not undertaken *due to* the attorney's other loyalties or interests." *Id.* (emphasis in original) (cleaned up). When these conditions are met, prejudice is presumed. *See Williams*, 372 F.3d at 106. In performing this analysis, the Second Circuit has cautioned that "'a mere theoretical division of loyalties,'" however, "does not present grounds for a new trial." *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003) (quoting *Mickens*, 535 U.S. at 171).

The lynchpin in finding an actual conflict is that counsel's "interests diverge[d]" with respect to a "material factual or legal issue" pertaining to the representation itself. *Feyrer*, 333 F.3d at 116. That is, that the incentives for lawyer and client were "*inherently* in conflict," or misaligned, due to an "attorney's other loyalties." *Schwarz*, 283 F.3d at 92 (emphasis added).

The quintessential example of an actual conflict in this Circuit arises where an attorney engaged in the same criminal conduct as the defendant he is representing. *See United States v. Fulton*, 5 F.3d 605, 609 (2d Cir. 1993) ("It is well-settled in this circuit that an actual conflict of interest exists when an attorney engages in wrongful conduct related to the charge for which the client is on trial."); *see also United States v. Levy*, 25 F.3d 146, 156 (2d Cir. 1994) (reasoning that, where an attorney is under investigation by the same prosecutor's office that is prosecuting his client, even for unrelated criminal conduct, there is a pronounced danger that the attorney may

33

"have believed he had an interest in tempering his defense of [his client] in order to curry favor with the prosecution"); *United States v. Elder*, 311 F. Supp. 3d 589, 596–97 (E.D.N.Y. 2018) (finding an actual conflict where the attorney "plainly has his own interest in this case—an interest in not having anything come to light that might further complicate his personal situation") (cleaned up).   The Second Circuit has explained that a presumption of prejudice is warranted in those circumstances because an attorney who has participated in the underlying criminal conduct may have an incentive to prevent information that would otherwise aid his client's case from coming to light at trial in order to prevent discovery of his own wrongdoing.  *See United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984) ("[W]ith the similarity of counsel's criminal activities to [his client's] schemes and the link between them, it must have occurred to counsel that a vigorous defense might uncover evidence or prompt testimony revealing his own crimes.").   The actual conflict framework is premised on the notion that such a division of incentives—where an attorney, for instance, "may fear that a spirited defense could uncover convincing evidence of the attorney's guilt," *Fulton*, 5 F.3d at 610—presents a heightened risk of violating the Sixth Amendment's guarantee of conflict-free counsel.

Similarly, the Second Circuit has found an actual conflict in the rare circumstance where a "defendant's lawyer faces possible criminal charges or significant disciplinary consequences as a result of questionable behavior related to his representation of the defendant."  *Levy*, 25 F.3d at 156.   For instance, where an attorney was accused of coercing a client's guilty plea, the Second Circuit found an actual conflict, reasoning that the attorney was faced with the option of defending against the clients' accusations of severe misconduct or advocating on the clients' behalf.  *See Lopez v. Scully*, 58 F.3d 38, 41 (2d Cir.1995).

Such a divergence of interests with respect to the action itself is of the kind that could often be identified *ex ante* in a hearing held pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982). Indeed, the Second Circuit has underscored the importance of an "initial, 'inquiry' stage," in situations where a "district court is confronted with 'the specter of conflicts of interest.'" *United States v. Cain*, 671 F.3d 271, 293 (2d Cir. 2012) (quoting *Levy*, 25 F.3d at 153). Such an inquiry requires the court to "investigate the facts and details of the attorney's interests to determine whether" they diverge from those of his client. *Id*; *see also Levy*, 25 F.3d at 152 (observing, in a case finding an actual conflict, that "a clear feature of this case is that the repeated reassignment of the case resulted in a failure to follow the procedures this Court set forth in [] *Curcio* [], procedures that might have resulted in a knowing and intelligent waiver from Levy of his right to a non-conflicted lawyer").

The Second Circuit has clarified, however, that typical ineffective assistance of counsel claims by a client do not rise to the level of an actual conflict. *See, e.g., Jones*, 482 F.3d at 75 ("The defendant's mere assertion, however, that his attorney is providing less than constitutionally effective assistance, which requires the attorney to defend his preparation and strategy, is not itself sufficient to create a divergence of the attorney's interests from those of the defendant."); *Moree*, 220 F.3d at 72 (holding that accusations an attorney had failed to "move for speedy trial, failed to prepare adequately, failed to forward papers, and failed to discuss strategic choices, etc." did not create an actual conflict of interest); *United States v. White*, 174 F.3d 290, 296 (2d Cir. 1999) ("[W]e decline to adopt any broad rule that would suggest that, simply by expressing dissatisfaction with his attorney's performance, a defendant can create 'conflict of interest' that can be said to require the attorney to choose between advancing the attorney's own cause and that of her client."); *Peebles v. United States*, No. 17-CV-463-A, 2022 WL 278179, at *7 (W.D.N.Y.

35

Jan. 31, 2022). Such a rule makes good sense, as general claims of ineffectiveness do not stem from an inherent misalignment between an attorney's and a client's interests in the outcome of a case. The Circuit has reasoned that, while client accusations that an attorney made poor strategic choices may place the attorney in the "difficult position of having to comment on an asserted disagreement with her client, if only to inform the court as to whether she believes that she can continue the representation," that circumstance, without more, does not amount to an actual conflict. *White*, 174 F.3d at 296.

So too, the Second Circuit has found that a disagreement about a client's failure to pay attorney's fees, although it may cause "some divisiveness between attorney and client," does not give rise to an actual conflict. *O'Neil*, 118 F.3d at 71. Rather, if an attorney under those circumstances ultimately "shirks his ethical obligation to dutifully represent his client as a result of a fee dispute . . . *Strickland* provides the appropriate analytic framework." *Id.* at 72; *see also Mickens*, 535 U.S. at 175–76 (finding the actual conflict doctrine inapposite to circumstances where "representation of the defendant somehow implicates counsel's personal financial interests").

In sum, cases presenting an actual conflict of interest warranting a presumption of prejudice are rare. And the Supreme Court has cautioned against "expansive application" of the actual conflict framework such that it would swallow the *Strickland* rule. *See Mickens*, 535 U.S. at 175. The purpose of the limited "*Sullivan* exception[]" for an actual conflict, it has reasoned, exists solely as "needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Id.* at 176.

**b.      Analysis**

Hild raises three separate but related theories as to why the timing of his trial and the Kentucky litigation created an "actual conflict" such that his interests materially diverged from

those of Dusing and Lawrence. First, he argues that the "schedule for [his] trial conflicted with the schedule in the Kentucky litigation" and Dusing's and Lawrence's "strong interests" in that proceeding were "inherently in conflict with [the] ability to defend [him] at trial, including with their ability to mount a robust defense case that would last past May 4." Def. Mem. at 29. Second, he contends that Dusing and Lawrence were "preoccupied" with the Kentucky litigation, which led to a lack of preparedness and several errors at trial. Def. Mem. at 29–30. Third, he argues that Dusing "had reason to believe he faced disciplinary proceedings" and "thus had a personal interest in using Mr. Hild's trial to demonstrate" his competency. Def. Mem. at 30.

All three theories relate to the pending Kentucky litigation, and primarily, the May 4 hearing that was scheduled during Hild's trial. While Hild contends that these proceedings were "inherently in conflict with" Dusing's representation, that is not so. Actual conflicts arise when "counsel's inability to make [] a conflict-free decision" is so substantially impaired that a court may not rely upon the result of the adversarial system. *Williams*, 372 F.3d at 106. The Kentucky litigation itself did not form such a divergence of incentives, such that Dusing had "had an actual adverse interest" in the outcome of Hild's trial. *Mathis v. Hood,* 937 F.2d 790, 795 (2d Cir. 1991). In other words, unlike the types of conflicts that the Second Circuit have found to be actual conflicts, Dusing and Hild's incentives regarding the outcome of Hild's trial were still aligned— they both wanted to see Hild acquitted.

In essence, Hild alleges that Dusing was simply more attentive to and invested in the outcome of his personal litigation than the outcome of the ongoing criminal trial. Such a circumstance does not form an actual conflict giving rise to a presumption of prejudice. Rather, where, as here, an attorney faced with a choice between his client's trial and a personal or other

37

professional obligation chooses to prioritize that obligation over his "ethical obligation to dutifully represent his client," *Strickland* provides the appropriate remedy. *O'Neil*, 118 F.3d at 71.

Because claims of attorney conflicts lack the prejudice showing required by *Strickland*, there is an "incentive for defendants to characterize ordinary ineffective assistance of counsel claims as conflict of interest claims." *Moree*, 220 F.3d at 69–70; *see also United States v. Berger*, 188 F. Supp. 2d 307, 333–34 (S.D.N.Y. 2002) ("[C]ourts have noted the incentive for defendants to characterize ordinary ineffective assistance of counsel claims as conflict of interest claims."). But expansive application of this standard would swallow the *Strickland* rule altogether. As aptly noted in *United States v. Mitchell*, courts "have been careful to guard against defendants' attempts to force their ineffective assistance claims into the 'actual conflict of interest' framework. . . and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* [*v. Sullivan*] test." 216 F.3d 1126, 1131 (D.C. Cir. 2000) (cleaned up). A finding here that Dusing's competing personal and professional obligations constituted an "actual conflict" could open the floodgates to challenges of purported "actual conflicts of interest" in nearly every criminal case, as every attorney has other obligations—personal and professional—that may affect their performance. It would dramatically alter the existing legal framework to conclude that an actual conflict may arise every time a lawyer has a family vacation, obligations to care for an ailing loved one, or a child to pick up from daycare.

The Court has little doubt that the Kentucky litigation implicated matters critically important to Dusing on a personal level. He faced the loss of custody over his daughter, among the most challenging circumstances any parent can confront. Dusing also stood accused of serious misconduct, both personal and professional, that could understandably have left him overwhelmed.

38

And closely tied to his ability to confront those serious challenges, it is clear that the May 4 hearing date presented, at the very least, potential overlap with Hild's trial.

But a decision granting Hild the relief he seeks here would fit squarely into the judicial adage that "bad facts make bad law." *Haig v. Agee*, 453 U.S. 280, 319 (1981) (Brennan, J., dissenting).  The Court is disinclined to open the floodgates to claims of an actual conflict based on circumstances like these.  As explained below, because the May 4 hearing, and any preoccupation it occasioned, did not create a division of loyalty or an inherent misalignment of incentives impairing Dusing's ability to make "a conflict-free decision," *Malpiedi*, 62 F.3d at 465, the Court concludes that it does not constitute an actual conflict.

i.     **The Scheduling of the May 4 Hearing Did Not Constitute an Actual Conflict**

The parties and the Court agree that there is little relevant caselaw addressing scheduling conflicts between an attorney's competing personal and professional obligations.  *See* Oral Arg. Tr. at 15 (Defense Counsel: "I don't know that there's any other case in any circuit where the facts line up perfectly with this one.").  Instead, Hild contended both in his memorandum, Def. Mem. at 26–28, 31, and at argument that these circumstances are analogous to cases in which an attorney "manipulates the scheduling of a trial because the lawyer [is] concerned about what will happen when the trial concludes [and] concerned about their own liability."  Oral Arg. Tr. at 15.  Those cases, however, are distinguishable, and their differences instructive.

In the *Mathis* case, for instance, the attorney in question had been appointed to represent an indigent client on his criminal appeal in 1984, but failed to perfect the appeal for two years. *Mathis v. Hood*, 851 F.2d 612, 613 (2d Cir. 1988).  By that time, Mathis had filed a disciplinary complaint against the attorney for this "dilatory" performance.  *Id.*  The district court found that under those circumstances, the attorney had an improper incentive for his own client's appeal to

fail "because reversal might have increased [the attorney's] potential liability for the delay or increased the possibility that [he] would be disciplined as a result of his delinquency in perfecting the appeal." *Mathis v. Hood*, No. 87-cv-6234 (RPP), 1990 WL 100869, at *4 (S.D.N.Y. July 11, 1990). Counsel's incentive to place his own interests above his client's undermined the court's "confidence in the outcome" of the appellate process, and thus a new appeal was granted. *Id.* Importantly, the actual conflict in *Mathis* arose not from the timing of two proceedings, but from the attorney's incentive for his own client's appeal to fail. *See* 937 F.2d at 795 (affirming district court's holding that the attorney "had an actual adverse interest in the outcome of [his client's] appeal"). Again, those circumstances are not present here. While the timing of Hild's trial may have posed a scheduling conflict for Dusing, it did not cause a divergence in their interests regarding the outcome of Hild's trial such that Dusing would have had any incentive for the jury to return a guilty verdict.

Hild relies on two additional cases involving attorneys who postponed the resolution of a client's trial to delay pending indictments against themselves, which are distinguishable for a similar reason. *See United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir. 1987) *overruled on other grounds by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989); *Rugiero v. United States*, 330 F. Supp. 2d 900, 907–08 (E.D. Mich. 2004). In neither case did the court hold that overlapping schedules, standing alone, amounted to a conflict of interest; instead, they held that the attorneys' conflicts resulted from the fact of the pending indictments, and found that those attorneys had manipulated their client's criminal proceeding in service of their own interest. *See McLain*, 823 F.2d at 1464 (finding an actual conflict where the attorney failed to vigorously pursue plea negotiations because he knew he would not be indicted until the case had ended); *Rugiero*, 330 F. Supp. 2d at 908 (finding actual conflict where the attorney was aware that he was under

investigation by the same prosecutor's office that was opposite him in his client's case, and refused

plea negotiations and delayed the case for two years in order to gain "time to attempt to dissuade

the Government from prosecuting him and delay[] his own indictment").[7]

Dusing's choice between appearing at a post-trial conference in a case where he was a

litigant and representing Hild in an unrelated criminal trial is far afield from those circumstances

found to jeopardize an attorney's loyalty to their client.  The outcome of Hild's criminal case had

no bearing whatsoever on Dusing's post-trial motions in his Kentucky family court case, and there

was thus no inherent conflict between the conference in Kentucky and Hild's ongoing trial, only a

scheduling burden caused by proceedings held close together in time, along with any emotional or

psychological toll occasioned by it.  Indeed, if anything, Dusing's incentives were *particularly*

aligned with Hild's—presenting a "coincidence of interests," not a conflict, *see Untied States v.*

*Gambino*, 864 F.2d 1064, 1071 (3d Cir. 1988)—once professional sanctions and potential

disbarment became relevant to the Kentucky litigation.  Far from having a motivation to

ineffectively represent Hild before this Court, the potential for sanctions effectively left Dusing

under a professional magnifying glass, with every incentive to zealously advocate for his client in

a high-stakes federal criminal trial.

Moreover, notwithstanding Lawrence's representations to the Kentucky Court that an

adjournment was required, neither Dusing nor Lawrence appeared at that hearing even though it

was held remotely after Hild's trial had already concluded.  *See* Levine Decl. Ex. B.1.  While the

Court does not credit Dusing's statement that he was "unaware" of the May 4 conference for the

purposes of this motion, the fact that he did not attend the remote hearing does undermine, at least

---

[7]      *Herrera v. Russi*, No. CV-95- 0187(CPS), 1996 WL 651017, at *9 (E.D.N.Y. Nov. 6, 1996), which Hild
cited in his supplemental letter after oral argument, *see* May 6, 2022 Letter, is also inapposite as to conflicting
schedules, and is more relevant to Hild's actual conflict claims under his two other theories, *see in fra* at 40–43.

to some degree, Hild's portrayal of the hearing, although for purposes of this motion, the Court nevertheless assumes the importance Hild attributes to it.

Hild has also failed to meet the second and third prongs required to establish an "actual conflict." *See Moree*, 220 F.3d at 69 (requiring a defendant to establish "some plausible alternative defense strategy not taken up by counsel," and that the failure to pursue it was due to the alleged actual conflict) (cleaned up).  That is, he has not shown that any plausible trial strategies were foregone—let alone that they were foregone as a result of the scheduling of the May 4 hearing. *See LoCascio*, 395 F.3d at 56.

The only evidence that any trial tactic was not undertaken due to the May 4 hearing is the proffered testimony of a former paralegal who was present at the trial team's meetings.  In addition to stating that Dusing was, contrary to his affidavit, well-aware of the proceedings in Kentucky, The paralegal recalled that Dusing raised the May 4 hearing when discussing trial logistics.  *See* Levine Decl. Ex. A.  The former paralegal stated that Dusing described the May 4 hearing as "inconvenient," and noted that it presented logistical issues when asked by one of Hild's new lawyers:

> *Attorney*: Do you remember what words he used when he said it was inconvenient, the May 4 date?
> *Former Paralegal*: It was in terms of talking about logistics, how much of a defense to put on, weighing several concerns. It was one of the factors, the cost of being in NY longer, the cost of paying witnesses, logistics in general. It was not specifically that one, but pros and cons.
> *Attorney*: So one of the cons of putting on more witnesses was that it would draw the case past May 4?
> *Former Paralegal*: Yes, and have implications for him.
>
> * * *
>
> *Attorney*: Going back to pros and cons list, what were some of the pros of calling additional witnesses in the defense case, do you remember other pros?

42

> *Former Paralegal*: Some of the concerns were matching the witness list, he said it would look better if we have a lineup of witnesses, said it was important to match them numbers wise.
> *Attorney*: What were other cons, other than May 4?
> *Former Paralegal*: Not having fully vetted them, a gamble, don't know what government is going to bring out. Called "bombs." Also cost and time.
> *Attorney*: Do you remember how he phrased it when he said it would conflict?
> *Former Paralegal*: Just that he wouldn't be able to make his hearing if we call all these witnesses.

*See* Levine Decl. Ex. A. Although the Court credits this proffered testimony as true, it is unclear whether the witnesses referenced were actually available, what testimony they would have offered, or whether their testimony would have even been plausibly helpful to Hild's case. In fact, to the extent the former paralegal's statements evince Dusing's contemporaneous view on the topic, it appears that he harbored serious concerns that the witnesses could even be detrimental to the defense case—calling them not "vetted" and a "gamble." *Id*.

In his post-trial motion, Hild proposes other avenues that were purportedly foregone as a result of the scheduling of the May 4 hearing—primarily that more witnesses could have been called and more evidence introduced—but proof of a causal link is still missing. For example, Hild suggests that more witnesses, including "Certified Public Accountants to provide expert opinion testimony as to the propriety of Live Well's pricing methodology (such as a certified fraud examiner and forensic accountant at Keiter)," Chris Krupa, an IDC employee, or other Live Well employees who participated in the fraud could have been called to testify. *See* Def. Mem. at 32. But he fails to connect the absence of these witnesses to the scheduling of the May 4 hearing. Indeed, there is no any allegation that these witnesses were prepared to testify, or that they were waiting in the wings or sent home at the last minute to cut the defense case short.

Hild draws particular attention to Dusing's purported error in failing to call a proposed expert, Allen Davis. Although Dusing's affidavit stated that he did not hire Mr. Davis because of

SPA-44

Hild's unwillingness to pay his fees, *see* Dusing Aff. ¶ 70, this was contradicted by Davis's own affidavit that he was offered a flat fee of $10,000 that he rejected, *see* Davis Decl. ¶¶ 6–7, and Hild's testimony that he was never informed of any fee issue, and would have paid more than $10,000, Hild Decl. ¶¶ 2–3.   But even accepting Hild's version of events, critically, his motion does not engage with the fact that his defense team would have needed to notice and disclose any expert it intended to call at trial well before the May 4 hearing was even scheduled in the Kentucky litigation on April 13, 2021, after jury selection in New York had already begun.  *See* Fed. R. Crim. P. 16(b)(1)(C); Def. Witness List, April 14, 2021 (not including Davis).  Assuming that the failure to call Allen Davis was not due to a dispute regarding his fee—as both Davis and Hild attest, *see* Dkt. 120-1, Hild Decl.; Dkt. 120-2, Davis Decl.—the absence of this expert testimony thus cannot be attributable to any decisions made in light of the scheduling of the May 4 hearing.

Finally, Hild suggests that Dusing could have put on an "advice of counsel" defense, asserting in a conclusory manner that there is a "serious risk" that Dusing did not do so because of the scheduling of the May 4 hearing.  But, again, there is no evidence offered as to what this defense might have entailed, that it would have aided Hild's defense, or how a failure to mount such a defense was "due to" the alleged conflict.  If anything, the trial transcript intimates that the decision not to present an "advice of counsel" defense may have been one made as a matter of sound trial strategy, as Dusing indicated that the defense presented complex privilege issues which the parties raised in their *motions in limine*.  *See* Tr. 20–53.  Indeed, when discussing the proposed defense at the final pretrial conference on April 9, 2021, Dusing highlighted the difference between questions regarding the presence of attorneys and a defense that the attorney's advice was relied upon, *see* Tr. 52, suggesting that, well prior to the scheduling of the May 4 hearing, Dusing had already made the decision not to proceed with an "advice of counsel" defense.

44

The contention that Hild's testimony was curtailed by Dusing's failure to introduce exhibits through his testimony at trial suffers from similar deficiencies. There is no basis in the record to conclude that the failure to pursue additional lines of questioning, or to admit additional exhibits, during the course of Hild's testimony—which spanned two full days before the jury—was at all related to concerns regarding timing.

### ii.   Dusing's and Lawrence's "Preoccupation" Did Not Create an Actual Conflict

Hild next argues that Dusing's and Lawrence's "preoccupation with [the] Kentucky litigation caused [him] to commit missteps in [] trial preparation and conduct." Def. Mem. at 34. To be sure, preoccupation can certainly result in ineffective assistance of counsel, as can any number of reasons for counsel failing to act in a reasonably professional manner, including poor legal training, forgetfulness, or a lack of attention to detail. But an actual conflict of interest does not arise from an attorney's divided attention—it arises from divided *loyalties* such that the interests of a "defendant and his counsel 'diverge with respect to a material factual or legal issue or to a course of action.'" *Martinez v. Kirkpatrick*, 486 F. App'x 158, 160 (2d Cir. 2012) (quoting *Schwarz*, 283 F.3d at 91).

In *Lopez v. United States*, Judge Crotty addressed a similar claim and found that an attorney's alleged "preoccupation" with concurrent disciplinary proceedings did not amount to an "actual conflict." No. 10 CR. 798 (PAC), 2017 WL 1424328, at *7 (S.D.N.Y. Apr. 20, 2017), *aff'd*, 792 F. App'x 32 (2d Cir. 2019). He reasoned that conclusory allegations and the defendant's subjective belief that his attorney was "preoccupied or too busy with the disciplinary proceedings to provide effective assistance, without [] any specific resultant prejudice," was insufficient to establish a conflict. *Id.* at *7.

45

This makes good sense, as preoccupation with another matter—whether personal or professional—is different in kind from a divergence of interests with respect to the representation itself. Whereas an actual conflict compromises the representation due to inherently conflicting incentives, accusations that an attorney was inattentive or distracted are more properly analyzed under *Strickland*, as they concern whether an attorney's performance suffered and fell below a reasonable professional threshold affecting the outcome. *See Abad v. United States*, No. 09-cv-08985 (GBD), 2011 WL 666361, at *3 (S.D.N.Y. Feb. 7, 2011) (analyzing and rejecting ineffective assistance of counsel claim under *Strickland* where a defendant claimed that his "counsel labored under a conflict of interest because . . . [he] was 'too preoccupied with his duties' in other cases."); *see also John v. United States*, No. 09-cv-3116 (GBD), 2010 WL 2346590, at *3 (S.D.N.Y. June 8, 2010).

The only authority cited by Hild for the notion that "preoccupation" could form the basis for an actual conflict is a single sentence from *Herrera v. Russi*, an out-of-district habeas case in which the court opined that "a conflict could arise simply because it is plausible that [the attorney] was unable to zealously represent the petitioner because of [his] preoccupation with the investigation into his competence and his possible suspension or disbarment." No. cv-95-0187 (CPS), 1996 WL 651017, at *9 (E.D.N.Y. Nov. 6, 1996).

As an initial matter, it is unclear whether this sentence refers to an "actual conflict," under the *Sullivan* line, that would give rise to a presumption of prejudice. The district court in *Herrera* did not analyze whether the conduct amounted to an actual conflict because the state court in the underlying proceeding had failed to inquire as to whether there was "an actual conflict, a potential conflict, or no genuine conflict at all." *Id.* at *7. Indeed, in the sentence immediately following the one which Hild quotes, the court explained that "[b]ecause the trial judge, on the basis of [the

attorney's] representation, took no further steps to explore the *potential conflict*, the trial judge failed to satisfy the court's inquiry obligation." *Id.* at *9 (emphasis added). Moreover, the factual circumstances of that case suggested the attorney may have had an actual conflict because the defense attorney was served with a motion to suspend him from the practice of law while in the judge's chambers during the course of the trial. *Id.* at *8. Those suspension papers indicated the attorney was "an immediate and present danger to the public and should be immediately suspended from the practice of law pending the completion of the investigation and prosecution of the pending complaints of professional misconduct." *Id.* at *9. The district court thus found that had the state court judge inquired further, he might have learned that the defense attorney had an incentive to hide the suspension from his client in order to continue the representation.

Hild also fails, again, to demonstrate that any strategy was forgone at trial, under the second prong of the actual conflict test, let alone that it was "due to" the alleged preoccupation, under the third. Beyond the assertion that expert disclosures were due a week before trial in the Kentucky litigation in February 2021, he does not offer evidence that the alleged errors were related to Dusing's or Lawrence's "preoccupation" with the Kentucky litigation.

### iii. Dusing's Potential Disciplinary Proceedings Did Not Create an Actual Conflict

Third, Hild contends that because Dusing "had reason to believe he faced potential disciplinary proceedings and investigations into the bribery of a witness," he had a "personal interest in using Mr. Hild's trial to demonstrate that he was competent to practice law." Def. Mem. at 30. This allegation appears to be based on both the pending sanctions motions against Dusing in the Kentucky litigation and separate investigations into his previous conduct.

To be sure, many courts have found an actual conflict where a lawyer "faces possible criminal charges or significant disciplinary consequences," but each of those cases concern

"questionable behavior" the attorney engaged in "*related to his representation of the defendant*." *Levy*, 25 F.3d at 156 (emphasis added) (collecting cases). As discussed above, when the attorney discipline is tied to representation of the client, there is an inherent tension *ex ante*, because the "attorney would have a strong personal desire to refrain from inquiring at the defendant's trial into certain matters that were directly relevant to, and potentially exculpatory of, his client," but which may tend to incriminate the attorney. *Id*. at 157; *see Lopez*, 58 F.3d at 43 (finding actual conflict where the attorney was accused of coercing her client's guilty plea).

No such concerns, and thus no actual conflict, are implicated here, where the potential professional discipline was wholly unrelated to Dusing's representation of Hild in his criminal proceeding. *See Lopez v. United States*, 792 F. App'x 32, 36 (2d Cir. 2019) (affirming district court's determination that an unrelated "disciplinary proceeding . . . did not create an actual conflict of interest" where the "potential sanctions against [his attorney] created a financial incentive to keep the case going and prevent [the client] from pleading guilty."). Indeed, some courts have gone so far as to find, under circumstances like these, that when an attorney faces potential professional sanctions due to unrelated conduct, his incentive to effectively advocate to demonstrate his competence ensures that no actual conflict can exist. *See id.; Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir. 1988) ("If anything, the charges pending against [the attorney] provided an incentive for the vigorous efforts he appears to have expended.").

In sum, the Court finds that none of the challenges presented by the overlapping timing of the two proceedings amounted to an actual conflict of interest, and thus any deficiencies in Dusing's performance—whether they resulted from distraction, a desire to appear in the Kentucky litigation or otherwise—must be analyzed under *Strickland*. [8]

---

[8]      Because the Court concludes that Dusing's representation did not violate Hild's Sixth Amendment right to conflict-free counsel, it need not evaluate in the alternative whether Lawrence, a more junior lawyer with no criminal

### 5.      Ineffective Assistance of Counsel Under *Strickland*

Apart from his claim of an actual conflict, Hild argues that, in any event, Dusing's performance was ineffective under the more familiar standard established by *Strickland v. Washington*, 466 U.S. 668, 684 (1984).

#### a.      Applicable Law

To be entitled to relief pursuant to *Strickland*, Hild must show both that (1) his counsel's performance "fell below an objective standard of reasonableness," and (2) he suffered prejudice as a result. *Id*. at 688, 691–92. In evaluating the first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. With respect to the second, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Ultimately, to merit vacatur, "counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687). The Court may reject a claim of ineffective assistance of counsel for failure to satisfy either prong of the *Strickland* standard, without reaching the other. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.").

#### b.      Analysis

Hild's argument that Dusing's representation was ineffective relies on the same theories of purported error discussed above regarding Dusing's alleged actual conflict. With respect to the choice to call certain witnesses or elicit additive testimony from Hild, there has not been a showing

---

experience, was conflicted or could have provided effective assistance notwithstanding Dusing's representation.

that Dusing's choice not to do so was professionally unreasonable. *See Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) ("Courts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury."). But even assuming that the choice to forgo eliciting the additional testimony fell below the threshold of reasonable representation under *Strickland*, "a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice," *United States v. Green*, 104 F.3d 354 (2d Cir. 1996), and Hild fails to establish prejudice here.

Specifically, as he does in his argument for an actual conflict, Hild makes reference to the purported failure to call Allen Davis, the proposed expert, to argue that Dusing was ineffective under *Strickland*. Assuming the failure to call Davis was unreasonable, *see Garner v. Lee*, 908 F.3d 845, 867 (2d Cir. 2018), the absence of his testimony did not inure prejudice upon the outcome of Hild's trial. Davis, who was "familiar with leasing and real estate mortgage lending securities and valuing complex and illiquid securities related thereto," Davis Decl. ¶ 1, drafted a preliminary expert report after being consulted as a potential expert for the defense, that included findings that:

> (a) in the absence of an active, liquid [] securities market, the value of a mortgage security is the value of the estimated discounted future cash flows (intrinsic value); (b) there was no active, liquid market for the HECM IO bonds; and (c) it is appropriate for a CEO to rely on other officers in the company, and in particular the CFO, in valuing company assets when preparing.

*Id.* ¶ 5. Accepting a scenario under which Davis had been retained by the defense, that his expert conclusion at trial had remained consistent with his preliminary report, and that such testimony would have been admitted, while it may have been somewhat helpful to Hild's case, it would not have affected the outcome of the trial with any reasonable likelihood. Substantively, each of these arguments were already presented to the jury through other testimony. Live Well employees, *see*

50

Tr. 240–41, and lenders, *see* Tr. 588, 645, agreed that the liquid market for the HECM IO bonds

was, at best, limited.  And the jury heard testimony that the Scenario 14 assumptions model began

as an academic exercise to value the bonds.[9]  But there was ample evidence to the contrary—that

above-market prices were submitted to IDC in order to generate cash for Live Well—and that

lenders expected the IDC prices would reflect an independent third party's evaluation of the price

for which the bonds could be sold.  *See United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008)

(holding that among the relevant factors in a determination of prejudice "the strength of the

Government's case is probably the single most critical factor") (cleaned up).  While the expert's

testimony may have been helpful to support Hild's own testimony that the prices were an effort to

"get it right," it is not, in other words, reasonably likely that the expert's testimony would have

changed the jury's verdict.  *See Jamison v. Griffin*, No. 15-cv-6716 (PKC) (AJP), 2016 WL

1698350, at *24 (S.D.N.Y. Apr. 27, 2016), *report and recommendation adopted by*, 2016 WL

4030929 (S.D.N.Y. July 27, 2016); *see id.* ("While a misidentification expert may have been

helpful to the defense, the testimony was not so vital that counsel was ineffective for failing to

procure it.").

    With respect to Hild's testimony, which spanned multiple days, Hild has failed to show he

was prejudiced by counsel's failure to elicit more "fulsome" testimony.  Although Dusing and Hild

apparently disagreed about the scope of Hild's testimony, *see* Dusing Aff., Ex. D; Hild Aff. ¶ 6,

beyond citing to several exhibits, Hild does not proffer what additional evidence would have been

offered or how it would have aided his case.  *See United States v. Green*, 104 F.3d 354, 1996 WL

---

[9]    Rohr also testified at multiple points that Scenario 14 was based on "discounted cash flow principles."  Tr. 993, 995, 1488.  The jury heard a recorded call from Rohr where he stated that "the market value is, in essence, the discounted cash flow of a security."  DX B.26; DX E.26.  On cross examination Dusing asked whether Rohr stood by that definition, and while he explained his position differently at trial, he stated that if the buyer and seller of a security agreed on the cash flow amounts and agreed to transact, that would be correct.  Tr. 1497–98.

665719, at *3 (2d Cir. 1996) ("A defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice."). The same is true for his claim regarding Dusing's failure to examine witnesses regarding the post-August 2017 losses.

"It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'  Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687, 693).  Even assuming there were errors in Dusing's representation, and considering them cumulatively, *see Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005), the Court does not find that it is "reasonably likely" the result would have been different absent them, *Harrington*, 562 U.S. at 111.

"[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."  *Harrington*, 562 U.S. at 111 (2011) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  Here, the Court presided over the trial, and observed Dusing's advocacy first-hand.  Although it is true that Dusing could have called more witnesses in the defense's case-in-chief, introduced more exhibits, or explored more topics, the Court was not left with an overall impression that the defense case was lacking.  To the contrary, Dusing's performance was strong, and at the very least on par with that of other white-collar litigators who regularly practice in this district.  On the whole, he was a zealous, passionate, articulate, and compelling advocate who presented a cogent defense theory that was similar, if not identical, to the theory set forth in Hild's post-trial briefing.  He advanced his case by thorough cross examination, especially of the two key government witnesses, and through Hild's testimony. Dusing was also able to synthesize the complicated financial concepts

52

and transactions at issue in this case, and had a disposition that appeared to be well-received by the jury.

At bottom, there is no "reasonable probability that, but for [any] deficienc[ies], the outcome of the proceeding would have been different." *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999).[10]  Accordingly, Dusing's motion for a new trial based on ineffective assistance of counsel is denied.

**B.      Sufficiency of the Evidence**

Hild further argues that he is entitled to a new trial because there was insufficient evidence presented at trial to warrant conviction.  The Court disagrees.

**1.      Applicable Law**

Where a defendant seeks a new trial based on the insufficiency of the evidence, the Second Circuit has cautioned that "Rule 33 authority" should be used "sparingly" and in "the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  More recently, the Circuit held that a court "may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (cleaned up).  A district court cannot "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.*  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. To grant the motion, there must be a real concern that an innocent person may have been convicted." *United States v. Aguiar*,

---

[10]      The remaining comparatively minor alleged errors—various missed objections during the trial and Dusing's failure to sequester witnesses pretrial—are similarly insufficient to state an ineffectiveness claim, as they too are not reasonably likely to have altered the outcome.  *See, e.g., Freeman v. Burge*, No. 05-cv-1585 (JFB), 2009 WL 1468464, at *14 (E.D.N.Y. May 22, 2009) ("[G]iven the overwhelming evidence presented by the prosecution at trial, there is no reasonable probability that the verdict at trial would have been different had petitioner's counsel successfully objected to the alleged hearsay testimony.").

737 F.3d 251, 264 (2d Cir. 2013) (cleaned up).

### 2.    Analysis

Hild raises the same arguments in connection with his Rule 33 motion based on insufficiency of the evidence that were advanced in connection with his Rule 29 motion, *see* Def. Mem. at 41, and those arguments fare no better under the Rule 33 standard.  For the reasons outlined in the Court's Rule 29 analysis, *supra* at 16–26, the evidence did not "preponderate [] heavily against the verdict" and the Court does not harbor concerns that permitting the jury's "verdict [to] stand would be a manifest injustice."  *Archer*, 977 F.3d at 188.  Accordingly, Hild's motion for a new trial based on the insufficiency of the evidence is denied.

### C.    Improper Opinion Testimony

Hild next contends that the government solicited improper opinion testimony from several lay witnesses at trial.  The Court ruled on this objection at trial and is not persuaded that a different outcome is warranted at this stage.

### 1.    Applicable Law

A lay witness may generally testify as to facts where "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Pursuant to Federal Rule of Evidence 701, however, lay witnesses may also offer opinion testimony so long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.  Testimony is "rationally based on the witness's perception" where it is "*both* (a) based on the witness's first-hand perceptions *and* (b) rationally derived from those first-hand perceptions." *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) (emphasis in original).  As the Second Circuit explained in *United States v. Rigas*:

54

> A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise. If, however, the witness's testimony was not a product of his investigation, but rather reflected his specialized knowledge, then it was impermissible expert testimony. In particular, Rule 701(c), which prohibits testimony from a lay witness that is based on scientific, technical, or other specialized knowledge, is intended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.

490 F.3d 208, 224 (2d Cir. 2007) (cleaned up).  In other words, whether a witness possesses specialized knowledge is not material; the question is whether the witness improperly strays from his own experience and testifies as an expert as outlined in Rule 702.  *See id.*; *see also Alto v. Sun Pharm. Indus., Inc.*, No. 19-cv-09758 (GHW), 2021 WL 4803582, at *13 (S.D.N.Y. Oct. 13, 2021) ("A witness with specialized knowledge may testify to facts known to the witness at the time of the events at issue but may not go beyond those facts to apply their expertise.").  Where testimony is improperly admitted, a new trial is warranted only if the testimony had a "substantial and injurious effect or influence in determining the jury's verdict."  *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003).

### 2.      Analysis

#### a.      Testimony of Dennis Hamilton

Hild first contends that the Court should not have admitted testimony of Dennis Hamilton, who worked in the Office of Litigation Economics at the SEC, concerning a chart that he had created at the request of the U.S. Attorney's Office comparing the recorded sales prices of various bonds with the prices of those same bonds in the IDC database.  *See* Tr. 1652–53.  The chart was intended to "illustrate comparisons at prices which bonds were purchased and subsequent valuations of those bonds."  Tr. 1653.  There is no dispute that the data in this chart was accurate.  Instead, Hild objects to Hamilton's use of the term "mark up" three times during the course of his

testimony; Hild claims that this constituted improper opinion testimony on ultimate legal issues in the case, seriously prejudicing him.

The graph shown below illustrated the price of each transaction as a function of the bond's "trade price." As Hamilton explained to the jury, "if Live Well purchased a bond at 10 and then that next [IDC] valuation that was published was 11, then the valuation would be reflected on the graph as 110 percent because the valuation of 11 would be 110 percent of the purchase price of 10." Tr. 1661. When asked to explain the length of the different arrows before and after Scenario 14, Hamilton explained that the arrows after Scenario 14 "go up higher than any of the arrows before," and that the differential or "mark up" of those arrows was higher. Tr. 1663 ("So the tall one you see to the left of the dotted line represents, if you want to think about that as a mark up, a mark up about 15 percent, so 115 percent is the point on the graph. All the ones to the right of the dotted line are at least 118 percent or a mark up of at least 18 percent.").



Hamilton's use of the term "mark up" was not improper as he used it to describe the difference between the price for which the bond was purchased and the price it then was quoted at by IDC, not as a comment on the propriety of Live Well's valuation methodology. *See* Tr. 1663. And to the extent there was any confusion during direct regarding the Hamilton's intended meaning, it was plainly clarified by defense counsel's cross examination:

> Q. You mentioned some kind of mark up there at the end. Did I hear that right?
> A. I mentioned that's one way of thinking about the difference between the valuation and the purchase price.
> Q. Is it though, given that one of the variables here is Live Well's and the other is a value from IDC – When you say mark up, you're not suggesting – it's a rather inappropriate word to describe this, right, given you're talking about two different things from two different parties?
> A. It was more to illustrate the concept of what is represented by the arrow.
> Q. Which would you agree it more appropriately represents very specifically the difference between the price at which Live Well acquired the bond and the price at which – the price published by IDC for that bond?
> A. That is a good, yes, definition.

Tr. 1666–67. Hamilton's testimony did not comment on the validity of Live Well's pricing model under Scenario 14 or offer an opinion on the matter at all; rather, he merely testified about the data. His use of the phrase "mark up" in that context was therefore not improper.

Although the government did use the term "mark up" in its summation to describe what it characterized as the improperly inflated gap between Scenario 14 prices submitted to IDC and the purchase prices, even if improper, its single reference to "Mr. Hamilton call[ing] it a mark up" is not sufficient to establish prejudice under Rule 33. *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."). Unlike *United States v. Kaplan*, on which Hild relies, the government did not "repeatedly call[] the jury's attention," 490 F.3d at 123, to Hamilton's use of the phrase; the evidence was not "unique," *id*. at 124; and Hamilton's personal assessment of the prices was not a critical piece of evidence as to Hild's intent, *see id*. To the extent Hamilton's testimony on

57

direct was in any way unclear, cross examination clarified that Hamilton used the phrase merely to describe the difference between the IDC price and original sale price—not to comment on the purportedly insidious nature of any price increase.  Further, on cross, Hamilton stated he knew nothing about how Live Well made its valuations and that he had used the term mark up "to illustrate the concept of what is represented by the arrow."[11]  Accordingly, unlike in *Kaplan*, the Court is not concerned the testimony "substantially swayed" the jury's verdict.  *Id.* at 123.

### b.    Testimony of Hayden Novikoff and Eric Rohr

Next, Hild objects to the testimony of two Live Well employees, Hayden Novikoff and Eric Rohr, who testified that they understood the pricing scheme to be fraudulent and wrong.  He contends that this "pervasive inadmissible lay opinion testimony" usurped the jury's role in assessing the wrongfulness of the conduct.  Def. Mem. at 47.  The Court ruled during trial that the witnesses could testify about the financial concepts at issue in the case so long as their testimony was based on their own perceptions and observations and involved reasoning that the jury could understand.  The testimony of Novikoff and Rohr did not exceed those bounds and was not otherwise improper.

Specifically, Hild objects now, as he did at trial, to Novikoff's testimony regarding an email he sent in February of 2017.  His email stated that a trader at one of Live Well's lenders wanted to "take a look at our positions and see if we are overcollateralized," and noted that he "couldn't find a way to tell [the trader] that I knew our prices would be going up over the next two days," GX162; *see* Tr. 855–56.  When asked at trial what was meant by this email, Novikoff explained:

> This was a really tough day for me.  This was the first time, as I was starting to be asked to put prices into IDC that had nothing to do with the market, just raise the prices, that I had to actually interact with one of our dealers.  And I knew that there was a plan to be raising the prices even further, and that I asked him to take a look

---

[11]    Any potential confusion was further mitigated by the Court's instructions to the jurors that they were the "exclusive judges of the facts," and that statements or arguments by lawyers "are not evidence," Tr. 2249, 2255.

> and see how the prices changed. And I remember him saying I will take a look at
> the market and let you know, and I knew that what he was going to consider to be
> the market were the price increases that had nothing to do with the market that I
> was submitting to IDC myself.

Tr. 856–57. Hild's counsel objected at trial on the basis that Novikoff's testimony lacked

foundation, was not probative, and was misleading. Tr. 858–59. Counsel also argued that the use

of the term "market" was confusing, and that Novikoff did not have the requisite experience to

testify as to "market" prices. *Id.* The Court issued a clarification to the jury that Novikoff was

"not being called as an expert witness" and his testimony was "based on his understanding in light

of his experience and what he was doing day to day." Tr. 860.

As the Court instructed, Novikoff's testimony was properly circumscribed to a narrative

description of on his own experiences—he told the jury what the email meant, how he felt in the

moment, and why he believed that what he did was wrong. While he used the term "market," it

was not outside his experience as a participant in the conspiracy to testify that he had been

instructed to "put prices into IDC that had nothing to do with the market." Tr. 856. Nor was the

government asking Novikoff to define market rates for general HECM IO bonds; rather, it only

inquired about his direct participation in the fraudulent scheme. Courts routinely permit such

testimony where a co-conspirator's impressions are "derived from his direct participation" in the

conspiracy. *See United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir.2008); *United States v.*

*Ghavami*, 23 F. Supp. 3d 148, 171 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Heinz*, 607 F.

App'x 53 (2d Cir. 2015) ("Zaino's testimony (concerning the complex financial transactions that

were the subject of the conspiracies) was proper, in that it was based on his participation in the

conspiracies."). Novikoff's testimony regarding his direct participation in the fraud here was

properly admitted.

With respect to Rohr, Hild objects to similar testimony that Live Well's pricing was "wrong," and that he knew there was "fraud going on at the company." *See* Def. Mem. 44–45. Hild also argues this testimony was especially improper and misleading because Rohr merely stated that he "was a CPA at one time," rather than that he was in any way qualified as an accounting expert. Def. Mem. at 46 (citing Tr. 1034). But to the extent Rohr—Live Well's Chief Financial Officer—had specific knowledge regarding whether the company's reporting of its revenue was "wrong" or "a fraud," that knowledge was properly derived from first-hand experience, and was not offered as an expert opinion. Rohr did not opine, for instance, as to whether another company's financials were prepared in accordance with the relevant accounting principles. Instead, he testified about financial statements that *he* prepared, that *he* believed to have been fraudulent at the time. For example, Rohr testified that Hild instructed him to "backdate" the financials, and that he felt it had been wrong to move one month's financial result into the previous one. Tr. 1029. This description of specific conduct (and for which Rohr pleaded guilty to fraud) was not an answer to a hypothetical question about accounting standards of the sort that an expert would be called to offer. The fact that Rohr was a CPA in 1995 does not change this analysis, and did not create confusion that he was an accounting expert. [12]

In sum, the Court finds that the testimony of Hamilton, Novikoff, and Rohr was properly admitted. In any event, even if the testimony were improperly admitted, any error was harmless. *See United States v. Dukagjini*, 326 F.3d 45, 61–62 (2d Cir.2003) ("Reversal is necessary only if the error had a substantial and injurious effect or influence in determining the jury's verdict.") (cleaned up). Hamilton's three uses of the term "mark up," especially given the clarification of its

---

[12]     Further, although Rohr was clearly familiar with and knowledgeable regarding financial statements, he did not hold himself out as a CPA on direct, and on cross examination stated explicitly that, although he was licensed as a CPA in 1995, he had not practiced as a CPA since that time. *See* Tr. 1229.

scope on cross examination, did not reasonably have any bearing on the jury's guilty verdict.  And the testimony from Novikoff and Rohr regarding their own assessments of their personal experiences—explaining that they believed their conduct had been wrong—similarly did not bear on the ultimate question of whether Hild shared the same fraudulent intent.  Moreover, the government presented substantial evidence of Hild's guilt, and it is reasonably likely the jury would have found Hild guilty even if the Court had sustained the objections to this testimony.  Any error thus "did not influence the jury, or had but very slight effect, [and] the verdict and the judgment should stand." *Kotteakos v. United States,* 328 U.S. 750, 764 (1946).

Accordingly, Hild's motion for a new trial on the basis of the testimony from Hamilton, Novikoff, and Rohr is denied.

### D.      Constructive Amendment and Prejudicial Variance

Finally, Hild argues that the Court should grant a new trial pursuant to Rule 33 because, while the government's indictment was premised on a "misrepresentation-based scheme," its evidence and arguments at trial instead relied on an "omissions-based theory," resulting in constructive amendment of the indictment or prejudicial variance.

#### 1.      Applicable Law

A defendant's rights under the Fifth Amendment's Grand Jury Clause are violated, and reversal required, when an indictment has been constructively amended—that is, where "the charge upon which the defendant [wa]s tried differs significantly from the charge upon which the grand jury voted." *United States v. Khalupsky,* 5 F.4th 279, 293 (2d Cir. 2021).  "A defendant claiming constructive amendment must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Id.* (cleaned up).

61

"Not every divergence from the terms of an indictment, however, qualifies as a constructive amendment." *United States v. Lisyansky*, 806 F.3d 706, 712 (2d Cir. 2015). Although a constructive amendment is a *per se* violation of the Grand Jury Clause requiring reversal, the Second Circuit has "consistently permitted significant flexibility in proof adduced at trial to support a defendant's conviction, provided that the defendant was given *notice* of the *core of criminality* to be proven against him." *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (emphasis in original) (cleaned up). The Circuit has explained that the "core of criminality" includes "the essence of a crime," not "the particulars of how a defendant effected the crime." *United States v. Vilar*, 729 F.3d 62, 90 (2d Cir. 2013). "Ultimately, whether an indictment has been constructively amended comes down to whether the deviation between the facts alleged in the indictment and the proof underlying the conviction undercuts the constitutional requirements of the Grand Jury Clause: allowing a defendant to prepare his defense and to avoid double jeopardy." *Bastian*, 770 F.3d at 220 (cleaned up).

Variance, by contrast, "occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012). Unlike constructive amendment, which is a *per se* violation requiring vacatur, a defendant must establish that "substantial prejudice occurred at trial as a result of the variance." *Khalupsky*, 5 F.4th 279, 294 (2d Cir. 2021) (cleaned up); *see also United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) ("[A] variance in proof rises to a constitutional violation only if it infringes on the notice and double jeopardy protections of an indictment.").

2.      Analysis

Hild contends the case was "charged" as a fraud "involving affirmative material misrepresentations," because the Indictment describes a scheme in which Hild "misrepresented

62

bond prices to lenders to induce the lenders to increase the amount of cash they were willing to lend." Def. Mem. at 55. By contrast, Hild argues, the government's evidence at trial focused on the failure by Hild and his co-conspirators to disclose the pricing methodology used in Scenario 14 and their attempts to obfuscate its origins. *See id.*

Hild's position construes both the grand jury's indictment and the government's proof at trial too narrowly. The "core of criminality" alleged was a scheme in which Hild and the others at Live Well submitted above-market prices to IDC and subsequently took loans against those values contrary to the expectations of Live Well's lenders. Indeed, the indictment describes a scheme involving both omissions and misstatements, and evidence at trial demonstrated that Hild and his co-conspirators submitted above-market rates to a third party and also induced lenders into loans based on those inflated prices. The precise combination of misrepresentations and omissions that Hild deployed to carry out this fraud are immaterial to "the essence of a crime," and instead make up "the particulars of how a defendant effected the crime." *Vilar*, 729 F.3d at 90. "Discrepancies in the particulars of how a defendant effected the crime do not constructively amend the indictment." *Bastian*, 770 F.3d at 223. The Court thus determines that there is no danger that the jury convicted Hild for a crime other than what is alleged in the indictment, *see Khalupsky*, 5 F.4th at 293, and that Hild has not made a showing of constructive amendment. For similar reasons, because the evidence presented at trial did not "prove facts materially different from those alleged in the indictment," *D'Amelio*, 683 F.3d at 417, the Court finds that there was no prejudicial variance.

Accordingly, Hild's Rule 33 motion on the basis of constructive amendment or prejudicial variance is denied.

SPA-64

**CONCLUSION**

For the foregoing reasons, Hild's motions are denied.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entry 102.

Sentencing is hereby scheduled for January 27, 2023 at 4:00 p.m.  The parties shall refer to the Rule 10(A)(i) of the Individual Rules and Practices in Criminal Cases for the appropriate filing timeline for their sentencing submissions.


SO ORDERED.

Dated:     December 7, 2022
           New York, New York

                                            _____
                                            Hon. Ronnie Abrams
                                            United States District Judge

SPA-65

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES, | |
| v. | No. 19-cr-602 (RA) |
| MICHAEL HILD, | ORDER |
| Defendant. | |

RONNIE ABRAMS, United States District Judge:

Defendant Hild is scheduled to be sentenced by this Court on January 27, 2023.  By letter dated December 28, 2022, his counsel "ask[s] that the Court address whether possible conflicts in this case should have led this Court to disqualify itself pursuant to Section 455, Title 28, United States Code," and whether it should recuse itself for purposes of sentencing.  Dkt. 141. Without citing any caselaw, Hild suggests that recusal is appropriate because the law firm of Davis Polk & Wardwell LLP, at which my husband is a partner, appears to have represented parties whose interests are "potentially adverse" to Hild.  *Id*. at 2.  Specifically, it lists Davis Polk's representations of Mizuho Bank and Industrial and Commercial Bank of China Limited (ICBC)—two of numerous victims of Hild's fraud—and Intercontinental Exchange—the owner of Interactive Data Corp. (IDC), which the government contended Hild "controlled" to perpetrate his fraud—as requiring recusal in this action.

The Court was unaware of these representations until the filing of Hild's letter, and my husband has had no involvement with any representation of these clients.  For the reasons set forth below, and based on longstanding interpretations of Section 455 by both the Second Circuit and the Advisory Committee on Judicial Ethics, the Court declines to recuse itself from this action.

A judge should recuse herself where "[s]he knows that [s]he, individually or as a fiduciary, or h[er] spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. §§ 455(b)(4), (b)(5)(iii). Interpreting this statute, the Second Circuit has remarked that "[i]t would simply be unrealistic to assume . . . that partners in today's law firms invariably 'have an interest that could be substantially affected by the outcome of' any case in which any other partner is involved." *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 83–84 (2d Cir. 1996). Similarly, the Advisory Committee on Judicial Ethics has advised that "judges generally are not required to recuse from cases involving a current client of a spouse or a spouse's business if the spouse is not then personally engaged in work for that client," reasoning that the "spouse's connection to such a client is indirect and attenuated, and absent other factors a reasonable person would not question the judge's impartiality if the client appeared before the judge in an unrelated proceeding." Advisory Comm. on Jud. Ethics, Advisory Op. No. 107 (2009); *see also In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (observing that "where an interest is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality" and collecting cases).

Courts in this district have thus regularly declined to recuse themselves from proceedings wherein partners at a spouse's law firm have represented an interested party. *See, e.g., Couri v. Pavia*, No. 19-cv-5436, 2019 WL 3553357, at *3 (S.D.N.Y. Aug. 5, 2019) (denying recusal motion where the Court's husband was a partner at the law firm Proskauer Rose LLP, to which plaintiff claimed to be an "adversary"); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97-cv-5499, 2003 WL 282187, at *5–7 (S.D.N.Y. Feb. 7, 2003) (denying recusal motion where the Court's husband was a partner at the law firm Cahill Gordon & Reindel, which represented

2

SPA-67

interested parties); *see also Gench v. Hostgator.com, LLC*, No. 14-cv-3592, 2015 WL 4579147, at

*2 (S.D.N.Y. July 29, 2015) (this Court denying recusal motion where partners at Davis Polk may

have represented an interested party in an unrelated matter).   Accordingly, the Court concludes

that recusal in this matter is unnecessary.


SO ORDERED.

Dated:       January 3, 2023
             New York, New York

                                                     _____
                                                     Hon. Ronnie Abrams
                                                     United States District Judge

SPA-68

AO 245B (Rev. 09/19)   Judgment in a Criminal Case        (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Michael Hild | ) Case Number:  19 Cr. 602-01 (RA) |
| | ) USM Number:  93692-083 |
| | ) Brian A. Jacobs, Esq. (212) 880-9536 |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☑ was found guilty on count(s)    (1), (2), (3), (4), (5)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 371 | Conspiracy to Commit Securities Fraud | 8/29/2019 | (1) |
| 18 USC 1349 | Conspiracy to Commit Wire Fraud and Bank Fraud | 8/29/2019 | (2) |
| 15 USC 78j(b) & 78ff | Securities Fraud | 8/29/2019 | (3) |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/27/2023
Date of Imposition of Judgment

Signature of Judge

Ronnie Abrams, U.S.D.J.
Name and Title of Judge

1/31/2023
Date

SPA-69

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

Judgment—Page   2   of   8

DEFENDANT:  Michael Hild
CASE NUMBER:   19 Cr. 602-01 (RA)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1343 | Wire Fraud | 8/29/2019 | (4) |
| 18 USC 1344 | Bank Fraud | 8/29/2019 | (5) |

SPA-70

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   3   of   8  

DEFENDANT:  Michael Hild
CASE NUMBER:  19 Cr. 602-01 (RA)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

44 months [on each count to run concurrently]

☑ The court makes the following recommendations to the Bureau of Prisons:
  It is recommended that the defendant be designated to a facility in or near Richmond, Virginia.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

  ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

  ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☑ before 2 p.m. on   5/1/2023_____ .

  ☐ as notified by the United States Marshal.

  ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-71

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page  4  of  8

DEFENDANT:  Michael Hild
CASE NUMBER:  19 Cr. 602-01 (RA)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years on each count to run concurrently

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-72

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page    5    of    8

DEFENDANT:  Michael Hild
CASE NUMBER:  19 Cr. 602-01 (RA)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____   Date  _____

SPA-73

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 8 |
|---|---|---|---|---|

DEFENDANT:  Michael Hild
CASE NUMBER:  19 Cr. 602-01 (RA)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall submit his person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

The defendant must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless he is in compliance with the installment payment schedule.

The defendant must provide the probation officer with access to any requested financial information.

The defendant shall be supervised in the district of residence.

SPA-74

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: Michael Hild
CASE NUMBER: 19 Cr. 602-01 (RA)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|          | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|----------|-----------|-------------|------|------------------|-------------------|
| **TOTALS** | $ 500.00 | $ | $ | $ | $ |

☑ The determination of restitution is deferred until ___4/27/2023___ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|-------------------|-----------------|-------------------------|----------------------------|
|                   |                 |                         |                            |

| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-75

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page   8   of   8

DEFENDANT:  Michael Hild
CASE NUMBER:  19 Cr. 602-01 (RA)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $  500.00  due immediately, balance due

☐  not later than  , or
☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal  (e.g., weekly, monthly, quarterly) installments of $  over a period of
 (e.g., months or years), to commence  (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal  (e.g., weekly, monthly, quarterly) installments of $  over a period of
 (e.g., months or years), to commence  (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E  ☐  Payment during the term of supervised release will commence within  (e.g., 30 or 60 days) after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
Money Judgment in the amount of $22,606,752.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

SPA-76

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC-SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC#:
> DATE FILED:  9/12/2023

UNITED STATES OF AMERICA,

v.

MICHAEL HILD,

Defendant.

No. 19-CR-602 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Defendant Michael Hild was convicted following a fourteen-day jury trial of committing securities fraud, wire fraud, and bank fraud, as well as conspiring to do so.  The evidence at trial established that Hild and his co-conspirators at Live Well Financial ("Live Well") engaged in a multi-year scheme to fraudulently inflate the value of a portfolio of Home Equity Conversion Mortgage "interest only" bonds ("HECM IO bonds") used as collateral to secure cash loans. Although the loan amounts were nominally based on market prices for the HECM IO bonds provided by a third party, the evidence demonstrated that Live Well had directly supplied valuations to that third party, unbeknownst to its lenders, basing them on its own novel internal pricing methodology rather than on what the bonds could readily be sold for in the market.  As a result, Live Well was able to purchase the bonds at one price, provide the third party its own inflated valuations, and then use those inflated bond values as collateral to take out loans worth significantly more than the price for which the bonds could be sold, resulting in a substantial cash windfall for Live Well.

Following his conviction, Hild filed motions pursuant to Federal Rules of Criminal Procedure 29 and 33 for, respectively, a judgment of acquittal and for a new trial.  The Court

denied those motions in a 64-page opinion and order issued in December 2022, *see United States v. Hild*, --- F. Supp. 3d ---, 2022 WL 17484992 (S.D.N.Y. Dec. 7, 2022), and sentenced Hild to 44 months' imprisonment, *see* Dkt. 147. Hild's appeal is now pending before the Second Circuit, *see Hild v. United States*, No. 23-6136 (2d Cir.), and this Court has granted him bail pending the resolution of that appeal, *see* Dkt. 154.

At his sentencing, the Court ordered Hild to pay restitution to the victim lending institutions, *see* Dkt. 148, but reserved judgment on the amount of restitution to be paid pending further justification from the Government. *See Dolan v. United States*, 560 U.S. 605, 611 (2010) (holding, where a district court has ordered restitution within the 90-day period set pursuant to 18 U.S.C. § 3664(d)(5), but has not set an amount, that it retains jurisdiction to order the amount at a later date). The Government has now filed a proposed order of restitution, along with supporting materials related to the harm suffered by the victim lenders. *See* Dkts. 161, 187. In critical part, the documents supporting the proposed restitution amount include information related to millions of dollars in so-called "coupon payments"—that is, annual interest payments—received by the victim lenders for holding the HECM IO bonds which were offered as collateral by Live Well.

Hild's latest motion seizes upon the Government's recent restitution submissions to argue that these materials—which show significant coupon payments to the lenders—constitute "newly discovered evidence" under Rule 33, and thus warrant Hild a new trial. In the alternative, he requests additional discovery related to coupon payments to the lenders, so that an appropriate restitution calculation can be made. Finally, Hild argues that the Supreme Court's recent decision in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), which invalidated the Second Circuit's "right to control" theory of wire fraud, *id.* at 1125–28, renders jury instructions with respect to Counts Two and Four plainly erroneous, further justifying that he be granted a new trial.

2

For the reasons that follow, and given the particularly stringent standard attendant to Rule 33, Hild's motion for a new trial on the basis of purported newly discovered evidence is denied. With the consent of the parties, the Court will refer the calculation of the restitution amount to be paid to Magistrate Judge Parker, who may also make a determination as to whether the Defense should obtain additional discovery related to the harm suffered by the victim lending institutions. *See* 18 U.S.C. § 3664(d)(6) (providing that a district court "may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition"). Lastly, the Court defers the issue of whether *Ciminelli* renders the fraud jury instructions in this case to be plainly erroneous to the Second Circuit, before which Hild's appeal remains pending.

## BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and procedural history of this action, about which the Court has previously written extensively. *See United States v. Hild*, --- F. Supp. 3d ---, 2022 WL 17484992, at *2–8 (S.D.N.Y. Dec. 7, 2022). The following is taken from the Court's prior opinion, and summarizes those facts relevant to Hild's present motion.

I.    **Evidence Presented at Trial**

A.    **Founding of Live Well and Reverse Mortgage Servicing**

Live Well was established in 2005, and, at all relevant times, Hild was its CEO, Tr. 1247, 1867, and largest shareholder, Tr. 1904–05; *see also* GX321. Hild founded Live Well to pursue a business opportunity in the burgeoning reverse mortgage space. Tr. 1785–88. Reverse mortgages, or Home Equity Conversion Mortgages ("HECMs"), are a financial product designed to provide liquidity to senior homeowners whose net worth is primarily tied up in their home equity. Tr. 57–58, 578–79, 1788. HECMs permit individuals to receive monthly cash income by using their home

3

equity as collateral.  Tr. 579.  For many years, Live Well operated as a traditional and reverse mortgage broker and servicer: it reviewed applications from borrowers, approved loans, and then serviced those loans.  Tr. 946, 1790–91, 1814.

Beginning in approximately 2011, Live Well began securitizing reverse mortgages into bonds called HECM mortgage-backed securities ("HMBSs").  Tr. 947.  After it began to sell these securities, it "[g]rew dramatically."  Tr. 1806.  Packaging the mortgages as bonds allowed Live Well to generate revenue more quickly by selling pools of similar reverse mortgages to investors in bulk, rather than one-by-one.  Tr. 947–49.  Key among these bonds was a subcategory of HECM IO bonds, which are made up of derivatives of HECMs that include only the interest portion of the loan rather than the entire reverse mortgage.  Tr. 59, 60, 950–52; *see also* Tr. 1814.  The HECM IO bonds are particularly attractive to investors because holders of those bonds receive regular interest payments.  Tr. 1818.

**B.      Expansion Into Purchasing HMBSs & the Stifel Transaction**

In 2014, Live Well expanded beyond securitization of reverse mortgages into the purchase of HMBSs.  Tr. 58–59, 951–52, 1817.  Hild stated that the goal of purchasing these bonds and holding them as investments was to diversify the company's revenue and reduce its susceptibility to cyclical changes in the mortgage space.  Tr. 1814.

At Hild's direction, the company acquired a portfolio of fifteen HECM IO bonds worth $55 million from Stifel Financial, a small investment bank that had previously held and traded in HMBSs (the "Stifel Transaction").  Tr. 57, 72–73, 951–53.  In addition to the bond portfolio, Live Well also hired three Stifel employees—Darren Stumberger, Ernie Calabrese, and Dan Foster—who had managed the portfolio at Stifel, to continue their work at Live Well.  Tr. 969.  Stumberger, described by Hild as the "reverse mortgage bond guru," Tr. 1815–17, was a particularly important

hire due to his expertise in the area, *see id.; see also* Tr. 73–74, 969.

Live Well did not have the cash on hand to buy the bonds outright, and it thus financed the acquisition using a combination of cash, "warehouse loans" it had access to through its mortgage business, and loans collateralized by the underlying bonds, the latter of which were referred to as "repo financing." Tr. 76–77, 731–32, 952. The repo financing agreements were loans structured as repurchase agreements in which Live Well sold the bonds to lenders and agreed to buy them back at a specific price after a short period had passed, typically thirty to sixty days. Tr. 76–77, 261; *see also* Tr. 1826. At the end of the period, lenders would generally "roll" the loan forward, Tr. 674–75, but they could alternatively end the lending agreement and demand repayment of the loan amount, Tr. 572–75. In the case that Live Well was unable to repay the loan at the end of the term, the lenders would keep the collateral (the HECM IO bonds), which they could either hold or sell to repay the defaulted loan. Tr. 76–77.

Typically, the loan amount was determined by discounting the value of the underlying bond by 10% to 30%. Tr. 86. This discount, often called a "haircut," ensured that the lenders remained sufficiently collateralized if the bonds decreased in value, and priced in the risk of a lender having to sell the bonds. Tr. 81, 588–89; *see also* Tr. 396, 573, 674–77. Different repo lenders extended loans with different haircut amounts, but Live Well preferred to borrow from lenders with lower haircuts, thereby maximizing the amount of cash it was loaned. Tr. 1069, 1162, 1461.

As the prices of the collateral fluctuated up or down, either party could request that the loan amount be adjusted accordingly. Tr. 85–87. If the value of the collateral decreased, lenders could require partial repayment of the loan amount via margin call, Tr. 85–86, and if the value of the bonds increased, Live Well could request to borrow more via "reverse margin call," Tr. 86–87.

With one exception, the loan agreements between Live Well and the lenders required that

5

the prices for the bonds be set by an independent third party.  Tr. 78–80, 575–76, 598–600.[1]  To take one example, Live Well's contract with Mirae Asset Securities (USA) Inc. ("Mirae") required that the amount of the loan be adjusted based on "the aggregate Market Value of all Purchased Securities."  GX603 at 3; Tr. 599–600.  "Market Value" was defined as:

> the price for such Securities on [a given] date obtained from (i) Interactive Data Corporation ("IDC") or (ii) if no quotation is available from IDC, then a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein.

GX603 at 11; *see also* Tr. 598–601.  As lenders typically lacked the expertise or experience required to value the bonds themselves, *see* Tr. 575–76, they thus relied on a third party— Interactive Data Corporation ("IDC")—to provide prices, *id.*; *see also* Tr. 81–82.  Stumberger testified that, based upon conversations with the lenders, it was his understanding that they required third-party prices "because [they] wanted independent, unbiased view[s] on valuations," and did not want the loan amount determined by the borrower or lender.  Tr. 81–83.

At the time of the Stifel Transaction in 2014, however, IDC was itself unable to value the bonds, and thus relied on "broker quotes" to provide pricing.  Tr. 173.  Also at that time, Live Well was providing estimates as to what the bonds could be sold for in the market as broker quotes to IDC.  Tr. 83.  In other words: IDC published prices provided by Live Well, which were in turn used in repo agreements to calculate the size of the loans Live Well could secure from most of its lenders.

In January of 2015, IDC began using its own independent pricing model to value the bonds.  Tr. 85; GX104.  Hild and the co-conspirators, however, determined that IDC's model was deficient.  Tr. 281–83.  Among other issues, IDC was "running the portfolio evaluations daily," and doing so caused a daily decline in the bond prices.  Tr. 85–87.  The overall downward pressure

---

[1]     One lender, Nomura, had its own trading desk that set the loan amount "based on the market."  Tr. 79.

on the bond prices in turn led to margin calls from the lenders as they became under-collateralized. *Id*. The corresponding need to constantly repay the loans caused strain at Live Well, so Stumberger and his team were directed by Hild to "rectify this problem," Tr. 87–88. Ultimately, IDC ceased modeling the bonds independently and returned to publishing Live Well's broker quotes. Tr. 88–89. Under that system, Live Well "suppl[ied] prices daily to IDC," which IDC used "verbatim." GX104. Live Well and IDC agreed that IDC would "not model the[] bonds until [Live Well was] interested in them doing so." Tr. 89, GX104. Thus, by February of 2015, Live Well had resumed providing broker quotes to IDC. Tr. 93–94.

### C.     Shift to Scenario 14 Pricing

Live Well developed its own internal models to project the value of the bonds later in 2015. Tr. 100–05, 990–93; GX113. Evidence adduced at trial showed that Hild and other Live Well employees believed that the market generally undervalued reverse mortgage bonds. As Stumberger, the so-called "reverse mortgage bond guru," explained, the yield requirement of the bonds "should theoretically . . . drift down gradually" over time, but "it wasn't working like that in the market." Tr. 111–12; *see also* GX402. He described the prevailing methodology as "improper" and "not sound," Tr. 112, and acknowledged the difference between the theoretical value of the bonds and "what happens in reality," GX402.

An assumption regarding yield requirements, among others, was incorporated into a new methodology for valuing the bonds called Scenario 14. Because the Scenario 14 assumptions differed from factors "in the market," the prices of the bonds derived using Scenario 14 were typically higher than those for which they could be sold. Tr. 113–14. Indeed, the jury heard testimony from multiple co-conspirators that they knew the Scenario 14 prices exceeded what the bonds were worth in the market. Tr. 158, 993–97, 1014.

7

Nevertheless, at Hild's direction, Tr. 91, 93, 103, Live Well began to submit Scenario 14 prices to IDC in September of 2015, Tr. 137, 150, 322–23, 410, 998–99.  The shift to Scenario 14 prices in turn resulted in an $11 million increase in the value of Live Well's portfolio.  Tr. 119–22; GX402 at 29.  But because such a substantial increase in a single day would "raise alarm bells all over the place," in Hild's own words, GX402 at 29, he directed his employees to implement the price increase gradually using a "glide path," *id.*, so as to avoid triggering any "red flags," Tr. 121–22; *see also* Tr. 1004–11; GX402; GX403; GX404.

Given that most of its repo agreements relied on IDC, the change to Scenario 14 pricing allowed Live Well to enter loan agreements where the loan amount would exceed the purchase price of the bond, which resulted in an immediate windfall for the company.  Tr. 128 (Stumberger testifying Live Well could "purchase new bonds in the market and apply the pricing, the [S]cenario 14 pricing, submit that to IDC, and because the lenders were relying on IDC pricing, they would be lending more money than needed to purchase the bond at the market."); *see also* Tr. 129–34. As Eric Rohr, the company's Chief Financial Officer, explained, "every time we bought bonds, we would have money left, extra money coming back to our pocket."  Tr. 1002.  Hild referred to this process as a "little bit of a self-generating money machine."  *Id.*  All told, by the end of 2015, the shift to Scenario 14 valuations had resulted in an increase in the value of the company's portfolio of more than $47 million.  Tr. 1084.

The witnesses' testimony was consistent that the Scenario 14 assumptions model was created as an "academic exercise" to value the bonds.  Tr. 995.  The jury heard competing narratives, however, concerning the intent behind submitting the Scenario 14 prices to IDC. According to Hild, these prices were the company's best effort to value the bonds, and thus submitting those values to IDC was appropriate.  *See, e.g.,* Tr. 1874–76. Several co-conspirators,

however, testified that they knew that providing the Scenario 14 prices to IDC and then borrowing against those prices was "wrong," Tr. 307–09, 1002, 1539, and that they believed that if the lenders had known the IDC prices were based on Live Well's internal investment "thesis," rather than the prices the bond could be readily sold for in the market, they would not have entered the agreements, Tr. 136, 309–12, 996–1009. The lenders expressed this same view directly. Tr. 605–10.

Stumberger went further, testifying that Hild directed the submission of Scenario 14 prices not as part of a good faith effort to value the bonds, but *in order to* increase Live Well's ability to borrow cash from lenders:

> Q. How did you feel about the decision to submit these [Scenario 14] prices to IDC?
> A. I was concerned. I was nervous.
> Q. You said this was done at whose direction?
> A. Michael [Hild]'s.
> Q. Based on your conversations with Mr. Hild, did you have an understanding about why he wanted these higher prices to be submitted to IDC?
> A. Yes.
> Q. What was your understanding?
> A. That it would create a situation, because of the higher valuations, that Live Well could borrow more money via [reverse] margin call.

Tr. 115–16. Live Well continued submitting prices to IDC, and, from 2015 onward, IDC published those prices "verbatim." Tr. 1014; 1254–55.

**D.     2017 Liquidity Events**

In January 2017, one lender, Wedbush, asked to speak with a Live Well dealer for more information about how the bonds were being valued. Tr. 166–67. On a recorded call, Hild and other co-conspirators discussed how to respond to the request. *See* GX407. There were several risks posed by Wedbush discussing prices with a dealer, in that Wedbush could learn the IDC rates were above market rates and/or learn that the prices were broker quotes that came from Live Well. Tr. 166–77. Hild and others discussed their options: Live Well could screen a dealer in advance, to see if they would come up with a valuation matching the Scenario 14 prices on IDC, or they

9

SPA-85

could find a "slimy" dealer willing to represent the IDC prices were correct.  Tr. 169–75, 1147, GX407.  Eventually, Hild questioned whether they could persuade Wedbush that the rates were not improper, given that Live Well was uniquely qualified to evaluate the bonds.  Tr. 136–42. Stumberger responded that Wedbush and other dealers were not concerned with the "intrinsic" value of the bonds, but rather on what they could be sold for in the market:

> HILD: . . . the reason we're in this space is because we're one of the few people that know how to value these securities, right?  Would you not disagree with the statement, Darren?  That most of the folks that are out there don't know how to value these securities including the big guys?
>
> STUMBERGER: Well, the dealers—the dealers make the market.  They offer bonds a certain way.  They finance them a certain way.  So, whether they—they're doing it right or not is —
>
> HILD: Well, that's my point—
>
> STUMBERGER: —I don't think Scott [at Wedbush] cares about that.  Scott cares about what is the market.  And it's gonna be defined—the market is going to be defined as something that is an 8 or 9% yield to 50 HPC on the— on the—on the sell side.  On the—on the ask.  The bid is behind—is a higher yield.  That's what he's gonna get from, we know, the guys who are pedaling the paper. May not be right, or proper, or sound, but that's what's gonna be defined as the market.  That's just realistic.
>
> HILD: There's no debating that.

GX407; *see also* Tr. 136–42.[2]  Hild and his co-conspirators also discussed whether to disclose their methodology to the market, which would hurt Live Well "in some respects" because, even if the others in the market agreed, it would increase the purchase price of the bonds.  Tr. 1155–56. Another option they considered was to mark down the portfolio to market rates.  Tr. 1156–57. Hild considered this option "obviously a non-starter," as it would have resulted in a $50 million loss on the company's income statement and triggered a substantial margin call.  Tr. 1157.

---

[2]    The jury heard similar testimony, that the lenders ultimately cared only about the price for which the bonds could be sold in the market, from one lender directly.  *See* Tr. 600–01.

In addition to requesting additional quotes, Wedbush also stated it was "no longer comfortable extending credit" with respect to a certain type of bond (MACRs), and that it would reduce Live Well's overall credit line.  Tr. 1157.  These events created "potential liquidity problems" for the company.  Tr. 1157.  No other lenders would finance the MACRs, and because they could not be sold at the rate Live Well was "carrying them," Live Well would need almost $22 million in cash to avoid defaulting on its debts.  Tr. 1158–63; GX151.  Even after Stumberger and Foster "optimized" as best they could, Live Well was left with an effective deficit of $21.8 million, a situation Hild described as a "catastrophe."  Tr. 1164; GX151.

Rohr testified that "at some point" it became clear to the Live Well team that the bonds could not be reshuffled and new financing was unavailable such that the "only way out of this situation was somehow getting the value of [Live Well's] collateral increased and getting more credit, and therefore, being able to borrow more against the existing collateral to kind of help facilitate some of these moves and pending liquidity hits."  Tr. 1166–67.  Rohr testified that Hild instructed them "to raise prices in IDC," although Hild acknowledged that "the trading desk is not going to like it."  Tr. 1167.  No market rationale was supplied for this proposed increase, and Rohr testified the prices were no longer consistent even with the inflated valuations calculated under Scenario 14.  Tr. 1167–68.  Rohr described feeling "sick to [his] stomach" at this point, as the prices being submitted were "beyond even our own investment thesis . . . way beyond that."  Tr. 1168.

Stumberger and others eventually modeled potential scenarios that would resolve the liquidity crisis, including one option, "Scenario 4," which they ultimately agreed to submit.  Tr. 1169.  Rohr testified that the "purpose" of Scenario 4 was "to resolve the pending liquidity crisis" at Live Well.  Tr. 1169–70.  Like Scenario 14, the prices were gradually increased over the course

11

—

of several weeks to avoid setting off "red flags." Tr. 1169–75; GX408.

In February of 2017, Wedbush indicated that it may not renew its loans when they expired in March, which created another substantial threat: because Wedbush offered the most favorable rates, it would "create a really negative liquidity situation," in Rohr's words, if Wedbush stopped financing the loans. Tr. 1183–84. Rohr testified that Hild continued to direct price increases at that point in an effort to avoid "potentially business-ending, company-ending situations," but that Hild's position was ultimately untenable, as there was "no way out" of the situation. Tr. 1185. Live Well continued to "adjust pricing in IDC" in response to further liquidity events in March 2017, Tr. 1198–1200, increasing the value of the portfolio by another $21 million, Tr. 1202–04.

After the liquidity crisis eased, these prices were gradually returned to the prices derived using Scenario 14. Tr. 1196–97, 1205. Soon after, in September of 2017, Live Well received a subpoena from the Securities and Exchange Commission ("SEC"), which led to a two-year investigation. Tr. 1205.

### E. Financial Statements

In addition to the evidence regarding the IDC prices and loans, the Government also presented evidence regarding Live Well's financial statements. Because the bond portfolio was Live Well's largest asset, the application of Scenario 14 prices to that asset resulted in a valuation of the bonds in Live Well's financial statements that was higher than the market rate. Tr. 1081–89, 1601–11. Lenders testified that they relied, in part, on the financial statements in making decisions about lending to Live Well. Tr. 591, 594–98, 682, 685–93.

Rohr testified that, as CFO, he was involved in preparing the company's financial statements, Tr. 1080, and was directed by Hild to value the portfolio using IDC prices to avoid any discrepancies, Tr. 1083. It was Rohr's view that the characterization of the bonds in the financial

statements was not true, both because the prices were above what the bonds could readily be sold for, and because the prices did not come from an independent third party.  Tr. 1087–89.

In 2019, Rohr was replaced as CFO by Glen Haddock, Tr. 1598, who worked at Live Well but was not involved in the fraud, Tr. 1601–02.  Haddock eventually learned that Live Well was providing IDC prices, Tr. 1608–09, and after evaluating the portfolio on his own, expressed his view to Hild that the bonds were overvalued, Tr. 1610–11.  Ultimately, he refused to sign the company's 2019 audited financial statements, Tr. 1616–17, and shortly thereafter Live Well announced it would cease operations and unwind, *see* Tr. 1617–19.

## II.    Procedural History

Hild was charged in a five-count indictment with conspiracy to commit securities fraud, 18 U.S.C. § 371; conspiracy to commit wire and brank fraud, 18 U.S.C. § 1349; securities fraud, 15 U.S.C. §§ 78j and 78ff; 17 C.F.R. § 240.10b-5; wire fraud, 18 U.S.C. §§ 1343 and 2; and bank fraud, 18 U.S.C. §§ 1344 and 2.  Hild maintained his innocence and proceeded to trial, which lasted fourteen days.  He was convicted by the jury on all five counts.

Following trial, Hild moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  Following oral argument—and a plethora of supplemental submissions—the Court issued a 64-page opinion and order denying the motions in their entirety.  *See United States v. Hild*, --- F. Supp. 3d ---, 2022 WL 17484992 (S.D.N.Y. Dec. 7, 2022).  Hild was sentenced on January 27, 2023 to 44 months' imprisonment.  He has since appealed to the Second Circuit.  This Court granted bail pending appeal after concluding that his appeal met the factors for release pursuant to 18 U.S.C. § 3143.  Dkt. 154. Although the Court underscored its continued assurance as to the merits of its opinion denying Hild's post-trial motions, it concluded that his appeal

"presents a substantial question" that was "so integral to the merits of the conviction" that any possible contrary holding by the Second Circuit would "likely require reversal of the conviction or a new trial." *See id.* at 2–3 (citing *United States v. Randell*, 761 F.2d 122, 124–25 (2d Cir. 1985)).

Following Hild's sentencing, the Government filed a proposed order of restitution on April 24, 2023, resulting in a flurry of letters from both parties regarding the appropriateness of the Government relying on the same affidavits it had previously submitted to the Court while affirming that they were "not sufficiently detailed to determine which expenses the victims have incurred that are compensable" for restitution purposes. Dkt. 144 at 19. The Court filed an order indicating that, although it had ordered Hild to pay restitution to the victims, it would not specify the amount "without additional justification for doing to," further setting a briefing schedule on the issue. Dkt. 164. The Government made an additional submission on May 16, 2023, Dkt. 168, and Hild thereafter filed his motion for a new trial on May 29, 2023, Dkts. 173–74.[3] The motion was fully briefed in July, and the Court heard oral argument on August 9th. Based upon the Court's questioning at oral argument, the parties filed supplemental letters on discrete issues related to the restitution calculation on August 18th.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under

---

[3] Although the Government initially moved to seal the records showing the amount in coupon payments received by the victim lending institutions, *see* Dkt. 168 at 2, it has since withdrawn this motion given the "passage of time since the events at issue and the fact that certain information has already been made public through the Government's in-court statements and other filings," Dkt. 188. Accordingly, the Government has now filed the records on the public docket. *See* Dkt. 187, Ex. 1 (Flagstar materials), Ex. 2 (Mirae materials), Ex. 3 (ICBC materials), Ex. 4 (Customers materials).

Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). "[T]he standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should only be granted in "extraordinary circumstances," *McCourty*, 562 F.3d at 475. *See also United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993). The "ultimate test" in evaluating a Rule 33 motion is whether "letting a guilty verdict stand would be a manifest injustice." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005). There "must be a real concern that an innocent person may have been convicted." *Id.*

Rule 37 permits a district court, while an appeal is pending, to "(1) defer considering [a Rule 33] motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a). Put differently, a "district court retains jurisdiction to deny a Rule 33 motion during the pendency of an appeal, even though it may not grant such motion unless the Court of Appeals first remands the case to the district court." *United States v. Camacho*, 302 F.3d 35, 36 (2d Cir. 2002).

## DISCUSSION

### I.     Documentation of Lender Coupon Payments is Not "Newly Discovered Evidence"

In his latest motion, Hild argues that the supplemental documents related to coupon payments that the Government obtained from lenders—and thereafter submitted to the Court in connection with the ongoing restitution calculation—constitute "newly discovered evidence" within the meaning of Rule 33. *See* Mot. at 18. He argues that these materials confirm that the lenders who held the HECM IO bonds at issue regularly received tens of millions of dollars in coupon payments. This fact, Hild argues in turn, undermines the Government's principal arguments at trial that the bonds were overvalued by Live Well, corroborates Hild's arguments at trial that the bonds were properly valued and the lenders fully secured, and impeaches the

15

testimony of lender representatives who told the jury that they would not hold the bonds and any coupon payment proceeds would not cover the loans made.[4]

Although this latest argument appears compelling at first blush, for the reasons which follow, the Court cannot conclude that the documents pertaining to coupon payments received by the lenders constitute newly discovered evidence under Rule 33's stringent standard. Accordingly, Hild's latest motion for a new trial is denied.

\* \* \*

A motion for a new trial pursuant to Rule 33 based on newly discovered evidence should be granted only when "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Owen*, 500 F.3d 83, 87–88 (2d Cir. 2007). This is a particularly "strict" standard, *Gambino*, 59 F.3d at 364, and a motion for a new trial is thus only to be granted in "extraordinary circumstances," *McCourty*, 562 F.3d at 475. "The balance between protecting the finality of judgments and the interests of justice is inherent in the Rule 33 analysis," *United States v. Forbes*, 790 F.3d 403, 408 (2d Cir. 2015), and the Circuit has "never before held that a new trial may be granted pursuant to Rule 33 on the basis of evidence

---

[4]       Hild's current Rule 33 motion appeared initially to further argue that documentation of the lenders' coupon payments also constituted undisclosed *Brady* material. *See* Mot. at 3 ("Whether viewed as newly discovered evidence under Rule 33 or a belated disclosure pursuant to *Brady v. Maryland*, the result should be the same: a new trial on all counts.") In the Government's response, however, it represented that it was "not previously in possession of this information." Opp. at 4; *see also id*. ("[A]nd to the extent the Government obtained information regarding coupon payments beyond what was previously produced in discovery or elicited at trial, that information was included in the Government's court filings.").

        In light of the Government's representation, Hild does not appear to continue to argue that evidence of coupon payments constituted undisclosed *Brady* material. Instead, he now asks merely that the Court order the Government "to disclose, pursuant to *Brady*, all information relating to the lenders' receipt of coupon payments, together with any other information relating to the holding and sale of the bonds and offsets for losses." Reply at 15. That request is discussed, *infra* in Section II.

16

that was known by the defendant prior to trial, but became newly available after trial," *Owen*, 500 F.3d at 89.  As noted previously, the "ultimate test" is whether "letting a guilty verdict stand would be a manifest injustice."  *Canova*, 412 F.3d at 349.

Most significantly, Hild has not established that any documentation related to the lenders' coupon payments for holding the HECM IO bonds is material under the third prong, or that it would have likely resulted in his acquittal on the fraud counts under the fifth.  It is well-established that actual harm is not an element of any of the offenses for which Hild was convicted.  *See, e.g., United States v. Abakporo*, 2014 WL 2608857, at *2 (S.D.N.Y. June 9, 2014) ("As a matter of law, the actual loss amounts cannot be 'material to the issue of guilt' and thus, cannot be the basis for granting a new trial or acquittal under Rule 33.").  It was therefore irrelevant to Hild's guilt, as a matter of law, whether any of the lenders lost any money—or even actually profited from—his fraudulent scheme.  Rather, as the Court recognized in its opinion denying Hild's previous post-trial motions, the proof at trial demonstrated "that Hild deceived the lenders by negotiating loan agreements under which the valuation of Live Well's bond portfolio was based on purported market prices set by an independent third party, but which was, in reality, based on Hild's company's internal, above-market pricing assumptions."  *Hild*, 2022 WL 17484992, at *10 (S.D.N.Y. Dec. 7, 2022).   The question for the jury's purposes, as the Government argued throughout trial, was thus simply whether Hild knowingly caused the bonds to be marked at prices that were not obtainable in the market in order to receive inflated loans from the lenders— something that was well supported by the evidence adduced at trial.  *See, e.g.*, GX402 (Hild describing the scheme as a "self-generating money machine"); Tr. 1002 (Hild discussing with co-conspirators how to best avoid detection in light of an inquiry from one of the lenders); Tr. 119– 21 (Hild directing co-conspirator to apply the inflated Scenario 14 prices slowly, by way of a "kind

of gradual glide path," so that Live Well did not appear to have its bond portfolio increased by "11.4 million [dollars] in one day"); Tr. 1652 (describing the process by which Live Well purchased the bonds and "immediately" marked them up 20%); Tr. 207 (showing Live Well maintained records demonstrating the differences between market prices and Scenario 14 prices).

To be sure, although the Government was not required to prove actual harm, it was required to prove Hild's intent to defraud the lenders by way of contemplated harm.  *See United States v. Jabar*, 19 F.4th 66, 81 (2d Cir. 2021); *see also United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) ("With respect to [wire fraud], the Government need not prove that the scheme successfully defrauded the intended victim . . . . However, the Government must show that some actual harm or injury was contemplated by the schemer.") (cleaned up).  Hild thus argues that documentation related to sizeable coupon payments to the lenders is material because it demonstrates, as he argued at trial, that he believed the Scenario 14 pricing model to be legitimate, and that he therefore did not contemplate any harm resulting to the lenders.  But contemplated harm under the fraud statute is "apparent where there exists a discrepancy 'between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'"  *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)).  Given the demonstrated, and amply proven, distinction between what Hild represented to be the market value of the bonds and the actual market value of those same bonds, *see Hild*, 2022 WL 17484992, at *8–14—and the fact that Hild knew that there was a discrepancy between the two[5]—his intent to offer the bonds as collateral for loans at inflated

---

[5]      *See* GX407 ("STUMBERGER: I don't think Scott [at Wedbush] cares about that.  Scott cares about what is the market . . . May not be right, or proper, or sound, but that's what's gotta be defined as the market.  That's just realistic.  HILD: There's no debating that."); *id.*, Tr. 169–75 (Hild and co-conspirators discussing whether they could find a "slimy" dealer willing to represent to a lender that the Scenario 14 prices were correct); *see also* GX416, Tr. 1040–41 (Hild directing co-conspirators to buy tranches of bonds so that lenders would not see the prices of individual bonds and discover that they did not match the prices from comparable bonds in a tranche).

18

market valuations was sufficient evidence of contemplated harm to establish his guilt.  Proof that the lenders eventually recouped some—or, indeed, even all—of the collateral initially represented by Live Well via coupon payments is thus immaterial to the harm that Hild contemplated by engaging in the scheme, and would not more likely than not have resulted in his acquittal.

So too, it is at the very least unclear whether Hild has established that he "could not with due diligence" have discovered documentation related to the coupon payments to the lenders "before or during trial."  *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980).  As the Government rightly observes, Hild could have issued Rule 17(c) subpoenas to obtain details regarding the coupon payments the lenders had received prior to (or at the time of) trial, or even could have obtained some details related to the coupon payments from Bloomberg or other providers of publicly available financial data.  Indeed, Hild was certainly aware of the fact of coupon payments being received by the lenders, as demonstrated by his trial counsel's cross-examination of several witnesses regarding the payments.  In one such exchange, Hild's trial counsel questioned a representative of Mirae, one of the lending institutions as follows:

> Q:  And so if I understand correctly, to this day Mirae's holding some of these bonds?
> A:  Yes.
> Q:  And presumably Mirae is—and has received the revenue streams generated by the bonds?
> A:  Yes.
> Q:  And Mirae would continue to receive those revenue streams generated by the bonds until they no longer generate revenue or they're sold?
> A:  Correct.
> Q:  And we have no idea how much that is going to be?
> A:  That is correct.
> Q:  And it very well could in fact be more than the amount of the loan to Live Well by Mirae?
> MS. ESTES:  Objection.
> THE COURT:  Overruled.
> A:  I don't know that.

Tr. 640.  Exchanges with other lender representatives on cross examination elicited much the same.

19

*See id*. at 711–12 (cross of ICBC lender representative, "Q: . . . When you said before that your only option was to sell the collateral, that's not true insofar as you just said you could hold it right? A:  That is an option, but I can tell you that that is not what we'd ever do in the market . . . ."); *id*. at 717 (continued cross of same ICBC lender representative, "Q:  Okay.  And I think we've established an option to hold the collateral and collect the revenue stream, yes?  A:  If that was your desire, sure.  Obviously you got to get—you got to mark up that collateral.  Obviously you can't just take collateral at any price.  And then you can hold it as an investment."); *id*. at 795 (cross of Flagstar lender representative, "Q: . . . [T]hese are bonds that generate revenue, yes?  A:  Correct. . . . Q: Okay.  And we can agree that Live Well could have decided to—excuse me— Flagstar could have decided to hold the bonds?  A:  We could have.  Q:  And if it had done that, it would have received the income streams connected thereto, yes?  A:  Correct.").

If anything, counsel's decision not to obtain more precise information related to the payments by way of this consistent line of cross examination evinces a strategic choice made in furtherance of Hild's defense to the jury.  That is, counsel strategically elected to develop the record regarding the lenders' ability to recoup ambiguous significant sums—even potentially "more than the amount of the loan to Live Well," *see id*. at 640—via coupon payments without seeking specific information regarding those payments, thereby bolstering Hild's claim that he believed the Scenario 14 pricing model to provide legitimate valuations of the bonds.  As the Second Circuit has observed, "[o]ne does not 'discover' evidence after trial that one was aware of prior to trial."  *Owen*, 500 F.3d at 89–90.  Although the Court need not rely on the due diligence prong in denying the instant Rule 33 motion, it is therefore highly skeptical that Hild, having made the strategic decision to leave the jury with the vague impression that the coupon payments could be sizeable (without pursuing financial specifics which could have risked refuting the point), has

20

now alleged facts "from which the court can infer due diligence on the part of the movant to obtain the evidence." *Id*. at 88.

Lastly, the evidence related to the coupon payments is likely "merely cumulative or impeaching." *Id*. Although Hild argues that the coupon payment information "demonstrates that the witnesses who represented the lenders gave misleading testimony about their institutions' unwillingness to hold the bonds and the lack of revenues the bonds were generating," Mot. at 22, the law is clear that "merely . . . impeaching" evidence does not provide a basis to grant a new trial pursuant to Rule 33, *Owen*, 500 F.3d at 88. And it was hardly a secret at trial that coupon payments to the tune of millions of dollars were generated by the HECM IO bonds. The Government introduced financial statements reflecting the millions of dollars that Live Well was receiving on a monthly basis due to coupon payments for the same bonds it then offered to the lenders as collateral, for instance, and questioned Hild's co-conspirators about the same. *See* GX324 (documenting $48 million in "interest income" for FY 2018); Tr. 1083 (Rohr explaining that the "interest income" portion of Live Well's financial statements reflected "the coupon we receive on the bonds"). Moreover, as observed above, Hild's trial counsel cross-examined each of the lender witnesses, repeatedly and effectively, regarding the fact that their losses could, and likely would, be mitigated by holding the HECM IO bonds and collecting coupon payments over time. *See* Tr. 639–40 (cross of Maisano); *id*. at 711–12, 717 (cross of Levy); *id*. at 795 (cross of Redoutey); *see also United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (underscoring that the purported newly discovered evidence must be "so material and noncumulative that its admission would probably lead to an acquittal" for a Rule 33 motion to be granted) (cleaned up).

Accordingly, because Hild fails to establish that each of the five prongs for newly discovered evidence are met by the documentation regarding the lenders' coupon payments, the

21

Rule 33 motion is denied in its entirety.[6]

## II.  Request for Discovery Regarding Coupon Payments for Restitution Calculation

In the alternative, Hild requests that the Court permit the Defense additional discovery related to coupon payments, so that an appropriate restitution calculation may be made.  While acknowledging that the Court is only tasked with arriving at a "reasonable estimate" of actual losses suffered by the victims in ordering a restitution amount, *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007), Hild argues that, with the materials thus far submitted by the Government, and given the repeated corrections—to the tune of millions of dollars, no less, *see, e.g.* Gov't Letter, Dkt. 185 at 2–3—the Court cannot be assured that any current restitution estimate would necessarily be "reasonable" in nature.  Hild therefore requests that the Court broadly direct the Government to make any additional disclosures related to "the amount of coupon payments every lender has received to date."  Reply at 16.  Among other things, he seeks discovery "regarding the transaction between [victim lender] ICBC and BMO, to determine whether ICBC received any additional benefits beyond the sale prices, and whether ICBC is continuing to receive benefits as the bond coupon payments continue to BMO."  Mot. at 16.  He insists that, if either of those inquiries were answered in the affirmative, for instance, any such financial benefits would need to

---

[6]     At oral argument, Hild requested that the Court hold his Rule 33 motion in abeyance until the issue of the calculation of restitution is resolved, anticipating, in effect, that any additional discovery related to lender coupon payments could "further support [the] motion and provide additional bases supporting the arguments [Hild] make[s]." Oral Arg. Tr., Aug. 9, 2023, at 5:3–11.  The Court declines to do so, and instead finds prompt resolution of the motion appropriate given Hild's ongoing appeal and the likelihood that the Second Circuit would consolidate its review of this action to include any appeal of the instant motion.

     Moreover, for the same reasons that the Court determined that the present documentation related to lender coupon payments does not meet the standard for newly discovered evidence requiring a new trial, *see supra* at 17–21, the Court is highly skeptical that additional material related to those payments would satisfy Rule 33's stringent demands.  Even were new materials to show that the lenders eventually profited handsomely by holding the HECM IO bonds, for instance, such evidence would not be material to Hild's fraud convictions. *See, e.g., Abakporo*, 2014 WL 2608857, at *2 ("As a matter of law, the actual loss amounts cannot be 'material to the issue of guilt' and thus, cannot be the basis for granting a new trial or acquittal under Rule 33.").  In the event that Hild believes later-obtained material does constitute newly discovered evidence, he is, of course, at liberty to seek appropriate relief at that time.

22

be deducted from ICBC's actual loss in order to ensure that the institution were not to obtain restitution "in excess of . . . its loss." *United States v. Gonzalez*, 647 F.3d 41, 67 (2d Cir. 2011).

At oral argument, when pressed to clarify the request being made, counsel indicated: "we want the amount of coupon payments every lender has received to date and an explanation for why these materials were withheld. And I would add to that that we would like any information about other benefits, such as settlement payments, that would also offset the restitution amounts." Oral Arg. Tr., Aug. 9, 2023, at 33:9–15. In its latest letter response, the Government has indicated that it "has requested copies of the settlement documents from the relevant victim entities," and that any such documents will be provided in order to assist in arriving at an accurate assessment of Hild's restitution obligation. Dkt. 188 at 3.

Given the parties' stated preference during oral argument, *see* Oral Arg. Tr., Aug. 9, 2023, at 3:16–19, and in the interest of resolving the issue of restitution expeditiously, by separate order, the Court will make a referral to Magistrate Judge Parker to make an appropriate calculation of the restitution to be paid to each of the lending institutions. *See* 18 U.S.C. § 3664(d)(6) (providing that a district court "may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition"). Any determination regarding whether additional discovery is necessary to facilitate that calculation will appropriately be before Judge Parker.

### III. Whether the Fraud Instructions Given Constitute Plain Error in Light of *Ciminelli* is Appropriately Before the Second Circuit

Lastly, Hild argues that the Supreme Court's recent decision in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), further underscores "the need for a new trial." Mot. at 26–27. In that case, the Supreme Court considered whether the Second Circuit's so-called "right-to-control theory of wire fraud"—"under which the government c[ould] establish wire fraud by showing that the

23

defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions"—was a "valid basis for liability under 18 U.S.C. § 1343." *Id*. at 1125–26.  Reversing the Second Circuit, *Ciminelli* invalidated the theory, holding that the "right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id*. at 1128.  It reasoned that the "theory cannot be squared with the text of the federal fraud statutes, which are 'limited in scope to the protection of property rights,'" *id*. at 1127 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)), and that Second Circuit had never cited authority "that established 'potentially valuable economic information' as a traditionally recognized property interest," *id*. at 1127–28.

Hild is certainly correct that the Court instructed the jury as to the now-invalidated right-to-control theory, given then-existing Second Circuit law and without objection from either party. Specifically, it instructed, as to Count Four (wire fraud), that

> the government must . . . prove that the alleged scheme contemplated depriving another of money or property . . . . In this regard, a person is not deprived of money or property only when someone directly takes his money or property from him. Rather, a person is also deprived of money or property when that person is provided false or fraudulent information that, if believed, would *prevent him from being able to make informed decisions about what to do with his money or property.*  In other words, a person is deprived of money or property *when he is deprived of the right to control that money or property.  And he is deprived of the right to control that money and property when he receives false or fraudulent statements that affect his ability to make discretionary economic decisions about what to do with that money or property.*

Tr., Dkt. 70-2 at 34–35 (emphasis added). The Court's instruction with respect to Count Two (conspiracy to commit wire fraud and bank fraud) was substantially identical, and also relied upon the theory. *See* Tr., Dkt. 70-4 at 1.  Indeed, the jury instructions from Mr. Hild's trial were cited in an amicus brief filed in *Ciminelli* as an example of a recent conviction the Government had secured by using the right-to-control jury instruction. *See* Br. of Amicus Curiae New York Council

24

of Defense Lawyers in Supp. of Petititioner at 5a, *Ciminelli v. United States*, No. 21-1170 (filed

Sept. 6, 2022), *available at* https://rb.gy/rhwdx.

The critical issue for Hild is therefore whether these jury instructions now constitute plain

error in light of *Ciminelli* warranting vacatur of his conviction. *See United States v. Marcus*, 560

U.S. 258, 262 (2010) (providing that plain error review is a stringent standard, requiring an

appellant to demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than

subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the

ordinary case means it affected the outcome of the district court proceedings; and (4) the error

seriously affects the fairness, integrity or public reputation of judicial proceedings") (cleaned up).

Central to such review is consideration of whether any error was nevertheless harmless—that is,

whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant

guilty absent the error." *United States v. Sheehan*, 838 F.3d 109, 121 (2d Cir. 2016) (quoting

*Neder v. United States*, 527 U.S. 1, 18 (1999)). While acknowledging that he "intends to raise this

issue in the Second Circuit in his pending appeal," Mot. at 27 n.5, and agreeing that *Ciminelli*

"does not provide an independent basis for this Court to grant a motion under Rules 33 and 37,"

Reply at 16–17, Hild nevertheless argues that, "[t]o the extent this Court provides an indicative

ruling that it would grant Mr. Hild's Rule 33 motion on all counts based on newly discovered

evidence, [it] may at the same time acknowledge that a new trial is required based on *Ciminelli* as

well," *id.* at 17.

The Court declines to reach the issue here. Although *Ciminelli*'s holding appears to be at

odds with certain instructions given to the jury at Hild's trial, given his ongoing appeal, whether

those instructions constitute plain error, and whether any error was nevertheless harmless, are

questions now appropriately before the Second Circuit.

25

SPA-101

**CONCLUSION**

Accordingly, for the foregoing reasons, Hild's Rule 33 motion for a new trial is denied. By separate order, the Court will refer the restitution calculation to Magistrate Judge Parker for a recommendation as to a disposition. The Court defers the applicability of *Ciminelli* to the jury instructions here to the ongoing appeal before the Second Circuit. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 173.

SO ORDERED.

Dated:    September 12, 2023
          New York, New York

                                        Hon. Ronnie Abrams
                                        United States District Judge