# 23-6136

*To Be Argued By*:
SCOTT HARTMAN

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-6136

————◆◆◆————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MICHAEL HILD, also known as SEALED DEFENDANT 1,

*Defendant-Appellant.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

SCOTT HARTMAN,
HAGAN SCOTTEN,
  *Assistant United States Attorneys,
    Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    A.   The Government's Case . . . . . . . . . . . . . . .   2

        1.   Live Well and the Bond Portfolio . . . . .   3

        2.   The Beginning of the Fraudulent
             Scheme . . . . . . . . . . . . . . . . . . . . . . . . .   6

        3.   The Fraudulent Financial
             Statements . . . . . . . . . . . . . . . . . . . . . .   8

        4.   The Shareholder Buyout . . . . . . . . . . . .   8

        5.   The Liquidity Crisis . . . . . . . . . . . . . . .   9

        6.   The End of the Fraudulent
             Scheme . . . . . . . . . . . . . . . . . . . . . . . .   10

    B.   The Defense Case . . . . . . . . . . . . . . . . . . . .   11

    C.   The Post-Trial Motions . . . . . . . . . . . . . . .   12

ARGUMENT:

POINT I—Ample Evidence Supported Hild's
    Convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

    A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .   13

    B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . .   14

POINT II—Hild's Unpreserved *Ciminelli* Claim Does
    Not Require a New Trial . . . . . . . . . . . . . . . . . .   23

ii

PAGE

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  23

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  24

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  25

POINT III—Hild's Trial Counsel Was Constitutionally
Effective . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  30

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  32

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  34

    1.  No Actual Conflict Existed . . . . . . . . .  34

    2.  Hild Cannot Show a Lapse in
        Representation . . . . . . . . . . . . . . . . . . .  39

    3.  Dusing's Performance Was
        Constitutionally Effective Under
        *Strickland* . . . . . . . . . . . . . . . . . . . . . .  41

POINT IV—The District Court Properly Denied Hild's
Newly Discovered Evidence Claim . . . . . . . . . .  45

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  45

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  46

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  47

POINT V—The District Court Did Not Abuse Its
Discretion in Declining to Recuse . . . . . . . . . . .  52

iii

                                                                    PAGE

   A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  52

   B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

## TABLE OF AUTHORITIES

*Cases*:

*Armienti v. United States,*
   234 F.3d 820 (2d Cir. 2000) . . . . . . . . . . . . . 32, 35

*Beets v. Scott,*
   65 F.3d 1258 (5th Cir.1995) . . . . . . . . . . . . . . . . 37

*Bennett v. United States,*
   663 F.3d 71 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 33

*Chang v. United States,*
   250 F.3d 79 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 40

*Ciminelli v. United States,*
   598 U.S. 306 (2023). . . . . . . . . . . . . . . . . . . . . . 23, 28

*Cuyler v. Sullivan,*
   446 U.S. 335 (1980). . . . . . . . . . . . . . . . . . . . . . 35, 40

*El Fenix de Puerto Rico v. The M/Y Johanny,*
   36 F.3d 136 (1st Cir. 1994). . . . . . . . . . . . . . . . . 56

*Eze v. Senkowski,*
   321 F.3d 110 (2d Cir. 2003) . . . . . . . . . . . . . . . . 44

*Greiner v. Wells,*
   417 F.3d 305 (2d Cir. 2005) . . . . . . . . . . . . . . . . 42

iv

PAGE

*Harrington v. United States*,
689 F.3d 124 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 34

*Harrington v. Richter*,
562 U.S. 86 (2011) . . . . . . . . . . . . . . . . . . . . . . . . 45

*In re Aguinda*,
241 F.3d 194 (2d Cir. 2001) . . . . . . . . . . . . . . . . 53

*In re Drexel Burnham Lambert, Inc.*,
861 F.2d 1307 (2d Cir. 1988) . . . . . . . . . . . . . . . . 53

*LoCascio v. United States*,
395 F.3d 51 (2d Cir. 2005) . . . . . . . . . . . . . . . 33, 39

*Mickens v. Taylor*,
535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . 33, 36

*United States v. Owen*,
500 F.3d 83 (2d Cir. 2007) . . . . . . . . . . . . . . . 48, 50

*Parisi v. United States*,
529 F.3d 134 (2d Cir. 2008) . . . . . . . . . . . . . . . . 33

*Pashaian v. Eccelston Props., Ltd.*,
88 F.3d 77 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . 54

*Pavel v. Hollins*,
261 F.3d 210 (2d Cir. 2001) . . . . . . . . . . . . . . . . 44

*Strickland v. Washington*,
466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . 33, 34

*Triana v. United States*,
205 F.3d 36 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 34

v

PAGE

*United States Commodity Futures Trading Comm'n v. Wilson*, No. 13-7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018). . . . . . . . . . . . . . . . . . . . 19

*United States v. Agrawal,*
726 F.3d 235 (2d Cir. 2013) . . . . . . . . . . . . . . . . 24

*United States v. Alessi,*
638 F.2d 466 (2d Cir. 1980) . . . . . . . . . . . . . . . . 49

*United States v. Alston,*
899 F.3d 135 (2d Cir. 2018) . . . . . . . . . . . . . . . . 47

*United States v. Atilla,*
966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 13

*United States v. Avenatti,*
81 F.4th 171 (2d Cir. 2023) . . . . . . . . . . . . . . . . 13

*United States v. Baker,*
899 F.3d 123 (2d Cir. 2018) . . . . . . . . . . . . . 13, 20

*United States v. Bankman-Fried,*
No. S5 22 Cr. 673 (LAK), 2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) . . . . . . . . . . . . . . . . . . . 54

*United States v. Bermudez,*
526 F.2d 89 (2d Cir. 1975) . . . . . . . . . . . . . . . . 49

*United States v. Binday,*
804 F.3d 558 (2d Cir. 2015) . . . . . . . . . . . . . . . . 25

*United States v. Brennan,*
867 F.2d 111 (2d Cir. 1989) . . . . . . . . . . . . . . . . 24

*United States v. Bruno,*
661 F.3d 733 (2d Cir. 2011) . . . . . . . . . . . . . . . . 27

vi

PAGE

*United States v. Cancilla,*
    725 F.2d 867 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 35

*United States v. Capers,*
    20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 13

*United States v. Connolly,*
    24 F.4th 821 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 18

*United States v. Coppola,*
    671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . 24, 26

*United States v. DiTomasso,*
    932 F.3d 58 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 40

*United States v. Eldridge,*
    2 F.4th 27 (2d Cir. 2021) . . . . . . . . . . . . . . . . 24, 26

*United States v. Facen,*
    812 F.3d 280 (2d Cir. 2016) . . . . . . . . . . . . . 14, 22

*United States v. Forbes,*
    790 F.3d 403 (2d Cir. 2015) . . . . . . . . . 46, 49, 51

*United States v. Griffith,*
    284 F.3d 338 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 29

*United States v. Guadagna,*
    183 F.3d 122 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 22

*United States v. Guiliano,*
    644 F.2d 85 (2d Cir. 1981) . . . . . . . . . . . . . . . . . 29

*United States v. Hamilton,*
    334 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 28

*United States v. Iorizzo,*
    786 F.2d 52 (2d Cir. 1986) . . . . . . . . . . . . . . . . . 32

vii

PAGE

*United States v. James,*
712 F.3d 79 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . 46

*United States v. Landesman,*
17 F.4th 298 (2d Cir. 2021) . . . . . . . . . . . . . 14, 46

*United States v. Levy,*
25 F.3d 146 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 32

*United States v. Litvak,*
808 F.3d 160 (2d Cir. 2015) . . . . . . . . . . . . . . . . 50

*United States v. Mahaffy,*
693 F.3d 113 (2d Cir. 2012) . . . . . . . . . . . . . . . . 51

*United States v. Malpiedi,*
62 F.3d 464 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 40

*United States v. Marcus,*
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Marcus,*
628 F.3d 36 (2d Cir. 2010) . . . . . . . . . . . . . . 25, 26

*United States v. McLain,*
823 F.2d 1457 (11th Cir. 1987) . . . . . . . . . . . . . 35

*United States v. Mejia,*
545 F.3d 179 (2d Cir. 2008) . . . . . . . . . . . . . . . . 43

*United States v. Melhuish,*
6 F.4th 380 (2d Cir. 2021) . . . . . . . . . . . . . . 43, 44

*United States v. Moree,*
220 F.3d 65 (2d Cir. 2000) . . . . . . . . . . . . . . 37, 38

*United States v. Morrison,*
153 F.3d 34 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 53

viii

PAGE

*United States v. O'Neil,*
118 F.3d 65 (2d Cir. 1997) . . . . . . . . . . . . . . . 36, 37

*United States v. Osuba,*
67 F.4th 56 (2d Cir. 2023) . . . . . . . . . . . . . . . . 41

*United States v. Persico,*
645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . .  13, 14, 51

*United States v. Raniere,*
55 F.4th 354 (2d Cir. 2022) . . . . . . . . . . . . . . . 14

*United States v. Rechnitz,*
75 F.4th 131 (2d Cir. 2023) . . . . . . . . . . . . . . . 53

*United States v. Robinson,*
430 F.3d 537 (2d Cir. 2005) . . . . . . . . . . . . . . . 51

*United States v. Rogers,*
209 F.3d 139 (2d Cir. 2000) . . . . . . . . . . . . . . . 32

*United States v. Rooney,*
37 F.3d 847 (2d Cir. 1994) . . . . . . . . . . . . . . . . 29

*United States v. Schwarz,*
283 F.3d 76 (2d Cir. 2002) . . . . . . . . . . . . . . . . 32

*United States v. Siddiqui,*
959 F.2d 1167 (2d Cir. 1992) . . . . . . . . . . . . . . . 50

*United States v. Silver,*
864 F.3d 102 (2d Cir. 2017) . . . . . . . . . . . . . . . 27

*United States v. Skelly,*
442 F.3d 94 (2d Cir. 2006) . . . . . . . . . . . . . . . . 24

*United States v. Skelos,*
707 F. App'x 733 (2d Cir. 2017) . . . . . . . . . . . . . 27

ix

PAGE

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . 46, 47, 51

*United States v. Tarricone,*
    996 F.2d 1414 (2d Cir. 1993) . . . . . . . . . . . . . . . 44

*United States v. Thompson,*
    76 F.3d 442 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . 53

*United States v. Venturella,*
    391 F.3d 120 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 33

*United States v. Vilar,*
    729 F.3d 62 (2d Cir. 2013) . . . . . . . . . . . . . . . 28, 29

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) . . . . . . . . . . . . . . . . . 51

*United States v. Wedd,*
    993 F.3d 104 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 53

*United States v. White,*
    174 F.3d 290 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 37

*United States v. Wong,*
    78 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . 46

*United States v. Wright,*
    665 F.3d 560 (3d Cir. 2012) . . . . . . . . . . . . . . . . . 29

*United States v. Yu,*
    902 F. Supp. 464 (S.D.N.Y. 1995) . . . . . . . . . . . . 49

*United States v. Zvi,*
    168 F.3d 49 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 24

*Yates v. United States,*
    354 U.S. 298 (1957). . . . . . . . . . . . . . . . . . . . . . . . 24

x

PAGE

*Statutes, Rules & Other Authorities:*

15 U.S.C. § 78j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Fed. R. Crim. P. 33(a). . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Crim. P. 33(a). . . . . . . . . . . . . . . . . . . . . . . . 46

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 23-6136

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MICHAEL HILD, also known as SEALED
DEFENDANT 1,

*Defendant-Appellant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Michael Hild appeals from a judgment of conviction entered on July 31, 2023, in the United States District Court for the Southern District of New York, by the Honorable Ronnie Abrams, United States District Judge.

Indictment 19 Cr. 602 (RA) (the "Indictment") was filed on August 26, 2019, in five counts. Count One charged Hild with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Count Two charged Hild with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349. Count

2

Three charged Hild with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5. Count Four charged Hild with wire fraud, in violation of 18 U.S.C. § 1343. Count Five charged Hild with bank fraud, in violation of 18 U.S.C. § 1344.

Trial commenced on April 13, 2021, and ended on April 30, 2021, when a jury found Hild guilty on all counts.

On January 27, 2023, Judge Abrams sentenced Hild principally to a term of 44 months' imprisonment.

Hild has been released on bail pending resolution of this appeal.

## Statement of Facts

### A.  The Government's Case

The evidence established that Hild, along with others at his company, Live Well Financial, engaged in a multiyear scheme to fraudulently inflate the market value of bonds owned by Live Well in order to induce lenders into loaning money to Live Well. The scheme allowed Live Well to grow its bond portfolio exponentially, from approximately 15 bonds with a stated value of approximately $50 million in 2014 to approximately 50 bonds with a stated value of over $500 million by the end of 2016. In May 2019, Live Well wrote down the value of its portfolio by over $200 million.

The Government presented the testimony of eight witnesses, including two members of the scheme, Eric Rohr and Darren Stumberger, who had pled guilty and testified pursuant to cooperation agreements. The

3

Government also introduced over 140 exhibits, including recorded calls, showing Hild's knowing and willful participation in scheme.

### 1. Live Well and the Bond Portfolio

Live Well was a private company that originated, serviced, and securitized government-guaranteed reverse mortgages known as Home Equity Conversion Mortgages. (A. 290-91). Hild founded Live Well and was its Chief Executive Officer and largest shareholder. (A. 290, 327, 337-338; GX 321).[1]

Around 2014, Live Well acquired a portfolio of bonds, each entitling the holder to receive a portion of the interest payments, but not the principal payments, from a particular pool of reverse mortgages. (A. 67, 292, 297). At Hild's direction, Live Well purchased these bonds from a company called Stifel for approximately $50 million. (A. 70-71). Hild also hired three employees of Stifel, including Stumberger, to manage the newly acquired portfolio. (A. 71, 297). Stumberger and the other two employees were referred to as the "trading desk." (A. 71, 297).

_____

[1]  "Br." refers to Hild's brief on appeal. "A." refers to the appendix filed with Hild's brief. "SPA" refers to the Special Appendix appended to Hild's brief. "GX" refers to a Government exhibit at trial. "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

4

Live Well financed the acquisition and growth of its bond portfolio through loans in which Live Well used the portfolio as collateral. (A. 71-72, 236-237, 292, 305, 320). Many of Live Well's lenders were securities dealers whose lending arrangements with Live Well were structured as bond repurchase agreements, also known as "repo agreements." (A. 71-72, 196-197, 222, 292-293). Functionally, a repo agreement is a collateralized loan in which title of the collateral is transferred to the lender. (A. 71-72). When the loan is repaid by the borrower, the collateral is returned to the borrower through a repurchase. (A. 197). In the event of a default, the repo lender is entitled to keep and sell the collateral to satisfy the borrower's debt. (A. 71-72).

The amount of credit the lenders agreed to extend to Live Well was determined by the lenders' understanding of the market value of the bonds. The lenders would not lend Live Well an amount equivalent to the price of the collateral; rather, they took 10-20% off that price to protect against market risk. (A. 73, 197-98). Thus, in the event of a default by Live Well, the lenders believed they could safely sell the collateral to recoup the money they had lent. (A. 197, 222; GX 603, 702, 1003).

Live Well's agreements with the lenders made clear that the amount of money that Live Well was permitted to borrow was calculated based on the price at which the collateral could be sold in the market. Live Well's contract with Mirae Asset Securities, for example, required that the amount of the loan be adjusted based on "the aggregate Market Value of all Purchased

5

Securities." (GX603 at 3; A. 203-204). "Market Value" was defined as:

> the price for such Securities on [a given] date obtained from (i) Interactive Data Corporation ("IDC") or (ii) if no quotation is available from IDC, then a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein.

(GX 603 at 11; *see also* A. 203-204). As that language reflects, the lenders generally relied on a widely utilized subscription service, IDC, to determine the market value of the securities against which Live Well borrowed. (A. 204, 228; GX 603, 1003). Stumberger testified that, based upon conversations with the lenders, it was his understanding that they required third-party prices "because [they] wanted independent, unbiased view[s] on valuations," and did not want the loan amount determined by the borrower or lender. (A. 73).

When Live Well first purchased the bond portfolio, IDC did not yet have the capability to value the bonds itself, so IDC agreed it would use "broker quotes" from Live Well on a temporary basis. (A. 73, 297, 440). By at least early 2015, IDC was using its own pricing model to value the bonds. (A. 73).

Hild and others at Live Well were unhappy with IDC's prices for the bonds. (A. 74, 298). In February 2015, Live Well and IDC agreed that they would return to the "broker quote" system, in which Live Well

6

provided IDC its prices. (A. 74-75, 299; GX 104). IDC then published those prices verbatim. (A. 299, 308; GX 104). There was no disclosure from IDC of who the broker quotes came from; nor did Live Well disclose its role in broker quotes to its lenders. (A. 204, 209, 304-308, 309).

## 2. The Beginning of the Fraudulent Scheme

The fraudulent scheme began in or about September 2015, when Hild and his co-conspirators began using a new method of pricing the bonds in the quotes, or "marks," they delivered to IDC. (A. 303). Rather than price the bonds as the market would price them, Hild asked the bond traders to run pricing "scenarios," with varying inputs, to see how those different inputs affected the price. (A. 76-77; GX 113). Hild selected the price that Live Well would submit to IDC based on the scenario he liked best, which was typically the scenario that provided Live Well with the most liquidity. (A. 78).

Hild and his co-conspirators ultimately selected a particular scenario—"Scenario 14"—to use in pricing the bonds. (A. 79, 81, 303-304). Among other things, Scenario 14 did not account for the yield (the return an investor sees on the bond) demanded by the market, which generally required the price of a bond to be lowered each month to maintain that high yield. (A. 80-81, 303).

As a result, bond prices under Scenario 14 increased dramatically. (A. 307, 311-312, 322; GX 1600). For example, after pricing bonds that were acquired in September 2015 with Scenario 14 methodology, those

7

bonds increased in value by approximately $11 million. (A. 312; GX 120). This increase in purported value allowed Live Well in many instances to borrow additional capital against the same bonds by making a "reverse margin call" to its lenders. (A. 74).

Scenario 14 pricing also allowed Live Well to purchase new bonds in the market without putting any capital down, providing a windfall of cash to Live Well. As Stumberger explained, Live Well could "purchase new bonds in the market and apply the pricing, the Scenario 14 pricing, submit that to IDC, and because the lenders were relying on IDC pricing, they would be lending more money than needed to purchase the bond at the market." (A. 84). Hild referred to this process as a "little bit of a self-generating money machine." (A. 305).

Hild and his co-conspirators knew that the prices under Scenario 14 were not obtainable in the market and that, if the lenders learned this fact, they would either stop lending to Live Well or lend significantly less money. (A. 303-307; GX 401, 403, 404). To hide the scheme from the lenders, Hild directed that the trading desk use a "glide path" to implement the Scenario 14 prices. On recorded calls, Hild explained that the glide path served to avoid triggering "alarm bells all over the place." (A. 307; GX 402). The conspirators thus concealed from lenders (i) that they were supplying prices to IDC; and (ii) that the marks published by IDC did not reflect market realities. (A. 303-07; GX 401, 403, 404). With the markups, the lenders no longer had any protection against market risk, because the markup under Scenario 14 generally allowed

8

Live Well to borrow more than the market value of the bond. (A. 84-85, 305). If Live Well defaulted, there was virtually no chance that the lenders could sell the bonds to cover the amount owed by Live Well. (A. 84-85, 340, 345, 348).

### 3. The Fraudulent Financial Statements

In addition to providing inflated bond prices to IDC, Hild and his coconspirators also deceived Live Well's lenders by misrepresenting the value of the bond portfolio in Live Well's financial statements. The bond portfolio was Live Well's largest asset, and Live Well used the same inflated Scenario 14 bond values in the financial statements, making it appear that Live Well's assets were more valuable than they really were. (A. 325-327; GX 310, 312, 314). Live Well falsely represented that it valued the bond portfolio at "exit prices"—meaning the price for which a buyer and seller would transact. (A. 326; GX 310, 312, 314). Live Well similarly used inflated Scenario 14 prices to calculate Live Well's revenue on the bond portfolio. (A. 325-26; GX 310, 312, 314). The lenders relied on these fraudulent financial statements in determining how much credit to extend to Live Well. (A. 202-03, 226-27).

### 4. The Shareholder Buyout

In addition to using the liquidity generated by the scheme to expand Live Well's bond portfolio, in 2016, Hild used $18 million generated from the repo lenders to buy out the preferred stockholders in Live Well. (A. 337; GX 311). That gave Hild control of the company and allowed him to substantially increase his personal compensation. (A. 337-40). Hild's compensation

9

jumped from approximately $1.4 million in 2015 to approximately $9.7 million in 2017. (A. 195; GX 2000).

### 5. The Liquidity Crisis

The fraudulent scheme escalated in early 2017, after one of the repo lenders, Wedbush, asked Live Well to have a broker provide a price for one of the bonds Wedbush was lending against. (A. 340). Hild and his coconspirators discussed how to address the issue on a call, because having a broker price the bond could result in the lenders discovering that the bond values were fraudulently inflated. (A. 341; GX 407). The conspirators considered going to a "slimy" broker who would be willing to help out with their fraudulent scheme. (A. 341; GX 407).

Shortly thereafter, Wedbush told Live Well that it wanted to reduce Live Well's credit line and stop lending against certain bonds. (A. 344). Wedbush's request caused a liquidity crisis, because Live Well needed to pay down its debt to Wedbush. It could not do so by selling the bonds, because the bonds could not be sold on the market at their fraudulently inflated values. (A. 344-45). Hild described the liquidity crisis as a "catastrophe." (A. 346; GX 151). Rohr testified that if Live Well defaulted on its debt to Wedbush, that would create cross-defaults with other lenders, likely leading to the company's insolvency. (A. 346).

To survive the liquidity crisis, Hild ordered that the trading desk inflate the bond prices above the already-inflated Scenario 14 prices. (A. 347). Hild provided no justification for the price increases, which Rohr said made him "sick to [his] stomach." (A. 347). The trading

10

desk ultimately marked up the portfolio by over $36 million. (A. 348; GX 408). At Hild's direction, they implemented the price increases incrementally, to avoid raising red flags with IDC or the lenders. (A. 348; GX 408). Shortly after those price increases were implemented, Live Well entered into new lending relationships with Flagstar Bank and Mirae. (A. 351-53).

### 6. The End of the Fraudulent Scheme

In the summer of 2017, Live Well reversed the price increases implemented during the liquidity crisis, but the bond prices remained at the fraudulently inflated Scenario 14 values. (A. 354). In 2018, two of Live Well's repo lenders, Mirae and the Industrial and Commercial Bank of China, began questioning the high pricing for Live Well's bonds. (A. 356-57). Both lenders tried to reduce the amount they were lending to Live Well, but Live Well did not have the money to pay down its debt. (A. 205-06, 357).

Around that time, Rohr began considering leaving Live Well because, as he put it, he was "morally bankrupt." (A. 358). Hild warned Rohr that they "potentially could face criminal charges if the lenders lost money." (A. 359). Around that time, Rohr asked Hild to reduce Hild's compensation, in an effort to help pay the lenders back. (Tr. 1215). Hild refused. (A. 359). Rohr did not return to work after that. (A. 359).

Hild replaced Rohr with Glen Haddock, who had no knowledge of the fraudulent scheme. (A. 456-59). In the spring of 2019, Haddock informed Hild that he would not sign the company's interim financial statements because he believed that the company's

11

carrying value for the bond portfolio was significantly overstated. (A. 460). Shortly thereafter, Live Well announced that it would cease operations and unwind. (A. 460). After the announcement of Live Well's closing, Haddock provided a balance sheet to the lenders showing that Live Well had reduced the value of its bond portfolio by over $200 million. (A. 461; GX 323).

## B.  The Defense Case

Hild developed large portions of his case through cross-examination of Government witnesses. (*See, e.g.*, A. 109-93 (cross of Stumberger)). Hild also testified in his own defense and called one witness, Stuart Cantor, a former Live Well director. Cantor testified that Hild's increased compensation after the shareholder buy-out had a legitimate business purpose: to compensate Hild for the risk of personally guaranteeing certain of Live Well's loans, including certain loans backed by the bonds. (A. 487-95).

Hild testified that he relied on the expertise of Stumberger and his subordinates. (A. 523). Hild maintained that Scenario 14 was an effort to model the bonds using a more "correct methodology." (A. 522). Hild acknowledged that using this methodology implied that the bonds were "more valuable than people thought." (A. 522). But he maintained that he considered Scenario 14 a "trade secret" and that his fiduciary duties to Live Well prevented him from sharing information about Scenario 14 with the lenders or IDC. (A. 524). Hild denied that he or, to his knowledge, any of his subordinates harbored concerns about the method that Live Well employed in submitting bond

12

valuations to IDC. (A. 524, 528). Hild claimed that the further increases in bond valuations that Live Well implemented during the 2017 liquidity crisis were part of an effort to account for unspecified regulatory changes that Hild anticipated would occur later in the year. (A. 530).

## C. The Post-Trial Motions

On July 27, 2021, Hild moved for a judgment of acquittal, or in the alternative a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33. As relevant here, Hild challenged the sufficiency of the evidence supporting his conviction, arguing that the Government failed to demonstrate that he misrepresented the value of the bonds, or acted with fraudulent intent. (Dkt. 104, at 4-15). Additionally, Hild argued that he was entitled to a new trial because his trial counsel suffered from an undisclosed conflict of interest that resulted in a violation of Hild's Sixth Amendment rights. (Dkt. 104 at 15-40).

On December 12, 2022, the District Court issued a 64-page opinion denying the motions. (SPA 1-64). The District Court's decision is reported at *United States v. Hild*, 644 F. Supp. 3d 7 (S.D.N.Y. 2022).

13

# **A R G U M E N T**

## **POINT I**

### **Ample Evidence Supported Hild's Convictions**

#### A.  **Applicable Law**

Although this Court will "review sufficiency of evidence challenges *de novo* . . . defendants face a heavy burden, as the standard of review is exceedingly deferential" to the jury's verdict. *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011). A court "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020). The Court "must analyze the pieces of evidence in conjunction, not in isolation," *Persico*, 645 F.3d at 104, and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023). The Court must also "credit every inference that the jury might have drawn in favor of the government, because the

14

task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

Because the jury is entitled to choose which inferences to draw, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). In a conspiracy case, the deference accorded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021).

## B. Discussion

As he did before the jury, Hild argues that the inflated values he submitted to IDC were a good faith effort to arrive at the "intrinsic value" of the bonds, and therefore that the prices he submitted to IDC were not false or deceptive. (Br. 25). But as the District Court explained, Hild's focus on the intrinsic value of the bonds ignores the Government's allegations and the proof at trial—namely that Hild had agreed to borrow from the lenders based upon "'market prices,' to be determined by a third party, [ ] that the rates Live Well submitted to IDC far exceeded [those prices], that Hild was aware of that difference, and that his combination of misstatements and omissions, specifically designed to prevent the lenders from discovering this

15

discrepancy, amounted to fraud." *Hild*, 644 F. Supp. 3d at 29.

The evidence was more than sufficient to find that Hild intentionally implemented a scheme to defraud Live Well's lenders, by misleading them into believing that the IDC prices reflected the market (in contrast to "intrinsic") value of the bonds.

*First*, the evidence firmly established that Hild knew that the lenders had agreed to extend credit to Live Well based on the market value of the bonds. As just discussed, Live Well's borrowing agreements with the lenders, including at least one agreement Hild personally signed, fixed the loan amount by relation to the "market value" of the securities, defined as the price for such securities obtained from IDC or "the most recent closing bid quotation." (GX 1001; A. 228). The jury was entitled to infer that because the contract provided these two alternative measures, Hild understood that IDC prices should be market prices. Although Hild points to language in IDC's subscription agreement cautioning that quoted prices "may not conform to actual purchase or sale prices in the marketplace" (Br. 29, citing A. 646), as the District Court recognized, "in context" the agreement makes clear that IDC prices are an attempt to capture " 'what the holder [of a security] would receive in an orderly transaction . . . under market conditions,' " in other words, a market price. *Hild*, 644 F. Supp. 3d at 29 n.4 (quoting A. 646).

This understanding also makes logical sense. As one lender explained:

16

> From a repo perspective, we're not an in-
> vestor looking at intrinsic value and not
> thinking of that over the life of this in-
> vestment we're going to get back X re-
> turn, I'm more interested in the liquidity,
> where can I sell it on the market. What
> does the market pay for this bond today?

(A. 204). Consistent with this logic, as the District
Court observed, "[w]itnesses both from Live Well . . .
and the lenders . . . testified as to the importance of
market rates to the lending agreements." *Hild*, 644 F.
Supp. 3d at 2 (citing A. 81, 86, 130, 304–307, 197-198,
205-206).

Hild's understanding that IDC prices were in-
tended to approximate market rates was evidenced by
his reaction on a recorded call when informed that one
of Live Well's lenders was attempting to obtain a third-
party price for a bond that Live Well had financed.
During the call, Stumberger said that the lender did
not care about Live Well's estimation of the bonds' in-
trinsic value:

> [The lender] cares about what is the mar-
> ket . . . the market is going to be defined
> as something that is an 8 or 9% yield to
> 50 HPC . . . on the sell side . . . . That's
> what he's gonna get from, we know, the
> guys who are pedaling the paper. May not
> be right, or proper, or sound, but that's
> what's gonna be defined as the market.
> That's just realistic.

Hild responded, "There's no debating that." (GX 407).

17

*Second*, ample evidence established Hild's knowledge that the prices that he caused Live Well to submit to IDC differed substantially from market prices. The jury heard multiple recorded phone calls in which Hild and his co-conspirators discussed the disparity, including:

- On a September 9, 2015 call, Rohr told Hild and others that they were "way out in front of the market," meaning "the market's way undervaluing it," but he cautioned they would face a tough situation if they had to sell their portfolio on the market. (GX 402).

- On a September 10, 2015 call, Hild stated that, with respect to their Scenario 14 methodology, "the market doesn't look at it this way . . . I mean, we've already established that." (GX 403).

- On a January 14, 2016 call, Hild asked a coconspirator to compare "current market pricing" versus "what the inherent markup would be to the full SC14." (GX 406).

Hild can thus claim that the cooperating witnesses —his former coconspirators—"undercut" the Government's case (Br. 26) only by misrepresenting the Government's case. That the witnesses found some legitimacy in Scenario 14 as an effort to calculate the bonds' intrinsic value is of little import, because the same witnesses also agreed that the lenders were lending based

18

on representations of *market* value, which Scenario 14 did not reflect. (A. 81, 86, 92, 130, 204, 303-307, 308).

That Hild knew that loans were obtained using a false claim that the bond marks approximated market prices distinguishes this case from *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), on which Hild principally relies. (*See* Br. 30-34). In *Connolly*, bankers were charged with making false or misleading statements in submitting hypothetical borrowing rates to the British Bankers Association ("BBA"). BBA guidelines provided that rate submissions should reflect "the rate at which [the bank] could borrow funds, were it to do so." 24 F.4th at 835. But the evidence failed to show that the defendants' bank could not borrow at the interest rates stated in the defendants' submissions. *Id.* at 835-36. Rather, the Government argued that the defendants' submissions were false or misleading because they deviated from the rates produced by the bank's pricing model and took into account the bank's own financial interests. *Id.* at 836. Because the BBA had given "no guidance" about whether banks could consider "intrabank input" in making rate submissions, the bank's failure to disclose that its submissions took into account the bank's own positions did not constitute a false or misleading statement or omission to the BBA. *Id.* at 842. Here, by contrast, ample evidence proved that Hild knew that IDC pricing was billed to lenders as intended to reflect market prices. But Hild nonetheless submitted prices for the bonds that he knew could not be obtained in the market.

19

Moreover, the Government did not rely exclusively on the IDC submissions to establish that Hild engaged in a scheme to defraud. Hild also made false and misleading statements in Live Well's financial statements regarding the independence of IDC and the market value of the securities. (A. 326; GX 310, 312, 314). Those financial statements, which Hild signed, listed the bonds as assets of the firm and said that the bonds were listed at "fair value," defined as "the exchange price that would be received for an asset . . . (exit price) in the principal or most advantageous market." (GX 312). As Rohr testified, this representation was false, because Live Well was "using estimates and calculations that [were] derived through Scenario 14, which [Live Well] knew [it] could not transact at in the market and therefore not fair value." (A.328).

For this reason, among others, Hild errs in relying on *United States Commodity Futures Trading Comm'n v. Wilson,* No. 13-7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018). In *Wilson*, Judge Sullivan faulted the CFTC for putting forth "no credible evidence as to what the fair value of the contract actually was" when the defendant made allegedly manipulative bids. 2018 WL 6322024, at *11. Here, there was ample evidence that the market value of the bonds at issue was substantially lower than the prices Live Well submitted to IDC, but that lenders were led to believe that those prices approximated market prices. Moreover, as Judge Abrams recognized, the outcome in *Wilson* was driven largely by the requirement to establish open market manipulation under the Commodities Exchange Act. By contrast, "Hild never needed to manipulate the visible market rates to create a windfall"

20

because the nature of the scheme guaranteed him a windfall, "without any exposure to other market participants or corresponding risk." *Hild*, 644 F. Supp. 3d at 29 n.3.

Finally, even if the jury had been required to accept Hild's claim that the Scenario 14 prices did not constitute false statements,[2] its verdict could still be justified by the evidence that Hild implemented further, arbitrary price increases in the first quarter of 2017, without justification in any model. During that period, in response to the liquidity crunch created by the loss of one of Live Well's lenders, Hild directed the trading desk to increase IDC prices. In one recorded call, Hild ordered an increase of each bond's mark by exactly five "ticks" for the express purpose of generating additional cash for Live Well. (GX 408). Hild explained that this gradual increase could be "claw[ed] back" and "reduc[ed] . . . if we don't need it" but was necessary to

---

[2]    The jury had no obligation to do so. On appeal, Hild relies on his own testimony as a basis to overturn the jury's verdict. (*See, e.g.*, Br. 25-27 (citing A. 523, 530, 568)). But witness credibility is a matter firmly committed to the jury, and this Court makes every inference in the verdict's favor when reviewing sufficiency. *Baker*, 899 F.3d at 129. Hild thus cannot reasonably ask this Court to adopt his narrative as true, then find the evidence insufficient on that basis. That is especially so given that the District Court—in a ruling not challenged on appeal—found that Hild had perjured himself on the stand, citing a number of clear lies. (*See* Dkt. 156 at 14-15).

21

avoid "having to make drastic moves" and "set off all kinds of alarm bells." (GX 408). A former member of Live Well's trading desk explained that a uniform increase in the value of the portfolio in a single day was "nearly impossible" under any set of market assumptions. (A. 265). And Rohr and Stumberger both testified that the increases were not driven by market conditions but were instead motivated by Live Well's liquidity needs. (A. 102, 346-47). As the District Court explained, "a reasonable jury could have accepted Stumberger's and Rohr's account of the pricing over Hild's." *Hild*, 644 F. Supp. 3d at 29. Hild does not, and could not reasonably, dispute that changing the supposed value of the bonds based solely on Live Well's need to borrow more money evinces a fraudulent scheme.

The jury also heard ample evidence that Hild intended to defraud his lenders. In one recorded call, Hild described Scenario 14 as a "self-generating money machine." (GX 402). In another, he and his coconspirators contemplated recruiting a "slimy" broker to help prevent one of the lenders from learning of their fraud, by revealing the true market price of certain bonds. (GX 407). To avoid raising "alarm bells" when adopting the above-market Scenario 14 prices, Hild directed that the trading desk implement those prices incrementally, on a "glide path." (A. 306-07; GX 402, 403). Hild gave the same direction during the liquidity crisis in February 2017, when Live Well increased the bond prices arbitrarily by over $36 million. (A. 347-49; GX 408). And Hild directed that Live Well buy whole tranches of bonds, so that no one in the market could see that the prices for Live Well's bonds did not match

22

prices from comparable bonds in a tranche. (A. 315; GX 416). Hild also transferred approximately $17 million from his own account to an account in the name of his wife's business when lenders began to raise questions about the value of Live Well's bonds. (A. 572-74). As the District Court recognized in denying Hild's post-trial motion, the jury was entitled to infer that "this transfer spoke to Hild's consciousness of guilt" by showing that he was trying to hide the proceeds of his fraud. *Hild*, 644 F. Supp. 3d at 31. Even without the ample direct evidence, this circumstantial evidence powerfully proved Hild's fraudulent intent. *See, e.g.*, *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (fraud can be proven through circumstantial evidence alone).

Ultimately, Hild's arguments about his intent were raised at trial, including through his own testimony, but were rejected by the jury. As the District Court observed, "while the jury perhaps could have accepted Hild's version of events—in which he was misled into participating in a conspiracy that was lucrative for him personally and professionally—there was more than sufficient evidence for a reasonable jury to find he acted with criminal intent." *Hild*, 644 F. Supp. 3d at 31; *accord Facen*, 812 F.3d at 286 ("[T]he government's case need not exclude every possible hypothesis of innocence.").

23

**POINT II**

**Hild's Unpreserved *Ciminelli* Claim Does Not Require a New Trial**

Hild seeks relief under *Ciminelli v. United States*, 598 U.S. 306 (2023), which was decided after his trial. But although an aspect of the jury instructions were incorrect in light of *Ciminelli*, the record shows that this error had no effect on the verdict, because the jury convicted Hild on a traditional theory of fraud that remains valid after *Ciminelli*.

**A. Relevant Facts**

As discussed above, Hild fraudulently obtained loans by deceiving his lenders as to the market value of bonds he used as collateral. *See Hild*, 644 F. Supp. 3d at 16-24. In instructing the jury on wire fraud, the District Court explained that the Government must "prove that the alleged scheme contemplated depriving another of money or property" (A. 630)—here, the loans. The District Court further instructed, without objection from Hild, that "a person is not deprived of money or property only when someone directly takes his money or property," but also "when he is deprived of the right to control that money or property." (A. 630). The latter portion of the instruction describes the so-called "right to control" theory of fraud, which this Court had repeatedly affirmed at the time of Hild's trial, but was subsequently invalidated by *Ciminelli*. *See* 598 U.S. at 312-17.

24

## B. Applicable Law

Where disjunctive theories of culpability are submitted to the jury, and the jury returns a general verdict, the verdict must be set aside if it "is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957); *see also United States v. Agrawal*, 726 F.3d 235, 250 (2d Cir. 2013) (discussing *Yates*). No *Yates* concern arises, however, where "it is not 'impossible to tell' whether the jury's conviction was based" on a valid ground. *United States v. Zvi*, 168 F.3d 49, 55 (2d Cir. 1999). Thus, this Court has affirmed convictions even upon the invalidation (or assumed invalidation) of one or more objects of a conspiracy, *id.* at 55-56, theories of liability, *Agrawal*, 726 F.3d at 250-51; *United States v. Coppola*, 671 F.3d 220, 237-38 (2d Cir. 2012), or racketeering predicates, *United States v. Brennan*, 867 F.2d 111, 114-16 (2d Cir. 1989).

A *Yates* claim is reviewable only for plain error where, as here, the defendant never objected at trial to instructions that permitted jurors to convict on a potentially invalid basis. *See United States v. Eldridge*, 2 F.4th 27, 36 (2d Cir. 2021), *vacated and remanded on other grounds*, 142 S. Ct. 2863 (2022); *Agrawal*, 726 F.3d at 243; *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006). To establish plain error, the defendant must show "an error" that is "clear or obvious," that "affected the appellant's substantial rights," and that "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). To show that an

25

erroneous jury instruction affected substantial rights, the defendant must show "a reasonable probability that the jury would not have convicted him absent the error." *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010).

## C. Discussion

The erroneous instruction on the right-to-control theory did not affect Hild's substantial rights, because he was convicted under a traditional theory of wire fraud: That he took money—the loans—from lenders through a material misrepresentation of the market value of his collateral. The right-to-control theory allowed a conviction when a victim was given "false or fraudulent information that, if believed, would prevent him from being able to make informed decisions about what to do with his or her money" (A. 630), as this Court held in cases such as *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015). Here, evidence that fit that theory was focused entirely on the lenders' being given false information about the market value of Live Well's bonds, on the basis of which they agreed to lend Live Well more money than they otherwise would have. Those facts also prove the traditional property theory of wire fraud: Hild and his co-conspirators tricked the lenders out of their money, by causing the lenders to believe, falsely, that, in the event of a default, they could sell the collateral and recoup their funds in their entirety.

In this case, then, the right-to-control and traditional property theories of Hild's guilt were one and the same, leaving no "reasonable probability" that the

26

jury convicted Hild based solely on the right-to-control theory. *Marcus*, 628 F.3d at 42. For example, in *Eldridge*, this Court considered a conviction that could have been obtained under alternative legal theories, one of which was later invalidated. 2 F.4th at 37-39. Although the jury had been instructed on both theories, and had not returned a special verdict form indicating which theory it relied upon, this Court affirmed the conviction. *Id.* at 39-40. As the Court explained, the nature of the evidence made clear that the jury could not have convicted without finding the still-valid theory proven, and thus would have convicted even if instructed only on that theory. *Id.* So too here: Because Hild's liability for fraud depends on showing that he sought to obtain money or property—the loans—the jury's verdict against him necessarily shows that it found traditional wire fraud proven. *See also, e.g.*, *Coppola*, 671 F.3d at 237 (rejecting *Yates* challenge where, if jury concluded that defendant was guilty on an invalid ground, "the jury necessarily would have had to conclude" that defendant was also guilty on a valid ground).

Hild claims that the Government emphasized a right-to-control theory in its summation, but his citations show no such thing. (*Compare* Br. 38 (citing A. 590, 599-601) *with* A. 590, 599-601). They do not, for example, show the Government arguing anything remotely resembling "that the jury should convict because Hild deprived the lenders of valuable economic information necessary for them to make discretionary economic decisions." (Br. 38). Instead, the Government described specific deceptions Hild used "to hide the fraud," by preventing lenders from realizing that the

27

bond "prices were too high." (A. 600-01). In other words, the Government merely presented the facts of this particular, traditional fraud, showing that Hild obtained the lenders' money by deceiving them about the value of the collateral.

This case thus does not resemble the cases on which Hild relies for the proposition that the basis of the jury's verdict cannot be discerned. (*See* Br. 39 (citing *United States v. Silver,* 864 F.3d 102, 119 (2d Cir. 2017); *United States v. Skelos,* 707 F. App'x 733, 737 (2d Cir. 2017); and *United States v. Bruno,* 661 F.3d 733, 740 (2d Cir. 2011))). In *Bruno*, this Court vacated several convictions based on the Government's concession; the opinion thus contains no reasoning having any bearing on whether the erroneous instruction affected Hild's verdict. *See Bruno*, 661 F.3d at 739-40. In *Silver* and *Skelos*—unlike here—the defendants preserved objections to the jury instructions, requiring the Government to prove beyond a reasonable doubt that the erroneous instruction was harmless. *Silver*, 864 F.3d at 117-19; *Skelos*, 707 F. App'x at 736-37. And in both cases, this Court performed a detailed factual analysis before concluding that the error may have affected the verdict. *Silver*, 864 F.3d at 119-24; *Skelos*, 707 F. App'x at 737-38. Here, by contrast, Hild bears the burden of showing the error affected his substantial rights. *Marcus*, 560 U.S. as 262. And yet he does little to refute the straightforward conclusion that the fraud proven in this case was a traditional property fraud, meaning that the erroneous additional instruction on the right-to-control theory could not have affected the verdict.

28

Even less meritorious is Hild's claim that Counts One and Three, charging conspiracy to commit securities fraud and substantive securities fraud, must be invalidated. (Br. 40-41). Hild does not claim that the instructions on these counts were erroneous. With good reason: The problem with the right-to-control theory concerned its definition of property. *See Ciminelli*, 598 U.S. at 314-15. But although the wire and bank fraud counts required the Government to prove that the fraudulent scheme sought to obtain money or property, securities fraud does not. *See* 15 U.S.C. §§ 78j, 78ff; *United States v. Vilar*, 729 F.3d 62, 93 (2d Cir. 2013).

Instead, Hild claims "spillover prejudice" from the erroneous wire fraud instruction. (Br. 41). "The concept of prejudicial spillover . . . requires an assessment of the likelihood that the jury, in considering one particular count . . . was affected by evidence that was relevant only to a different count." *United States v. Hamilton*, 334 F.3d 170, 181-82 (2d Cir. 2003). Here, the only "evidence" Hild identifies is the Government's summation argument that Hild forced the lenders to unwittingly subscribe to his speculative investment thesis. (Br. 41 (citing A. 594)). Argument, of course, is not evidence. And in any event, the Government's argument was perfectly appropriate regardless of a right-to-control instruction: Its point was that Hild deceived the lenders by using IDC to feed them his Scenario 14 calculations of the bonds' intrinsic value, when they believed they were receiving an independent appraisal of market value. (*See* A. 594). That supports conviction on a traditional wire fraud theory— since it explains how Hild obtained the lenders' money through deceit. And it is plainly proper with respect to

29

securities fraud, where the Government had no obliga-tion to prove that Hild aimed to take property in any event. *See Vilar*, 729 F.3d at 93.

Hild thus derives no support from the spillover prejudice cases on which he relies. (*See* Br. 41 (citing *United States v. Rooney,* 37 F.3d 847, 856 (2d Cir. 1994); *United States v. Guiliano,* 644 F.2d 85, 88-89 (2d Cir. 1981); and *United States v. Wright,* 665 F.3d 560, 565 (3d Cir. 2012))). Two concerned *evidence* that would not have been presented to the jury had the dis-trict court correctly prevented the Government from proceeding on an invalid count. *Rooney*, 37 F.3d at 856-57; *Wright*, 665 F.3d at 575-76. Another concerned ev-idence that should not have been admitted, and the possibility that the defendant was prejudiced by the jury's consideration of improper racketeering charges —which tarred the defendant as a "racketeer"—along-side a viable, minor charge for concealing assets in a bankruptcy proceeding. *Guiliano*, 644 F.2d at 89. Here, Hild was not charged with any improper counts, nor does he identify any improperly admitted evi-dence. His spillover prejudice claim should thus be re-jected out of hand. *See, e.g.*, *United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002) (requiring "prejudice so substantial as to amount to a miscarriage of justice" to prevail on spillover prejudice claim).

## POINT III

### Hild's Trial Counsel Was Constitutionally Effective

Hild is not entitled to a new trial based on claims that his trial attorney performed ineffectively. Hild's theory that his attorney's supposed preoccupation

30

with a personal matter qualifies as a conflict of interest is without merit, and the District Court correctly found that Hild could not satisfy the familiar *Strickland* test for ineffective assistance of counsel.

## A. Relevant Facts

Attorney Benjamin Dusing entered his appearance on behalf of Hild on February 13, 2020, and was Hild's principal counsel at the April 2021 trial. During that time, Dusing was also a party, in his personal capacity, to two cases in Kentucky family court. One of those cases went to trial in February and March of 2021 and concerned custody of Dusing's daughter. *Hild,* 644 F. Supp. 3d at 32.

On April 5, 2021, eight days before jury selection in Hild's trial, the judge presiding over Dusing's child custody case issued an order awarding sole custody to the child's mother. *Id.* This decision triggered a 10-day deadline for Dusing to file a motion to alter or vacate the judgment and a 30-day period for Dusing to file a notice of appeal. *Id.*

On April 13, 2021, the day that jury selection in Hild's trial began, Dusing and Brandy Lawrence, who was co-counsel in Hild's trial, were served with a motion for sanctions in the Kentucky litigation, in which Lawrence represented Dusing. *Id.* Two days later, Dusing filed a motion to vacate the custody decision. *Id.* On April 16, Dusing was served with a second sanctions motion. All four of these motions were then noticed to be heard on May 4, 2021. *Id.*

While the Kentucky proceedings were ongoing, Dusing and Lawrence were vigorously representing

31

Hild before the District Court. On April 15 and 16, for example, Dusing engaged in a cross-examination of Stumberger that occupies nearly twice as many transcript pages as the direct (*compare* A. 65-108; *with* A. 109-93) and involved the introduction of dozens of exhibits.

On April 19, 2021, Lawrence filed a motion in the Kentucky court to "continue any and all proceedings, suspend communications with the Court staff regarding the scheduling of any future proceedings, and for an extension of the deadline to file responses to any and all actions until no later than June 1, 2021." *Hild,* 644 F. Supp. 3d at 33. Lawrence's motion explained that the Kentucky proceedings had been "a distraction" from representing Hild, and that Dusing and Lawrence would suffer "serious prejudice" if the Kentucky court did not grant the requested adjournment. *Id.*

Hild's defense case began on April 27, 2021, a week before the hearing scheduled in Dusing's Kentucky matter. (A. 487). Hild testified in his own defense and called one additional witness. Hild's direct testimony occurred over two days and occupied nearly 200 transcript pages. (A. 502-52).

On April 29, 2021, the day closing arguments began in Hild's case, the Kentucky court issued an order denying the application for a continuance of the May 4 hearing. *Hild*, 644 F. Supp. 3d at 33. Ultimately, the hearing was held by video on May 4, 2021. Neither Dusing nor Lawrence appeared. *Id.* Counsel for Dusing appeared remotely, and the conference lasted approximately eighteen minutes. *Id.* The judge

32

reserved decision on the pending sanctions motions until another hearing scheduled for September 10, 2021. *Id.*

## B.  Applicable Law

"A defendant's Sixth Amendment right to counsel includes a right to conflict-free representation." *United States v. Rogers*, 209 F.3d 139, 143 (2d Cir. 2000). In order to establish that an actual conflict of interest deprived him of his Sixth Amendment right to adequate representation, a defendant bears the burden of showing that "during the course of the representation, the attorney's and defendant's interests diverge[d] with respect to a material factual or legal issue or to a course of action." *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000).

Although a defendant who has established that his attorney labored under an actual conflict of interest "need not prove prejudice," in order to establish a Sixth Amendment violation, he must still prove that "a lapse in representation resulted from the conflict." *United States v. Iorizzo*, 786 F.2d 52, 58 (2d Cir. 1986). *Accord United States v. Schwarz*, 283 F.3d 76, 91-92 (2d Cir. 2002) ("The finding of an actual conflict . . . is only the first step in determining whether [a defendant] has established his claim of ineffective assistance of counsel."). To prove a lapse in representation, a defendant must "demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Levy*, 25 F.3d 146,

33

157 (2d Cir. 1994). "In other words, he must show that trial counsel chose not to undertake the alternative strategy because of his conflict." *LoCascio v. United States*, 395 F.3d 51, 56-57 (2d Cir. 2005). A "mere theoretical division of loyalties" is not sufficient to obtain relief. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).

In the absence of an actual conflict, a defendant seeking to establish a Sixth Amendment violation must satisfy the framework set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on such a claim, a defendant must: (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from the alleged dereliction in counsel's performance. *Strickland*, 466 U.S. at 687-88, 693-94 (1984); *accord Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011). Only if both elements are satisfied can the defendant demonstrate that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The burden is on a defendant to establish both elements. *Id.* at 687. "This test is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on it." *Parisi v. United States*, 529 F.3d 134, 140-41 (2d Cir. 2008).

In evaluating counsel's performance under the first prong of *Strickland*, "a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Venturella*, 391 F.3d 120, 135 (2d Cir.

34

2004). "The determinative question at this step is not whether counsel deviated from best practices or most common custom, but whether his representation amounted to incompetence under prevailing professional norms." *Harrington v. United States*, 689 F.3d 124, 129-30 (2d Cir. 2012).

To demonstrate prejudice under the second prong of *Strickland*, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant cannot establish prejudice by showing merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693.

In reviewing denial of an ineffective assistance claim, this Court "reviews factual findings for clear error and questions of law de novo." *Triana v. United States,* 205 F.3d 36, 40 (2d Cir. 2000).

## C.  Discussion

### 1.  No Actual Conflict Existed

Hild argues that "Dusing's personal interests in [attending] the May 4 hearing in Kentucky, and Lawrence's interests in [attending] that hearing as Dusing's counsel," were at odds with Hild's interest in "putting on a robust defense case with additional defense witnesses and exhibits." (Br. 57). But as the

35

District Court recognized, "Dusing's choice between appearing at a post-trial conference in a case where he was a litigant and representing Hild in an unrelated criminal trial is far afield" of the circumstances in which courts have found a conflict. *Hild*, 644 F. Supp. 3d at 39. Those cases address divergences between the interests of a client and an attorney "with respect to a material factual or legal issue or to a course of action." *Armienti*, 234 F.3d at 824. For example, an attorney might harbor such a conflict where he was implicated in the defendant's crimes—and thus conducted the client's defense with an eye toward protecting himself— or where the defense attorney had reason to curry favor with the prosecutor. *See, e.g.*, *United States v. Cancilla*, 725 F.2d 867 (2d Cir. 1984); *United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir. 1987). The principal case on which Hild relies concerns the allegation that attorneys representing multiple defendants in the same case sacrificed the interests of one to help another prevail. *See Cuyler v. Sullivan*, 446 U.S. 335, 346-50 (1980).

Hild's claim that Dusing was too concerned with his family court litigation to prioritize defending Hild is the sort of scheduling conflict that courts do not recognize as a conflict *of interest*. It is not unusual for lawyers to be involved in multiple litigations at the same time or to have matters scheduled in close proximity to one another. As Judge Abrams observed, a holding that such scheduling concerns can give rise to an actual conflict of interest "could open the floodgates to challenges of purported 'actual conflicts of interest' in nearly every criminal case, as every attorney has other

36

obligations—personal and professional—that may affect their performance." *Hild*, 644 F. Supp. 3d at 38.

Notably, Hild has not cited any authority (and the Government is aware of none) for the proposition that a lawyer's personal interests unrelated to the matter in which the representation occurs can create an actual conflict. That is unsurprising given courts' refusal to find an actual conflict even where a lawyer's representation of a defendant risked adversely affecting the lawyer's financial interests. *See United States v. O'Neil*, 118 F.3d 65, 71 (2d Cir. 1997) (holding that a disagreement about a client's failure to pay attorney's fees, although it may cause "some divisiveness between attorney and client," does not give rise to an actual conflict); *Mickens*, 535 U.S. at 175-76 (finding the actual conflict doctrine inapposite to circumstances where "representation of the defendant somehow implicates counsel's personal financial interests"). In such circumstances, if the lawyer "shirks his ethical obligation to dutifully represent his client . . . *Strickland* provides the appropriate analytic framework." *O'Neil*, 118 F.3d at 72.

Nor can Hild limit this Court's decision in *O'Neil* to case where the attorney and client engage in fee disputes. (*See* Br. 63). The particular facts of *O'Neil* concerned a fee dispute. *O'Neil*, 118 F.3d at 71. But *O'Neil* provides an example of a divergence between the interests of the client and the attorney—the client wants to pay less, the attorney would like to be paid more—that nonetheless does not trigger the conflict-of-interest jurisprudence. *See id.* at 71-72. *O'Neil* thus cited a Fifth Circuit case having nothing to do with fee

37

disputes for the proposition that "*Strickland* provides [the] superior framework where the conflict involves [the] attorney's self-interest rather than multiple representation." *Id.* at 72 (citing *Beets v. Scott,* 65 F.3d 1258, 1271 (5th Cir.1995) (en banc)). Indeed, that conclusion is necessary to avoid the temptation—noted by this Court—for defendants to evade *Strickland* by recategorizing claims that their attorney should have done more for them as a conflict between the attorney's personal interests and the representation. *See United States v. Moree*, 220 F.3d 65, 70 (2d Cir. 2000) (citing *Beets* and *United States v. White,* 174 F.3d 290, 296 (2d Cir. 1999) (finding that *Strickland* rather than *Cuyler* governed asserted conflict-of-interest claim)).

Hild resists the District Court's conclusion that examining his claim under *Cuyler* would "open the floodgates" to a host of other claims where defendants felt their attorneys dedicated too much time to personal interests. (Br. 65). But he does so by citing cases finding no such risk from examining claims under *Strickland*. And that is exactly the point: Any defendant who believes his attorney was insufficiently attentive can raise a *Strickland* claim; what he cannot do is evade *Strickland* by recasting his claim as a conflict of interest. *See, e.g.*, *White*, 174 F.3d at 296.

In further seeking to dodge the *Strickland* standard, Hild mischaracterizes the District Court's opinion. He claims that Judge Abrams thought a conflict could exist only where the attorney holds an affirmative incentive for the client's case to fail. (Br. 53-55, 57-59). But in the statements on which Hild relies, Judge Abrams was merely distinguishing cases cited by Hild

38

in which that was the source of the conflict, and then went on to address other instances where conflicts arose without such an incentive. *Hild*, 644 F. Supp. 3d at 38-40 (explaining that the cases upon which Hild relied "are distinguishable, and their differences instructive"). And as Hild concedes (Br. 53), the District Court described the correct legal standard at the outset of its analysis. *See Hild*, 644 F. Supp. 3d at 35 (an actual conflict arises "'when the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action'" (quoting *Moree*, 220 F.3d at 69 (2d Cir. 2000))).

Moreover, to the extent this Court would ever recognize claims of misallocated focus as giving rise to the sort of conflict of interest addressed by *Cuyler*, it should not be here. To be sure, the facts of Dusing's *post*-trial deterioration appear egregious. (*See* Br. 44-51). But that cannot show a conflict *during* the trial, which is the relevant period. And the inference that his May 4 hearing date caused Dusing to curtail Hild's defense is particularly weak. During the course of the trial, Dusing engaged in cross-examinations of the Government's principal witnesses that exceeded the length of the Government's direct examinations, and a direct examination of Hild that rivaled the length of the direct of any of the Government's witnesses. He also introduced dozens of exhibits on cross-examination of the Government's witnesses. And although the defense rested six days before the May 4 hearing, neither Dusing nor Lawrence appeared at the hearing. *Hild*, 644 F. Supp. 3d at 40.

39

### 2. Hild Cannot Show a Lapse in Representation

Hild has also failed to muster any evidence that counsel chose not to pursue a particular trial strategy "because of" the conflict Hild alleges. *LoCascio*, 395 F.3d at 56-57. Although Hild proffered the account of a former paralegal that Dusing mentioned the May 4 hearing as a logistical obstacle to calling additional defense witnesses, there is no evidence that was the reason that Dusing ultimately chose not to call the witnesses. In fact, as the District Court recognized, "to the extent the former paralegal's statements evince Dusing's contemporaneous view on the topic, it appears that he harbored serious concerns that the witnesses could even be detrimental to the defense case— calling them not 'vetted' and a 'gamble.'" *Hild*, 644 F. Supp. 3d at 41.

The same is true of Hild's claim that Dusing's interest in curtailing the trial led him to forgo calling an expert witness. As the District Court recognized, that Hild failed to give notice of a defense expert on the appointed deadline, which was weeks before the hearing had been put on the calendar, suggests the hearing was not a factor in deciding not to pursue this line of defense. *Hild*, 644 F. Supp. 3d at 41. While it is possible, as Hild suggests, that the District Court could have permitted him to call an expert despite making a belated disclosure (Br. 65), there is no evidence that Dusing considered and rejected that option, whether because of the May 4 hearing or for any other reason. Thus, even if Hild had shown the sort of conflict of interest that this Court would recognize, he cannot

40

obtain relief, because he has failed to show that the supposed conflict caused him not to pursue this strategy. *See Cuyler*, 446 U.S. at 350; *see also Malpiedi*, 62 F.3d at 469 (requiring the strategy or tactic to be foregone "due to" or "because of" the conflict).

Hild resists this conclusion, arguing that the District Court "wrongly resolved questions of causation against Hild without holding a hearing." (Br. 64). But the District Court properly expanded the post-trial record by receiving affidavits and evidentiary submissions from the parties. *See Hild*, 644 F. Supp. 3d at 34. It also accepted the factual assertions in the affidavits and documents Hild submitted as true. *Id.* The District Court was thus well within its discretion not to hold a hearing. *See United States v. DiTomasso,* 932 F.3d 58, 69 (2d Cir. 2019) (whether to hold hearing on new trial motion is reviewed for abuse of discretion); *Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001) (affirming district court's authority to resolve ineffective assistance of counsel claims based on affidavits, rather than holding full hearing).

Nor has Hild shown any error, much less clear error, in Judge Abram's conclusions. The District Court gave a detailed explanation that the evidence did not suggest a causal link between Dusing's personal concerns and the defense case. *See Hild*, 644 F. Supp. 3d at 40-42. Against that, the only specific evidence Hild cites on causation is the previously mentioned paralegal (Br. 64-65), who said that in discussing whether to call additional witnesses, Dusing had stated that he would not be able to attend the May 4 hearing if he called all the possible defense witnesses, 644 F. Supp.

were "an independent third party's evaluation of the price for which the bonds could be sold" when, in fact they were not. *Hild*, 644 F. Supp. 3d at 45-46.[3]

Hild takes issue with the first point, arguing that "there was no comparable testimony" offered at trial. (Br. 68-69). But Hild testified, for example, that "the securities couldn't be sold, there was no market for them, so we really needed to understand the value of these bonds . . . how long we expected the bonds to be around and how much cash they would produce." (A. 521). As to the second point, Hild claims that "had the jury understood that the correct value of the bonds was the intrinsic value . . . the jury would have better understood that nothing was misrepresented." (Br. 69). To the contrary, Hild's misrepresentation did not concern the bonds' theoretical correct value, but rather that the bonds could actually be sold at the prices he caused to be relayed to lenders, which is all the lenders cared about. (*See supra* at 6-11). Because the District

---

[3]   The District Court also found that Hild failed to show that Dusing had acted unreasonably in not calling additional witnesses. *Hild*, 644 F. Supp. 3d at 44-45 (citing *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) ("Courts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury.")). But with respect to Davis specifically, Judge Abrams assumed that not calling Davis satisfied the first prong of *Strickland*, presumably because there was a dispute about whether Dusing had supplied an accurate reason for his decision not to do so. *See id.* at 41, 45.

43

Court correctly identified ample evidence proving that material misrepresentation, it correctly found that expert testimony on this secondary matter had no reasonable likelihood of affecting the verdict. *Hild*, 644 F. Supp. 3d at 45 (citing *United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008)).[4]

Hild also draws no support from the cases he cites on this issue. (*See* Br. 69). Each concerned a counsel's decision not to seek expert testimony on a dispositive issue, and even then hesitated to find ineffective assistance. For example, this Court noted that "failure to offer expert testimony can, in some unusual contexts, constitute ineffective assistance" in *United States v.*

---

[4]    In a bid to cast whether the Scenario 14 prices were "correct" as a central issue, Hild cites portions of testimony and argument offered by the Government. (Br. 70 (citing (A. 269, 273, 305, 312, 314, 323-24, 328, 472, 592, 595-96, 601)). But much of what he cites concerned other issues. For example, that Hild authorized entirely arbitrary markups, above and beyond Scenario 14 (A. 592), or that his subordinates engaged in accounting shenanigans, with Hild's knowledge (A. 312), certainly bore on fraudulent intent, but did not involve Scenario 14's abstract rectitude. And in other instances, the testimony Hild cites illustrates the Government's point exactly, such as when a coconspirator testified that it was "wrong" to use intrinsic value not because the intrinsic value was incorrect, but because lenders understood they were being told how much they could actually sell the bonds for. (A. 305, 323-24, 328).

44

*Melhuish*, 6 F.4th 380, 398 (2d Cir. 2021). And after explaining how "expert mental health testimony could have provided compelling support for an affirmative defense of insanity" in a case about an irrational act by a clearly disturbed defendant, the Court remanded for further inquiry. *Id.* Hild's other cases similarly concerned the core issue in a case. *See Eze v. Senkowski,* 321 F.3d 110, 130 (2d Cir. 2003) (remand for further inquiry into not calling medical expert to contravene prosecution expert who testified that victims had signs of sexual abuse); *Pavel v. Hollins,* 261 F.3d 210, 223-26 (2d Cir. 2001) (failure to call medical expert on signs of sexual abuse was ineffective in combination with other errors by counsel); *United States v. Tarricone,* 996 F.2d 1414, 1418-20 (2d Cir. 1993) (remanding for hearing on decision not to call handwriting expert in case where defendant's handwriting on documents was central issue). Here, by contrast, the theoretical correctness of using intrinsic value was—at best—a secondary point, and Judge Abrams was thus correct to conclude that the absence of expert testimony on that score did not prejudice Hild.

Ultimately, as the District Court observed:

> Dusing's performance was strong, and at the very least on par with that of other white-collar litigators who regularly practice in this district. On the whole, he was a zealous, passionate, articulate, and compelling advocate who presented a cogent defense theory that was similar, if not identical, to the theory set forth in Hild's post-trial briefing. He advanced

45

> his case by thorough cross examination,
> especially of the two key government wit-
> nesses, and through Hild's testimony.
> Dusing was also able to synthesize the
> complicated financial concepts and trans-
> actions at issue in this case, and had a
> disposition that appeared to be well-re-
> ceived by the jury.

*Hild*, 644 F. Supp. 3d at 46. Given that trial counsel's "overall performance indicates active and capable advocacy." *Harrington v. Richter*, 562 U.S. 86, 111 (2011), Hild's *Strickland* claim should be rejected.

## POINT IV

### The District Court Properly Denied Hild's Newly Discovered Evidence Claim

### A.   Relevant Facts

At sentencing, the District Court ordered Hild to pay restitution to the victim lenders but reserved judgment on the amount of restitution, concluding that the existing record was insufficient to establish the lenders' losses with reasonable certainty. (Dkt. 156 at 35). At Hild's request, the Government then obtained from the lenders supplemental records showing the amount of coupon (or interest) payments that they received between the time that they foreclosed upon the bonds and the time they sold them. (Dkt. 168). These records were submitted to the District Court to support the victims' restitution claim, with copies to Hild. (Dkt. 168).

46

On May 29, 2023 Hild filed a motion arguing that the evidence of the coupon payments constitutes "newly discovered evidence" under Rule 33, and thus entitled Hild to a new trial. (*See* Dkt. 173). On September 12, 2023, the District Court denied Hild's motion in a written decision. (SPA 90-98).

## B.  Applicable Law

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Where a motion for a new trial is based on a claim of newly discovered evidence, the defendant bears a heavy burden, because relief may only be granted upon showing that (1) the evidence is newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013); *see also United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015).

A new trial motion "is ordinarily not favored" and "should be granted only with great caution." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996); *see also United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006) (recognizing that new trial motions based on new evidence should be granted only "with great caution and in the most extraordinary circumstances"). "[T]he ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Landesman*, 17 F.4th 298, 330

47

(2d Cir. 2021), *cert. denied*, 143 S. Ct. 86 (2022) (quoting *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018)).

This Court has recognized that a district court's discretion on this question "is broad because its vantage point as to the determinative factor—whether newly discovered evidence would have influenced the jury—has been informed by the trial over which it presided." *Stewart*, 433 F.3d at 296.

## C.  Discussion

Hild argues that the supplemental documents that the Government obtained from the lenders and submitted to aid in determining restitution constitute "newly discovered evidence" under Rule 33 because they "support[ ] the defense's argument that the lenders were fully secured and could be fully repaid had they held the bonds." (Br. 78). But what Hild characterizes as a revelation was in fact explored at the trial: Hild introduced the fact that the lenders held the bonds and received significant interest payments on them as part of his (unsuccessful) good faith defense. Given the record at trial, it would have come as no surprise to the jury that some of the lenders collected millions in coupon payments. But the allegation in this case was that Hild deceived the lenders regarding the prices at which the bonds could be sold on the market at the time of default. And the coupon payment information says little about that issue. The District Court was therefore correct to conclude that the documents pertaining to coupon payments received by the lenders

48

do not constitute newly discovered evidence under Rule 33.

*First*, the fact that that the lenders held the bonds and that the bonds paid large coupons is not newly discovered. Hild claims that "the District Court did not contest" that evidence was new, but the District Court plainly held that "documentation of lender coupon payments is not 'newly discovered evidence.'" (SPA 90 (capitalization removed)).[5] As Judge Abrams explained, Hild's trial counsel elicited from each of the lenders that they could have held—and in some cases did hold—the bonds after Live Well's default and that, during that time, the bonds generated coupon payments that were recouped by the lenders. (SPA 96 (citing A. 213-214, 231-232, 233, 253)). Nor was it a secret that the coupon payments generated by the bonds totaled millions of dollars. For example, at trial the Government introduced Live Well's financial statements, which reflected the millions of dollars that Live Well was receiving on a monthly basis from the coupon payments. (*See* GX 324; A. 325). Hild thus cannot obtain a new trial "on the basis of evidence that was known by the defendant prior to trial, but became newly

───────────

[5]   Even less accurate is Hild's claim that "the government failed to disclose" the coupon payment information. (Br. 85; *see also* Br. 80). The Government was not in possession of the material until it obtained it in connection with sentencing, and thus could not have disclosed it any earlier than it did. (SPA 91 n.4).

49

available after trial." *United States v. Owen*, 500 F.3d 83, 89-90 (2d Cir. 2007).

*Second*, to the extent Hild argues that the "newly discovered" evidence is the precise dollar amounts that the lenders received in coupon payments, Hild cannot show that this evidence "could not with due diligence have been discovered before or during trial." *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980). If Hild had wished, he could have issued Rule 17(c) subpoenas to obtain the details regarding the coupon payments before trial. Having chosen not to do so, Hild cannot rely upon this evidence now. *See Forbes*, 790 F.3d at 411 ("The failure to exercise due diligence does not provide a legal basis for the unavailability of evidence"). Hild claims he could not have easily obtained the evidence, but there is nothing arduous about using a subpoena to gather information that Hild knew was in the lenders' records. *See, e.g.*, *United States v. Bermudez*, 526 F.2d 89, 100 (2d Cir. 1975); *United States v. Yu*, 902 F. Supp. 464, 468 (S.D.N.Y. 1995), *aff'd sub nom. Kwok Ching Yu v. United States*, 101 F.3d 1393 (2d Cir. 1996).[6]

––––––––––

[6]    Even further afield is Hild's response to the District Court's reasoning that the information could also have been obtain from a commercial source like Bloomberg. (SPA 94). Hild does not so much deny this is true, as posit that *if* it were true, "the government could have obtained and submitted" the information. (Br. 77). But whether the Government might *also* have

50

*Third*, the precise amount of the coupon payments was not material to the issues at trial. "The question for the jury's purposes, as the Government argued throughout trial, was [ ] simply whether Hild knowingly caused the bonds to be marked at prices that were not obtainable in the market in order to receive inflated loans from the lenders—something that was well supported by the evidence adduced at trial." (SPA 92). Hild argues the coupon payment evidence was relevant to his intent to cause harm (Br. 77-78), but, as the District Court explained, the harm that Hild intended was causing lenders to extend credit against collateral they believed to have a market value of a certain amount when, in fact, its market value was much lower. (SPA 93-94).[7] By contrast, in the case on which Hild relies (Br. 79), the newly discovered evidence bore directly on the dispositive issue with respect to the only counts of conviction—more or less the opposite of the circumstances here. *See United States v. Siddiqui,* 959 F.2d 1167, 1173 (2d Cir. 1992).

*Fourth*, the District Court was correct to observe that the evidence about coupon payments was "merely cumulative or impeaching." (SPA 96). Although Hild asserts that the coupon payment information "demonstrates the lenders gave misleading testimony about

———————

been able to obtain this information has nothing to do with whether Hild sought it diligently.

[7]    Intent to harm is also not an element of the securities fraud counts. *See United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015).

51

their unwillingness to hold the bonds and the lack of revenues the bonds generated," the law is clear that evidence that is "merely . . . impeaching" does not provide a basis for relief under Rule 33. *Owen*, 500 F.3d at 88. And Hild effectively elicited from each of the lender witnesses that their losses could be mitigated by holding the bonds and collecting the coupons, rendering any substance, or impeachment, on this point purely cumulative. *See, e.g.*, *Persico*, 645 F.3d at 111.

*Fifth*, informing a jury about the exact amount of the coupon payments would not "likely result in an acquittal." *Forbes*, 790 F.3d at 407. Hild claims that this evidence would have buttressed his defense that he did not intend to harm the lenders and believed that the intrinsic value of the bonds reflected the marks he assigned to them, but that defense was ably put to the jury by trial counsel. In the end, it failed not because it was inadequately corroborated, but because there was overwhelming evidence that Hild misled his lenders on the material question of market value. (*See* SPA 92-96). Judge Abrams thus did not abuse her discretion in finding that Hild failed to identify the "most extraordinary circumstances" needed to grant a new trial on grounds of newly discovered evidence. *Stewart*, 433 F.3d at 296.[8]

————————

[8] Hild's disparate collection of cases do nothing to undermine this conclusion, and indeed have little to do with the circumstances of this case. (*See* Br. 80-81 (citing *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (district court did not abuse discretion in granting new trial where new evidence undermined

52

## POINT V

### The District Court Did Not Abuse Its Discretion in Declining to Recuse

On December 28, 2022, more than three years after this case was assigned to Judge Abrams, and less than a month before she was going to sentence him, Hild filed a letter asking that Judge Abrams recuse herself because the law firm of Davis Polk & Wardwell LLP ("Davis Polk"), at which her husband is a partner, has represented IDC and certain of the victim lenders in unrelated matters. On January 3, 2023, Judge Abrams issued a decision in which she concluded that recusal was unnecessary, because Davis Polk had not appeared in this case and did not represent any party as part of this litigation, and neither she nor her husband had any stake in the outcome of the case. (SPA 65-67). That decision was correct, and far from an abuse of discretion.

### A. Applicable Law

A judge must "disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Disqualification is also mandatory where the judge "has a personal bias or prejudice concerning a party, or personal knowledge

---

central issue of identification); *United States v. Mahaffy,* 693 F.3d 113, 132 (2d Cir. 2012) (granting *Brady* claim); *United States v. Wallach,* 935 F.2d 445, 456-58 (2d Cir. 1991) (granting new trial because prosecution's main witness perjured himself).

53

of disputed evidentiary facts concerning the proceeding," *id.* § 455(b)(1), or where "[sh]e or [her] spouse . . . [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding" *id.* § 455(b)(5)(iii). But "[d]isqualification is not required on the basis of remote, contingent, indirect or speculative interests." *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996); *accord United States v. Morrison*, 153 F.3d 34, 48 (2d Cir. 1998) ("Where an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality.").

"A judge is as much obliged not to recuse [her]self when it is not called for as [s]he is obliged to when it is." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988). In deciding whether to recuse, a judge "must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning [her] impartiality might be seeking to avoid the adverse consequences of [her] presiding over their case." *Id.* Thus, "[w]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001).

This Court will "review a district court's decision not to recuse itself for abuse of discretion." *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021), and "will rarely disturb a district court's decision not to recuse itself." *United States v. Rechnitz*, 75 F.4th 131, 142 (2d Cir. 2023).

54

## B.  Discussion

Judge Abrams did not abuse her discretion in re-
fusing to recuse herself from this matter. Davis Polk
does not represent any party in this litigation, Judge
Abrams' husband does not represent any party to this
litigation, and neither Judge Abrams nor her husband
has a financial interest in this case. (*See* SPA 65-67).
As this Court has explained, "It would simply be unre-
alistic to assume . . . that partners in today's law firms
invariably have an interest that could be substantially
affected by the outcome of any case in which any other
partner is involved." *Pashaian v. Eccelston Props.*,
*Ltd.*, 88 F.3d 77, 83–84 (2d Cir. 1996). Similarly, the
Advisory Committee on Judicial Ethics has advised
that "judges generally are not required to recuse from
cases involving a current client of a spouse or a
spouse's business if the spouse is not then personally
engaged in work for that client," reasoning that the
"spouse's connection to such a client is indirect and at-
tenuated, and absent other factors a reasonable person
would not question the judge's impartiality if the client
appeared before the judge in an unrelated proceeding."
Advisory Comm. on Jud. Ethics, Advisory Op. No. 107
(2009).

Hild argues that Judge Abrams recused herself in
*United States v. Bankman-Fried*, where Davis Polk ad-
vised FTX, "a victim in that case." (Br. 82). That is
something of an understatement. FTX was not merely
"a victim" in the Sam Bankman-Fried case, it was
squarely at the center of the controversy—owned and
operated by the defendant, and used by him to carry
out the massive fraud at issue. *See United States v.*

55

*Bankman-Fried*, No. S5 22 Cr. 673 (LAK), 2024 WL 477043, at *1 (S.D.N.Y. Feb. 7, 2024). Hild cannot seriously claim that FTX's pivotal role in *Bankman-Fried* resembles the victim lenders who were the subject of his motion.[9]

The remainder of Hild's arguments trail off into irrelevance. Hild claims that Judge Abrams relied "on a clearly erroneous factual finding" in stating that there were "many victims" here. (Br. 83). Over the life of the scheme, there were six victim lenders. (GX 1600). Whether that qualifies as "many," can be left for another day, because it is plain that Judge Abrams' decision rested on the fact—which Hild still has not brought into dispute—that neither Judge Abrams nor her husband had any stake in this case, not the proportion of lenders who had ever done business with Davis Polk. (SPA 65-67). Similarly, Judge Abrams may have said she would recuse "in cases in which Davis Polk represented a party or appeared" (Br. 82), but

—————

[9] Hild quotes the Government's argument "that Hild 'was IDC' and 'controlled IDC.'" (Br. 82 (quoting A. 590)). But there has never been any contention that IDC was Hild's alter ego, in the sense one might have said about FTX and Bankman-Fried. Rather, the Government's point was that because Hild used IDC as a conduit to convey what were really his bond valuations, he "was IDC" on the specific question of the bond marks—meaning that IDC was not the independent analyst the lenders believed it was, but that its valuations for Live Well's bonds were "controlled" by Hild. (*See* A. 590).

56

there is no contention that Davis Polk appeared in this case, or otherwise represented a party *in this case*. Having never established that Judge Abrams had an actual or apparent conflict, Hild's analysis of what remedy should apply (Br. 83-84) is irrelevant. But it is particularly ambitious to request a new trial based on a supposed conflict he raised shortly before sentencing, having purported to suddenly discover the relevant facts on Davis Polk's website (Dkt. 141). *See El Fenix de Puerto Rico v. The M/Y Johanny*, 36 F.3d 136, 141 n.6 (1st Cir. 1994) ("[A] litigant who is aware of a potential ground of recusal should not be permitted to sandbag that ground, hoping for a satisfactory resolution, but retaining a ground of attack on the judge's ruling.")

## CONCLUSION

The judgment of conviction should be affirmed.

Dated:    New York, New York
           March 14, 2024

                  Respectfully submitted,

                  DAMIAN WILLIAMS,
                  *United States Attorney for the*
                  *Southern District of New York,*
                  *Attorney for the United States*
                      *of America.*

SCOTT HARTMAN,
HAGAN SCOTTEN,
      *Assistant United States Attorneys,*
           *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,998 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: HAGAN SCOTTEN,
*Assistant United States Attorney*